

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
09/28/2012

| | | |
|---|---|---|
| In re: | § | |
| DAVID   HENLEY   AND   BELINDA HENLEY, | § § | Case  No. 11–33438 |
| | § | Chapter 7 |
| Debtors. | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| RODNEY   TOW,   TRUSTEE   AND JERRY AND MARY CAROOM, | § § | |
| Plaintiffs, | § | |
| v. | § | Adversary No. 11–03453 |
| | § | |
| DAVID   HENLEY   AND   BELINDA HENLEY, | § § | |
| Defendants. | § | |

### MEMORANDUM OPINION REGARDING:
### (1) PLAINTIFFS' OBJECTION TO DISCHARGEUNDER 11 U.S.C. § 727(a);
### and (2) DEFENDANTS' COUNTERCLAIM AGAINST PLAINTIFFS,
### JERRY CAROOM AND MARY CAROOM PURSUANT TO 11 U.S.C. § 362(k)
[Adv. Docket Nos. 1 & 10]

## I. INTRODUCTION

It would be a gross understatement to characterize the dispute in this adversary proceeding as acrimonious.  The Plaintiffs, who are the Chapter 7 Trustee and the two largest creditors in the main case, assert that the Defendants, who are the Debtors, committed numerous fraudulent acts, and therefore should not receive their discharge under 11 U.S.C. § 727(a)[1] (the § 727 Action). The Debtors vehemently deny that they have done anything to justify the denial of their discharge; and, as counter-plaintiffs, contend that the two creditors orchestrated their arrest by a swat team, thereby violating the automatic stay under 11 U.S.C. § 362(k) (the § 362 Action).

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

The Court has decided to issue this Memorandum Opinion for three reasons. First, all too frequently this Court hears debtors blame their attorneys when challenges are made to the accuracy of the debtors' Schedules and Statements of Financial Affairs. In this particular suit, the Debtors do exactly that. In issuing this opinion, the Court wants to emphasize the following tenet: the more time a debtor's counsel spends personally meeting with the debtor, the more difficult it will be for the debtor to escape responsibility by pointing the finger at counsel.

Second, the Court issues this opinion to highlight the need for debtor's counsel to give notice of the bankruptcy filing—both oral and written—to any known creditors' counsel *as soon as the petition is filed*. Failure to give immediate notice can result in harsh consequences to debtors whose creditors are willing to aggressively seek and collect the debts owed to them. That is exactly what happened here. The creditors and their attorney, not having received timely and sufficient notice of the filing of the Debtors' petition, took no action to stop the enforcement of an arrest warrant that was issued in the wake of a civil court in Arkansas holding the Debtors in contempt.

Finally, this Court publishes this opinion to alert the bar of its position on an issue about which there is split authority. Specifically, some courts have held that creditors who assist the appropriate officials in taking criminal action against debtors in order to collect debts owed to them are in violation of the automatic stay. *See In re Dovell*, 311 B.R. 492, 494 (Bankr. S.D. Ohio 2004). Other courts have held that regardless of whether a creditor assists in a criminal matter concerning the debtor, there is no violation of the stay. *See In re Bartel*, 404 B.R. 584, 590 (B.A.P. 1st Cir. 2009). This Court adopts the latter position.

Based upon the entire record, the Court now makes the following written findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52, as incorporated into adversary proceedings

by FED. R. BANKR. P. 7052.[2]  For the reasons set forth herein, the relief which the Plaintiffs seek is granted:  the Debtors' discharge will be denied; and the relief which the Debtors seek is denied in its entirety:  no damages will be awarded to them because the creditors did not violate the automatic stay.

## II.  FINDINGS OF FACT

1.      David and Belinda Henley are the debtors in this Chapter 7 case (the Debtors).  Belinda Henley (Ms. Henley) is a licensed general contractor specializing in construction and interior design.  [June 14, 2012 Tr. 52:4–18].  She is licensed by the American Society of Quality Control, is recognized as a quality engineer by the American Society of Quality Control, and obtained a degree in industrial management with an emphasis in industrial engineering from the University of Arkansas at Little Rock.  [*Id.*].  Moreover, Ms. Henley has purchased between six and eight properties during her adult life.  [*Id.* at 52:23–53:12].  David Henley (Mr. Henley) holds a degree in business from Southern Arkansas State University.  [*Id.* at 87:21–23].

2.      The Debtors owned Henley Design & Construction, Incorporated (HDC, Inc.), a construction and design company in Hot Springs, Arkansas.  [Tape Recording, 6/11/2012 Trial at 11:13:54–11:14:04 a.m.]; [Tape Recording, 6/27/2012 Trial at 6:51:00–6:52:13 p.m.].  They also owned Aqua-Lock Waterproofing, Inc. (Aqua-Lock).  [June 14, 2012 Tr. 98:25–99:9]; [Caroom/Trustee Ex. No. 7].

3.      Ms. Henley also operated an interior design business under the name of Henley Design.  [Tape Recording, 6/27/2012 Trial at 6:23:00–6:23:13 p.m].  Ms. Henley also claimed to own a jewelry design company.  [Tape Recording, 6/27/12 Trial at 6:30:59–6:31:26 p.m.].  Mr. Henley

---

[2] Although this is a single adversary proceeding, this Court held trial on the §§ 727 and 362 Actions on separate days.  Each party introduced trial exhibits on both days.  Throughout this opinion, both sets of exhibits are cited. The § 727 Action exhibits are referred to as "Caroom/Trustee" and "Debtors'" exhibits.  The § 362 Action exhibits are referred to as "Carooms'" and "Henleys'" exhibits.

also claimed to be in the business of buying old cars, repairing, and selling them.[3]   [June 15,

2012 Tr. 42:21–25].

4.       In December 2007, Jim Henley, Mr. Henley's brother, signed and recorded a quitclaim

deed conveying residential property located at 3035 Marion Anderson Road (the Anderson

Property) to the Debtors.[4]   [June 14, 2012 Tr. 58:8–11]; [Caroom/Trustee Ex. No. 8, at 1–2].

5.       On June 26, 2009, the Debtors submitted an asset/liability sheet (the Financial Statement)

to Diamond Bank in which the Debtors listed the Anderson Property as their homestead.   [June

14, 2012 Tr. 59:10–62:23]; [Caroom/Trustee Ex. No. 7, at 1].    To obtain a loan from Diamond

Bank, the Debtors included the Anderson Property on the Financial Statement.   [June 14, 2012

Tr. 62:19–23].

6.       Jim Henley deeded the Anderson Property to the Debtors on the condition that they

obtain financing to buy the Anderson Property from Diamond Bank.    [Tape Recording,

6/14/2012 Trial at 10:46:16–10:48:49 a.m.].   On June 19, 2009, the Debtors submitted a loan

application to Diamond Bank, not to obtain financing for the purchase of the Anderson Property,

but to gain financing to buy other real property.  *See* [Caroom/Trustee Ex. No. 24].   The loan

application was for $79,000.00.  [*Id.*].   In that loan application, the Debtors purported to already

---

[3] Ms. Henley also testified that her jewelry design business and Mr. Henley's car repair business were under the
umbrella of HDC, Inc.  [Tape Recording, 6/27/12 Trial at 6:22:50–6:23:35 p.m.].

[4] The deed contains the following language:

> That I James B. Henley, an unmarried person, GRANTOR, for and in consideration of the sum of
> Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by DAVID
> HENLEY AND BELINDA HENLEY, husband and wife, as tenants by the entirety, GRANTEES,
> do hereby **grant, convey and quitclaim** unto said Grantees, and unto their heirs and assigns
> forever, all of my right, title, equity and estate in and to the following . . . subject to any existing
> easement and restrictions of record, if any.   To have and to hold the same unto the said Grantees,
> and unto their heirs and assigns forever, with all tenements, appurtenances and hereditaments
> thereunto belonging.

[Caroom/Trustee Ex. No. 8, at 1].

own the Anderson Property—they checked the box marked "OWN" in the section next to the address query.  [Caroom/Trustee Ex. No. 24].

7.      The Debtors lived on the Anderson Property from the spring of 2004 to June of 2010. [June 14, 2012 Tr. 63:5–10].  While living on the Anderson Property, the Debtors made monthly payments to Jim Henley in the amount of $1,710.09—the exact amount of the monthly payment under the note for which Jim Henley is liable; this note is secured by a mortgage on the Anderson Property.  [*Id.* at 57:19–58:7]; [Debtors' Ex. No. 96].

8.      The Financial Statement included the balance sheet for Aqua-Lock.  [June 14, 2012 Tr. 98:25–99:9]; [Caroom/Trustee Ex. No. 7.  As of May 31, 2009, the Financial Statement showed Aqua-Lock's total value to be $548,685.00.  [Caroom/Trustee Ex. No. 7, at 3].  The Debtors purchased Aqua-Lock for an amount between $62,000.00 and $68,000.00.  [June 14, 2012 Tr. 100:6–9].  The other company owned by the Debtors was HDC, Inc.  The Financial Statement did not include a separate balance sheet for HDC, Inc., but simply represented that HDC, Inc.'s total value was $187,000.00 as of June 26, 2009.  [Caroom/Trustee Ex. No. 7, at 2].

9.      In June 2008, Jerry and Mary Caroom (the Carooms) contracted with the Debtors to build a home at 148 Catalina Circle, Hot Springs, Arkansas (the Caroom Home).  [Tape Recording, 6/11/2012 Trial at 11:14:53 a.m.].

10.     On December 7, 2009, the Carooms filed a lawsuit (the Lawsuit) against the Debtors in the Garland County Circuit Court of the State of Arkansas, Civil Division (the Arkansas Court). [Carooms' Ex. No. C-02]; [Tape Recording, 6/14/2012 Trial at 10:36:50–10:36:57 a.m.].  The Lawsuit was assigned No. CV-2009-1712-1.  [Caroom/Trustee Ex. No. 1, at 31–32].  The Carooms filed suit based upon their disenchantment with the Debtors over the Debtors' construction of the Caroom Home.  In the Lawsuit, the Carooms alleged that the Debtors

fraudulently overcharged them by padding invoices submitted to the Carooms for the construction of the Caroom Home.  [Caroom/Trustee Ex. No. 16, at 6].

11.     The Debtors retained an attorney named Ray Baxter (Baxter), who subsequently filed an answer and counterclaim against the Carooms in the Lawsuit.  [June 14, 2012 Tr. 53:22–54:2]; [*Id.* at 154:2–8].  Due to ensuing health problems, Baxter engaged D. Scott Hickam (Hickam) to assist him in representing the Debtors in the Lawsuit.  [Tape Recording, 6/11/2012 Trial at 11:18:29–11:19:29 a.m.].

12.     The Debtors' counterclaim in the Lawsuit asserted that the Carooms interfered with HDC, Inc.'s contractual relations.  [Tape Recording, 6/11/2012 Trial at 11:22:56–11:24:10 a.m.]. The Debtors further alleged that the Carooms contacted current HDC, Inc. clients and advised them to terminate their contracts as HDC, Inc. would soon be bankrupt.  [*Id.* at 11:22:56–11:24:10 a.m.].

13.     In March of 2010—while the Lawsuit was pending—HDC, Inc. ceased operations, and the Debtors deeded[5] the Anderson Property back to Jim Henley.[6]  [June 14, 2012 Tr. 62:24–63:04].

---

[5] This deed contains the following language:

> That We, David Henley and Belinda Henley, husband and wife, GRANTORS, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations in hand paid by James B. Henley, an unmarried person, GRANTEE, the receipt of which is hereby acknowledged, do hereby **grant, sell, and quitclaim** unto the said GRANTEE, and unto their heirs and assigns forever, the following lands lying in Garland County, Arkansas, to wit. . . [t]o have and to hold the same unto the said GRANTEE, and unto their heirs and assigns forever, with all appurtenances thereunto belonging.  And We hereby covenant with said GRANTEE that we will forever warrant and defend the titled to the said lands against all claims whatever.

[Caroom/Trustee Ex. No. 9, at 1–2].

[6] The Debtors testified that they did not qualify for a loan at Diamond Bank; however, no copy of any loan application that the Henleys allegedly submitted to obtain financing for purchase of the Anderson Property was ever produced at trial.  Although the Debtors deeded the Anderson Property back to Jim Henley, the Debtors continued to live on the Anderson Property until they relocated to Houston in June 2010.  [June 14, 2012 Tr. 63:5–10].

14.     In June of 2010, the Debtors relocated from Hot Springs, Arkansas to Houston, Texas. [*Id.* at 55:5–8]. The Debtors testified that their hostile relationship with the Carooms left them unable to gain or retain business in Hot Springs, Arkansas, and so they concluded that they needed to depart from that area. [*Id.* at 54:14–24]. They chose to move to Houston because Mr. Henley has family in the area, including his brothers and his mother (who has died since the Debtors moved to Houston). [*Id.*]. The Debtors did not inform their counsel of record in the Lawsuit that they had moved to Houston. Nor did the Carooms know of their whereabouts at this time.

15.     On September 27, 2010, the Arkansas Court held a hearing on the Carooms' Motion for Summary Judgment. [Carooms' Ex. No. C-01, at 1]. The Carooms appeared at this hearing with their attorney, J. Sky Tapp (Tapp). [Carooms' Ex. No. C-04, at 1]. Hickam appeared for the Debtors. [Carooms' Ex. No. C-04, at 1]. During this hearing, Hickam informed the Arkansas Court that he had been unable to get in touch with the Debtors.[7] [Carooms' Ex. No. C-04, at 4].

16.     On October 20, 2010, the Arkansas Court granted summary judgment in the Carooms' favor (the Judgment).[8] [Caroom/Trustee Ex. No. 10, at 1]. The Arkansas Court found that no genuine issue of material fact existed regarding the Carooms' claims against the Debtors for breach of contract and fraud. [Carooms' Ex. No. C-01]; [Caroom/Trustee Ex. No. 13, at 1]. The Arkansas Court also ordered that the Debtors file a Schedule of Assets and Verified Affidavit of

---

[7] Hickam withdrew as the attorney of record on September 27, 2010, the same day that the Arkansas Court entered an Order Granting Partial Summary Judgment in the Carooms' favor. [Caroom/Trustee Ex. No. 10, at 1]. It is unclear from the record when Baxter withdrew as counsel.

[8] By the time the Arkansas Court issued the Judgment, the Debtors had already relocated to Houston, Texas. Hickam represented the Debtors at the hearing on September 27, 2010, but withdrew immediately thereafter. [Carooms' Ex. No. C-04]. The Arkansas Court set a hearing to allow the Carooms to present evidence of the damages they claimed based on the Debtors' actions. [Caroom/Trustee Ex. No. 10, at 2]. The hearing was set for November 3, 2010. [Caroom/Trustee Ex. No. 10, at 2]. The Arkansas Court served notice of the hearing on the Debtors by regular mail at their last known address—the address of the Anderson Property. [Caroom/Trustee Ex. No. 10, at 2]. The Arkansas Court also directed that copies of the Judgment against the Debtors be sent to Hickam and Baxter "previously attorneys for [the Debtors]." [*Id.*].

Assets.  [Debtors' Ex. No. 1]; [Carooms' Ex. No. C-01, at 1–2].  On November 3, 2010, the Arkansas Court awarded $1,589,711.21 to the Carooms in the Lawsuit, including $524,293.72 in punitive damages.  [Adv. Doc. No. 1, at 2].  The Judgment therefore was for $1,589,711.21.

17.     Ms. Henley testified that she first learned of the Judgment in the Lawsuit when she was served at her Houston, Texas home on December 4, 2010.[9]  [Tape Recording, 6/11/2012 Trial at 11:30:15–11:30:43 a.m.].  The Debtors retained Q. Byrum Hurst (Hurst) with the objective of setting aside the Judgment.  [Hurst Dep. 7:7–11].  Hurst is an attorney licensed in the State of Arkansas.  [*Id.* at 6:19–7:2].  Hurst was unable, however, to convince the Arkansas Court to vacate its Judgment.[10]  [Tape Recording, 6/11/2012 Trial at 11:32:41–11:32:50 a.m.].

18.     On March 15, 2011, the Carooms filed another suit in the Arkansas Court, No. CV-2011-292-IV, against the Debtors to set aside a fraudulent transfer (the Fraudulent Transfer Suit).  [Caroom/Trustee Ex. No. 19, at 5]; [Henleys' Ex. No. 28, at 1].  The relief sought by the Carooms in the Fraudulent Transfer Suit requested that the Arkansas Court invalidate the transfers of various parcels of real property that the Debtors had transferred to Jim Henley.  [Henleys' Ex. No. 28].

19.     On March 28, 2011, the Arkansas Court issued an Order of Body Attachment on the Debtors for contempt of court because the Debtors had failed to file a Schedule of Assets and Verified Affidavit of Assets as required by the Arkansas Court's partial summary judgment.  [Debtors' Ex. No. 1]; [Carooms' Ex. No. C-01, at 1–2].

---

[9] This delay in learning about the Judgment against them may well be the Debtors' fault because they did not keep their counsel of record in Arkansas apprised of their whereabouts or of the fact that they were relocating to Houston, Texas.  [Carooms' Ex. No. C-04, at 3–5].

[10] By the time that the Debtors hired Hurst, it was too late to contest the Judgment because the Arkansas Court had lost plenary jurisdiction.  [Tape Recording, 6/11/2012 Trial at 11:32:07–11:36:00 a.m.].

20.      On April 11, 2011, the Arkansas Court issued an order to set aside the Order of Body Attachment.  [Debtors' Ex. No. 3, at 1–2].

21.      On April 13, 2011, the Arkansas Court issued its Second Amended Order of Body Attachment (the Body Attachment Order) because the Debtors had again failed to provide a Schedule of Assets or otherwise abide by the Arkansas Court's order.[11]  [Caroom/Trustee Ex. No. 13]; [Tape Recording, 6/14/2012 Trial at 11:16:52–11:17:19 a.m.].  Hurst, thereafter, advised the Debtors to file for bankruptcy to stop the enforcement of the Body Attachment Order.  [Hurst Dep. 8:11–9:11].  The Debtors then contacted Anis Damani (Damani), an attorney in Houston who had some—but by no means extensive—experience in representing consumer debtors.[12]  [Tape Recording, 6/14/2012 Trial at 11:17:21–11:18:09 a.m.].

22.      The Debtors worked up a list of assets to prepare for filing bankruptcy in Houston, Texas.  [*Id.* at 11:43:34–11:44:21 a.m.].  The Debtors did not produce this list to this Court or to the Arkansas Court, and they discarded it after they filed their bankruptcy petition.  [Tape Recording, 6/15/2012 Trial at 11:43:34–11:44:21 a.m.].

23.      On April 14, 2011, the Debtors met with Damani at his office.  [Tape Recording, 6/27/2012 Trial at 11:42:26 a.m.].  The Debtors retained Damani during this meeting.  [Henleys' Ex. No. 32].  The Debtors told Damani that they needed to file bankruptcy as soon as possible.  [June 14, 2012 Tr. 70:16–71:6].  The Debtors wanted to stop the execution of the Arkansas

---

[11] The Arkansas Court's Body Attachment Order provided a means by which the Debtors could purge themselves of contempt and evade the Body Attachment.  [Carooms' Ex. No. C-07, at 3].  The Arkansas Court found that if the Debtors filed the appropriate Schedule of Assets, properly completed and verified as required by the Arkansas Court's Judgment, then the Debtors would purge themselves of contempt and avoid enforcement of the Arkansas Court's Body Attachment Order.  [*Id.*].

[12] Damani received his law degree from the University of Arkansas at Little Rock in December of 2008.  [Tape Recording, 6/26/2012 Trial at 2:29:44–2:30:48 p.m.].  While in law school, he took one bankruptcy course and interned with a federal bankruptcy judge.  [*Id.*].  He relocated to Houston in December of 2008.  [*Id.*].  He took the Texas Bar Exam in February of 2010, and received his law license in July of 2010.  [*Id.*].  He opened his own law firm in December of 2010.  [*Id.*].  Before opening his own firm, Damani worked as a social worker from December 2008 to December 2010.  [*Id.*].

Court's Judgment and Body Attachment Order.  [Tape Recording, 6/26/2012 Trial at 2:40:58–2:41:14 p.m.].  Damani told the Debtors that filing Chapter 7 would help them accomplish this objective.  [*Id.*].  At that time, Damani was not aware that the Arkansas Court's Judgment was based upon fraud committed by the Debtors.  [*Id.*].  The Debtors brought the following documents to their meeting with Damani:  a list of their assets, information regarding their real property, information on their lawsuits, and documents related to their counterclaims against the Carooms.  [Tape Recording, 6/27/2012 Trial at 12:17:37–12:19:06 p.m.].  This first meeting lasted a total of two hours.  [Tape Recording, 6/26/2012 Trial at 2:31:45–2:40:26 p.m.].

24.     As already noted, Damani received his law license in July of 2010—five months before opening his own practice in December of 2010.  [Tape Recording 6/26/2012, Trial at 10:27:29–10:28:26 a.m.].  At the time Damani represented the Debtors, he had never handled a business bankruptcy case, and he still does not handle business bankruptcy cases.  [*Id.* at 10:28:26–10:28:31 a.m.].  Additionally, the Debtors were Damani's third or fourth clients.  [*Id.* at 10:27:29–10:28:26 a.m.].  Damani accepted the Debtors' case, among other reasons, because the Debtors informed Damani that both HDC, Inc. and Aqua-Lock retained no value and were non-operational.  [*Id.* at 9:57:48–9:58:08 a.m.]; therefore, Damani assumed that he would not be dealing with business bankruptcy issues.[13]

25.     Between April 15, 2011 and April 19, 2011, Mr. Caroom continuously communicated with David Gunter (Officer Gunter).[14]  [Debtors' Ex. Nos. 27, at 24–25, 28–29, 131 & 133].

---

[13] Due to his overall lack of experience, Damani did not understand several of the documents that the Debtors provided to him, including the March 2010 quitclaim deed signed by the Debtors reconveying the Anderson Property to Jim Henley.  [Tape Recording, 6/27/2012 Trial at 11:21:53–11:22:13 a.m.].  In fact, Damani, due to his inexperience in dealing with quitclaim deeds, advised the Debtors to consult a real estate attorney with questions about the Anderson Property.  [Tape Recording, 6/26/2012 Trial at 10:02:08–10:02:43 a.m.].

[14] Unless otherwise indicated, the Debtors had no knowledge of the actions of the Carooms, Houston Police Officer David Gunter, or the Houston Police Department between April 15, 2011 and April 19, 2011 that led to the Debtors' arrests in Houston, Texas on April 19, 2011 at approximately 2:30 p.m.  *See* [Finding of Fact No. 68].

Officer Gunter is a seasoned Houston Police Department (HPD) officer presently assigned to the Homicide Division.  [Tape Recording, 6/12/2012 Trial at 1:19:46–1:20:59 p.m.].  He has worked in HPD's Homicide Division for approximately two years.  [*Id.* at 1:20:18–1:20:30 p.m.].

26.     HPD's Homicide Division ordinarily deals with investigations involving murders and shootings involving police.  [Tape Recording, 6/13/2012 Trial at 1:20:38–1:20:50 p.m.].

27.     During Officer Gunter's employment with HPD, HPD's Internal Affairs Division has investigated Officer Gunter approximately seven times.  [Tape Recording, 6/12/2012 Trial at 1:23:06–1:23:32 p.m.].  Currently, HPD has relieved Officer Gunter of active duty.  [*Id.* at 1:19:46 p.m.].  HPD is investigating bigamy allegations against him.  [*Id.* at 11:36:32 a.m.].

28.     Officer Gunter first met Mr. Caroom over five years ago after responding to a theft call.  [*Id.* at 1:24:21–1:25:12 p.m.]; [April 3, 2012 Tr. 17:8–17].  Officer Gunter continued to stay in touch with Mr. Caroom after completing his theft investigation.  [Tape Recording, 6/12/2012 Trial at 1:24:38–1:25:12 p.m.].  Indeed, when Officer Gunter married, he received a wedding gift from Mr. Caroom.  [*Id.* at 1:25:50–1:25:51 p.m.].  During 2008's Hurricane Ike, Mr. Caroom sent food to Officer Gunter and twenty-two other HPD officers who could not procure any food while working twenty-four-hour shifts.  [April 3, 2012 Tr. 17:25–18:5].

29.     On several occasions, Officer Gunter has stated to Assistant District Attorney Connie Spence (Spence), Officer Jude Vigil (Vigil), and other law enforcement personnel that Mr. Caroom is his uncle.  [Tape Recording, 6/12/2012 Trial at 1:26:08 p.m.]; [June 15, 2012 Tr. 105:8–16].  Moreover, prior to the Debtors' arrest, Officer Gunter told Spence that Mr. Caroom offered to pay for his law school tuition should he ever decide to obtain a law degree.  [Tape Recording, 6/12/2012 Trial at 1:26:34–1:26:58 p.m.]; [*Id.* at 11:47:40–11:48:20 a.m.].

30.     Spence is an Assistant District Attorney for Harris County, Texas in the Criminal Division.  [*Id.*] at 11:35:35–11:35:52 a.m.].  She has held her position for twenty-three years.  [*Id.*].  Spence worked with Officer Gunter prior to the Debtors' arrests when Officer Gunter was an HPD officer in the Homicide Division.  [*Id.* at 11:36:02 a.m.].

31.     Vigil is a police officer with the HPD's Criminal Intelligence Unit (CIU) of the Criminal Intelligence Division.  [June 15, 2012 Tr. 90:23–91:5].  The CIU supports various investigative divisions such as homicide, robbery, burglary, and theft, and helps obtain, analyze, and map communications data.  [*Id.* at 91:12–91:17].

32.     Between April 15 and April 18, 2011, Officer Gunter and Mr. Caroom continuously called and sent text messages to each other.  [Henleys' Ex. No. 27, at 24–25, 28–29, 131 & 133].[15]

33.     Before April 15, 2011, Mr. Caroom, in attempting to determine where the Debtors had relocated after departing Hot Springs, Arkansas, found the Facebook profile of one of the Debtors' children.  [April 3, 2012 Tr. 34:1–4].  Mr. Caroom determined that the child attended Lamar High School in Houston, Texas because she was wearing a Lamar High School shirt in her Facebook profile picture.  [*Id.*].  Following this discovery, Mr. Caroom called Officer Gunter to investigate and enforce the Arkansas Court's Body Attachment Order.  [Tape Recording, 6/13/2012 Trial at 3:19:05–3:20:39 p.m.].

34.     At some point prior to April 15, 2011, Officer Gunter went to Lamar High School and spoke with an officer of the Houston Independent School District (HISD).  [*Id.* at 2:17:16–2:17:56 p.m.].  The HISD officer confirmed to Officer Gunter that some of the Henley children

---

[15] The parties introduced no exhibits containing the contents of these text messages or the substance of these phone calls.

attended Lamar High School.  [*Id.* at 9:18:07–9:20:00 a.m.]; [*Id.* at 10:35:06–10:35:47 a.m.]; [*Id.* at 2:17:16–2:17:56 p.m.].

35.     On April 15, 2011, soon after the Debtors discovered that Officer Gunter had spoken with an HISD officer at Lamar High School, the Debtors checked into a hotel. [*Id.* at 2:17:16–2:18:15 p.m.]; [*Id.* at 2:30:32–2:31:40 p.m.].  The Debtors then moved to different hotels between April 15, 2011 and April 19, 2011 to avoid detection by either the Carooms or Officer Gunter, and out of fear that they would be arrested pursuant to the Arkansas Court's Body Attachment Order. [*Id.* at 2:30:32–2:31:40 p.m.].    During this time, the Debtors prepared to file for bankruptcy. [*Id.*].

36.     On the morning of April 15, 2011, Officer Gunter and Mr. Caroom exchanged the following phone calls and text messages[16]:

- At 9:52 a.m., Officer Gunter called Mr. Caroom and the call lasted over four minutes. [Debtors' Ex. No. 27, at 24].
- At 10:05 a.m., Officer Gunter sent a text message to Mr. Caroom.  [*Id.* at 131].

37.      On April 15, 2011, after talking with Officer Gunter, Mr. Caroom called his attorney, Tapp, at 11:58 a.m. and the call lasted over five minutes.  [*Id.* at 24].  As already noted, Tapp is licensed to practice law in the State of Arkansas, [June 12, 2012 Tr. 4:8–14], and he represented the Carooms in the Lawsuit.  [*Id.* at 5:10–20].

38.      On April 15, 2011, Officer Gunter called Mr. Caroom at 1:07 p.m. and the call lasted for thirty-three seconds.  [Debtors' Ex. No. 27, at 25].  Mr. Caroom then called Tapp five times between 1:08 p.m. and 1:10 p.m.  [*Id.*].  Each call lasted between zero and seven seconds.  [*Id.*].

39.     On April 15, 2011, a Garland County Sheriff's Officer entered the Body Attachment Order for David and Belinda Henley into the National Crime Information Center (NCIC) at 1:11

---

[16] The parties introduced no exhibits containing the contents of these text messages or the substance of these phone calls.

p.m. and 1:19 p.m.  [Debtors' Ex. No. 5, at 7–12]; [Debtors' Ex. No. 29, at 1].[17]  Shortly

thereafter, Officer Gunter searched NCIC for existing warrants issued for the Debtors' arrest.

[Debtors' Ex. No. 22, at 14].  Officer Gunter found warrants for felony fraud with bonds of

$3,500.00 each for David and Belinda Henley.  [*Id.*].

40.     On April 15, 2011 at 2:10 p.m., Mr. Caroom e-mailed a copy of the NCIC arrest warrants

to Ms. Caroom.  [Debtors' Ex. No. 6].  Shortly thereafter at 3:33 p.m., Officer Gunter called Mr.

Caroom; Mr. Caroom did not answer.  [Debtors' Ex. No. 27, at 25].  Mr. Caroom returned

Officer Gunter's phone call at 3:34 p.m. and the call lasted one minute and fifty-six seconds.

[*Id.*].  At the same time, Officer Gunter sent a text message to Mr. Caroom.  [*Id.* at 131].[18]

41.     On April 15, 2011, the Debtors returned to Damani's office to discuss the client

questionnaire that Damani had previously given them to complete, and to obtain his assistance in

filling out their original Statement of Financial Affairs (SOFA) and Schedules, which would be

filed once they filed their bankruptcy petition.  [Tape Recording, 6/27/2012 Trial at 12:17:46–

12:18:00 p.m.].  While reviewing the SOFA, Ms. Henley claims to have underlined the following

words in item 10[19]:  "ordinary course of business or financial affairs of the debtor."

---

[17] At trial, counsel for the Debtors made much of the fact that the Body Attachment Order, which arises from a civil lawsuit, was entered into the NCIC database.  Counsel asserted that this entry was highly unusual because this database is primarily for criminal matters, not civil matters; and that it was done because the Carooms and Tapp conspired to have this entry made so that Officer Gunter could then use this entry to obtain the arrest warrants in Houston.  Counsel for the Debtors, however, introduced no exhibits and adduced no testimony to prove up his assertions.  Essentially, he wants this Court to draw an inference that in rural Arkansas, a seasoned and well-known local attorney (i.e., Tapp), a well-heeled businessman (i.e., Mr. Caroom), and a former law clerk well connected in the legal community (i.e., Ms. Caroom) used their influence and connections with someone in the Garland County Sheriff's Office (unknown person) to have the Body Attachment Order entered into the NCIC database.  The Court is unwilling to draw this inference.  Rather, the Court finds that the Body Attachment Order was entered into the NCIC database pursuant to appropriate internal procedures of the Garland County Sheriff's Office.

[18] Once again, the parties introduced no exhibits containing the contents of these text messages or the substance of these phone calls.

[19] Item 10 of the SOFA, entitled "Other Transfers," reads as follows:

> List all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within **two years**

[Caroom/Trustee Ex. No. 3]; [June 14, 2012 Tr. 181:2–8]. She claims to have underlined these portions to ensure that she "[filled out the SOFA] perfectly correctly in respect of the Bankruptcy Court." [June 14, 2012 Tr. 181:1–8]. Damani informed the Debtors that they were not required to disclose minor transactions conducted in the ordinary course of business that amounted to no more than "a couple of hundred dollars."[20] [Tape Recording, 6/26/2012 Trial at 4:16:50–4:17:53 p.m.]. During the meeting, the Debtors did not inform Damani that Mr. Henley had owned a 2007 Men's Rolex watch within the previous two years. [June 15, 2012 Tr. 72:18–23]. The Debtors also did not inform Damani that Ms. Henley was the business of jewelry design and that Mr. Henley was in the business of buying old cars, fixing them up, and selling them. [Tape Recording, 6/26/2012 Trial at 4:17:58–4:18:17 p.m.].[21] This second meeting lasted approximately two hours. [Tape Recording, 6/26/2012 Trial at 2:31:45–2:40:26 p.m.].

---

immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

[Caroom/Trustee Ex. No. 3].

[20] Mr. Henley testified that Damani advised the Debtors that they did not need to "list items of personal property" on their Schedules if they were worth less than $10,000.00. [June 15, 2012 Tr. 84:18–25]. While Damani was fairly inexperienced at the time he represented the Debtors, this Court finds that Damani provided no such advice to the Debtors, and that Ms. Henley's testimony is not at all credible, but rather a very poor and disingenuous attempt to blame Damani for the Debtors' numerous omissions in their SOFA.

[21] The SOFA sets forth the following directions:

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. To indicate payments, transfers and the like to minor children, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

Questions 1-18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19-25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any

42.     On April 16, 2011, the Debtors faxed Damani the following documents:   (1) the agreement between the Debtors and Jim Henley for the purchase of certain property located on Airport Road in Hot Springs, Arkansas (the Airport Road Property); (2) a survey of the Airport Road Property; (3) a quitclaim deed executed on March 2, 2010 from the Debtors to Jim Henley conveying the Anderson Property and two rural lots located on Kathy Lane (the Lots); (4) a promissory note in the amount of $79,385.00 made payable to Diamond Bank; (5) bills of sale for a 2001 Harley Davidson motorcycle, an enclosed twenty-foot by eight-foot trailer, and an open sixteen-foot flat trailer; and (6) a copy of a cashier's check from Jim Henley in the amount of $13,965.00, representing the price that Jim Henley paid to purchase the 2001 Harley Davidson motorcycle, the enclosed twenty-foot by eight-foot trailer, and the open sixteen-foot flat trailer. [Debtors' Ex. No. 39].  The fax coversheet to Damani listed all of the items included in the fax except for (1) the cashier's check from Jim Henley; and (2) the deed dated March 2, 2010 conveying the Anderson Property.  [Debtors' Ex. No. 39, at 1].  Although the Debtors informed Damani about the Anderson Property at their initial meeting with him, they never told Damani that Ms. Henley herself once owned the Anderson Property arising from an additional quitclaim transaction that took place in December of 2007.  [Tape Recording, 6/27/2012 Trial at 10:07:07–10:08:47 a.m.].

---

question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

[Caroom/Trustee Ex. No. 1, at 30] (emphasis added).  Specifically, item 18 of the SOFA, entitled "Nature, location and name of business" reads as follows:

a.   *If the debtor is an individual*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

[*Id.*] (emphasis added).

43.     On the first page of the Debtors' bankruptcy petition, in response to the section that requires the Debtors to list their first, middle, and last names, the Debtors listed their names as David Henley and Belinda Henley.  [Caroom/Trustee Ex. No. 1, at 1].  Ms. Henley's middle name is Lenee.  [Tape Recording, 6/27/2012 Trial at 6:13:34–6:13:54 p.m.].   Although Damani typed Ms. Henley's first and last name onto the petition, Ms. Henley reviewed the document before Damani filed it on the Debtors' behalf and did not request that Damani correct it to include her middle name.  [*Id.*].

44.     On the first page of the Debtors' bankruptcy petition, in response to the section that requires the Debtors to disclose "All Other Names used by the Debtor[s] in the last 8 years," the Debtors did not disclose HDC, Inc., or Aqua-Lock.   [Caroom/Trustee Ex. No. 1, at 1]. Additionally, the Debtors did not disclose that Mr. Henley had a business of buying old cars, fixing them up, and selling them.  [*Id.* at 30]; [Debtors' Ex. No. 62, at 4–7].  Finally, the Debtors did not disclose that Ms. Henley had either a jewelry design business, or an interior design business, which she referred to as "Henley Design."[22]

45.     In response to the Debtors' original SOFA, item 1, "Income from employment or operation of business . . . received during the two years immediately preceding [the] calendar year [in which the Debtors filed bankruptcy]," the Debtors reported their income as $0.00 for the years of 2009 and 2010.[23]  [Caroom/Trustee Ex. No 1, at 30].  The Debtors further reported that they were currently preparing their tax returns for the years 2009 and 2010.  [*Id.*].

---

[22] The Court distinguishes between Ms. Henley's interior design business, which she refers to as "Henley Design," from the entity known as "Henley Design and Construction, Inc.," (which has already been defined as HDC, Inc.). HDC, Inc. was a duly established corporation, which was in the business of general contracting; whereas Henley Design apparently was a sole proprietorship of Ms. Henley in the business of doing interior designing.  Henley Design is also separate from Ms. Henley's jewelry design business which, along with Mr. Henley's car refurbishing business, was purportedly part of Henley Design and Construction, Inc. (i.e., HDC, Inc.).

[23] Item 1 of the SOFA, entitled "Income from employment or operation of business" reads as follows:

46.    In response to the Debtors' original SOFA, item 2, entitled "Income other than from employment or operation of business . . . received during the two years immediately preceding [the] calendar year [in which the Debtors filed bankruptcy]," the Debtors disclosed income received from Jim Henley in the amount of $21,000.00 ($3,500.00 monthly) and child support received from Ms. Henley's ex-husband in the amount of $15,360.00 ($640.00 monthly).[24] [Caroom/Trustee Ex. No 1, at 31].  The Debtors did not disclose the income received from their garage sales, their "in-house" sales, or Ms. Henley's "designer" sales of personal property. [Caroom/Trustee Ex. No. 1, at 31]; [Debtors' Ex. No. 62, at 4–7].

47.    In the Debtors' original SOFA item 4, called "Suits and administrative proceedings, executions, garnishments and attachments," the Debtors disclosed two suits:   (1) Jerry H. Caroom, Jr. and Mary C. Caroom v. David Henley, Belinda Henley, and HDC, Inc. (No. CV-2009-1712-1) (i.e., the Lawsuit); and (2) Alice Murphy v. David Henley and Belinda Henley (the

---

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced.  State also the gross amounts received during the **two years** immediately preceding this calendar year.  (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income.  Identify the beginning and ending dates of the debtor's fiscal year.)  If a joint petition is filed, state income for each spouse separately.  (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

[Caroom/Trustee Ex. No. 1, at 30].

[24] Item 2 of the SOFA, entitled "Income other than from employment or operation of business" reads as follows:

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case.  Give particulars.  If a joint petition is filed, state income for each spouse separately.  (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

[Caroom/Trustee Ex. No. 1, at 31].

Murphy Small Claims Suit).[25]   [Caroom/Trustee Ex. No. 1, at 31–32].   The Debtors did not disclose the Fraudulent Transfer Suit, which was filed on March 15, 2011—34 days prior to the filing of the Debtors' bankruptcy petition.   [Caroom/Trustee Ex. No. 19, at 5]; [Debtors' Ex. No. 28, at 1]; [June 14, 2012 Tr. 59:11–60:9].

48.   Item 10 of the SOFA required that the Debtors disclose all transfers effectuated within two years prior to filing for bankruptcy that were not in the ordinary course of business. [Caroom/Trustee Ex. No. 1, at 33].   In response to item 10, entitled "Other transfers," the Debtors disclosed the following: (1) the transfer of the Airport Road Property to Jim Henley; (2) the transfer of the Lots to Jim Henley; (3) the transfer of the 2001 Harley Davidson motorcycle to Jim Henley; and (4) the transfers of a twenty-foot enclosed trailer and sixteen-foot open trailer to Jim Henley.   [Caroom/Trustee Ex. No. 1, at 33].   Although the Debtors also executed a transfer of the Anderson Property to Jim Henley by quitclaim deed within the previous two years, they did not disclose this transfer in response to item 10.   [Caroom/Trustee Ex. No. 1, at 33]; [Caroom/Trustee Ex. No. 9, at 1–2].

49.   In their original "Schedule B – Personal Property," in response to item 2, "Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives," the Debtors placed an "X" in the column marked "NONE."   [Caroom/Trustee Ex. No. 1, at 11].   Thus, the Debtors did not disclose the two bank accounts that they had when they

---

[25] Item 4 of the SOFA, entitled "Suits and administrative proceedings, executions, garnishments and attachments" reads as follows:

> List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case.   (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

[Caroom/Trustee Ex. No. 1, at 31].

filed their Chapter 7 petition.  *See* [Caroom/Trustee Ex. No. 35, at 2] (quoting Ms. Henley, who testified at the § 341 meeting of creditors that she had two bank accounts at the time of their bankruptcy filing).

50.     In their original "Schedule B – Personal Property," in response to item 13, "Stock and interest in incorporated and unincorporated businesses," the Debtors marked an "X" in the column titled "NONE."  [Caroom/Trustee Ex. No. 1, at 13].  Thus, on the date of the filing of their bankruptcy petition, the Debtors did not disclose their ownership interest in HDC, Inc., Aqua-Lock, or Henley Design (i.e., Ms. Henley's interior design proprietorship).  [*Id.*].[26]

51.     In their original "Schedule B – Personal Property," in response to item 21, "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims," the Debtors marked an "X" in the column marked "NONE."  [Caroom/Trustee Ex. No. 1, at 13].  Thus, the Debtors did not disclose the counterclaims which they filed against the Carooms in the Lawsuit.[27]  [June 14, 2012 Tr. 35:11–17]; [Caroom/Trustee Ex. No. 1, at 13].

---

[26]  At trial, Ms. Henley tried to convince this Court that her jewelry design business and Mr. Henley's car refurbishing business were actually part of HDC, Inc.'s business.  The Court does not find Ms. Henley to be credible.  Rather, the Court finds that Ms. Henley concocted this testimony in an effort to justify her position that the sales of various assets in her name, or her husband's name, were done in the ordinary course of HDC, Inc.'s business, and therefore did not need to be disclosed in either the original or amended SOFA.

[27]  The counterclaims that the Debtors filed pre-petition in the Arkansas Lawsuit are not to be confused with the counterclaims that the Debtors filed in this Court in this adversary proceeding.  The counterclaims filed here, in addition to the § 362 Action for violation of the automatic stay, are:  (1) malicious criminal prosecution; (2) abuse of process; and (3) defamation.  [Tape Recording, 12/20/2011 Hearing at 10:35:12–10:35:46, 10:36:07–10:44:13 a.m.] [Adv. Doc. Nos. 10, 11 & 19].  There is no question that these causes of action belong to the Debtors, who are allowed to pursue them for their own benefit, as these claims arose post-petition and therefore are not property of the bankruptcy estate.  *See French v. Institute for Orthopaedic Surgery*, No. 3:08-CV-1002, 2008 WL 3992160 at *2–3 (N.D. Ohio Aug. 12, 2008) (finding that because the plaintiff's claims related to events that occurred after his bankruptcy petition date, these claims were *not* property of the estate).
        This Court dismissed, without prejudice, the counterclaims for malicious prosecution, abuse of process, and defamation.  [Tape Recording, 12/20/2011 Hearing at 10:36:07–10:44:13 a.m.].  The Court ruled that these post-petition state law causes of action should be tried in the Harris County District Court, not the bankruptcy court.

52.     In their original SOFA, in response to item 18, "Nature, location and name of business," the Debtors disclosed the following corporations:  (1) HDC, Inc.; and (2) Aqua-Lock, Inc. [Caroom/Trustee Ex. No. 1, at 35].  The descriptions under "NATURE OF BUSINESS" were as follows:  general contractor and waterproofer.  [Caroom/Trustee Ex. No. 1, at 35].  The Debtors did not disclose Mr. Henley's car repair business and Ms. Henley's jewelry design business. [Caroom/Trustee Ex. No. 1, at 35]; [June 15, 2012 Tr. 42:21–43:3].  Moreover, the Debtors did not indicate under "NATURE OF BUSINESS" that both Mr. Henley's car repair business and Ms. Henley's jewelry design business were operated within HDC, Inc.[28]  [Caroom/Trustee Ex. No. 1, at 35].

53.     In their original SOFA, in response to item 19c, "List all firms or individuals who at the time of the commencement of this case were in possession of the books or account and records of the debtor.  If any of the books of account and records are not available, explain," the Debtors indicated that their "records were lost during recent move."  [Caroom/Trustee Ex. No. 1, at 36]. The records that the Debtors assert were lost were both business and personal records.  [June 15, 2012 Tr. 38:1–13].[29]

54.     In their original SOFA, in response to item 19d, "List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued by the Debtor within two years immediately preceding the commencement of this case,"

---

[28] At trial, Ms. Henley, under cross-examination, testified that Mr. Henley's car repair business and her jewelry design business were part of HDC, Inc.'s business.  The Court finds that Ms. Henley concocted this statement in order to attempt to explain away why her husband and she failed to disclose these businesses in their SOFA.  [Tape Recording, 6/27/12 Trial at 6:22:50–6:23:35 p.m.].

[29] The Trustee testified at trial that the records the Debtors concealed, lost and destroyed included both business records of their businesses in Arkansas as well as some personal records.  [Tape Recording, 6/27/2012 Trial at 12:49:00–12:50:41 p.m.].  The Trustee first learned of this loss at the meeting of creditors held on May 20, 2011, when the Debtors told him that a number of their business and personal records were lost in the Arkansas-to-Texas move.  [*Id.* at 12:49:00–12:53:05 p.m.].

the Debtors marked the box entitled "NONE."  [Caroom/Trustee Ex. No. 1, at 36].  The Debtors did not disclose Diamond Bank, the financial institution to which they gave the Financial Statement, even though Ms. Henley had constant contact with Diamond Bank in early 2011 (i.e., prior to filing bankruptcy).  [Tape Recording, 6/27/2012 Trial at 6:12:56–6:13:10 p.m., 6:18:01–6:18:15 p.m.]; [Caroom/Trustee Ex. No. 7].  Moreover, Ms. Henley knew that Diamond Bank had a copy of the Financial Statement at the time the Debtors filed their bankruptcy petition.  [Tape Recording, 6/27/2012 Trial at 6:12:19–6:12:39 p.m.].

55.     On April 18, 2011, Mr. Caroom called Officer Gunter at 10:53 a.m., and the call lasted five seconds.  [Debtors' Ex. No. 27, at 28].  Officer Gunter then called Mr. Caroom at 10:55 a.m., and the call lasted forty-six seconds.  [*Id.*].  Later that morning, Officer Gunter visited Vigil to discuss and draft the Debtors' arrest warrants.  [Tape Recording, 6/12/2012 Trial at 2:08:50–2:10:31 p.m.].

56.     On April 18, 2011, Officer Gunter and Mr. Caroom communicated by phone and text message while Officer Gunter visited Vigil.  Officer Gunter and Mr. Caroom exchanged the following phone calls and text messages[30]:

- At 11:16 a.m., Officer Gunter sent a text message to Mr. Caroom.  [Henleys' Ex. No. 27, at 133].
- At 11:19 a.m., Officer Gunter called Mr. Caroom and the call lasted one minute and eleven seconds.  [*Id.* at 28].
- At 11:36 a.m., Officer Gunter called Mr. Caroom and the call lasted three minutes and twenty-eight seconds.  [*Id.* at 28].
- At 11:46 a.m., Officer Gunter called Mr. Caroom and the call lasted one minute and twenty-three seconds.  [*Id.*].
- At 11:49 a.m., Officer Gunter sent a text message to Mr. Caroom.  [*Id.* at 133].
- At 11:56 a.m., Mr. Caroom sent a text message to Officer Gunter.  [*Id.*].
- At 11:57 a.m., Officer Gunter sent a text message to Mr. Caroom.  [*Id.*].

---

[30] Once again, the parties introduced no exhibits containing the contents of these text messages or the substance of these phone calls.

57.     On April 18, 2011 at 11:50 a.m., Ms. Caroom forwarded each of the Debtors' drivers' licenses and other identification by text message to Mr. Caroom.  [Henleys' Ex. No. 7].  At 11:54 a.m., Mr. Caroom then e-mailed the Debtors' drivers' licenses and other identification to Vigil at his HPD e-mail address.  [Henleys' Ex. No. 8].  Between 12:00 p.m. and 1:00 p.m., Officer Gunter went to the Harris County Criminal Courthouse to meet with Spence.  [Tape Recording, 6/12/2012 Trial at 2:11:00–2:11:54 p.m.].  There, Spence assisted Officer Gunter in preparing arrest warrants for the Debtors.  [*Id.* at 2:11:54–2:12:14 p.m.].  Spence drafted the affidavit based on what Officer Gunter told her—a normal practice in the Harris County District Attorney Office.  [Henleys' Ex. No. 27, at 25]; [Tape Recording, 6/12/2012 Trial at 11:58:20–11:58:37 a.m.].

58.     While Officer Gunter visited with Spence, Officer Gunter and Mr. Caroom communicated by phone call and text message[31]:

- At 12:02 p.m., Officer Gunter called Mr. Caroom and the call lasted for less than one minute.  [Henleys' Ex. No. 27, at 29].
- At 12:14 p.m., Officer Gunter called Mr. Caroom and the call lasted one minute and nine seconds.  [*Id.*].
- At 12:53 p.m., Officer Gunter sent a text message to Mr. Caroom.  [*Id.*].
- At 1:56 p.m., Officer Gunter sent a text message to Mr. Caroom.  [*Id.* at 133].

59.     On April 18, 2011, Officer Gunter presented Judge Vanessa Velasquez, a district judge of Harris County, Texas, with affidavits and arrest warrants for the Debtors, which issued at 2:38 p.m.  [Henleys' Ex. No. 10, at 2–3].  Judge Velasquez was presiding over the 183rd Criminal Court in Harris County.  Subsequently, at 2:51 p.m., Officer Gunter called Mr. Caroom and the call lasted for one minute and twenty-six seconds.  [Henleys' Ex. No. 27, at 29].  Officer Gunter called Mr. Caroom again at 3:30 p.m. and the call lasted less than one minute.  [*Id.*].

---

[31] Once again, the parties introduced no exhibits containing the contents of these text messages or the substance of these phone calls.

60.     Meanwhile, also on April 18, 2011, the Debtors returned to Damani's office for a third meeting.  [Henleys' Ex. No. 9]; [Henleys' Ex. No. 10, at 2–3].  This meeting lasted between one to two hours.  [Tape Recording, 6/26/2012 Trial at 2:31:45–2:40:26 p.m.].   During this meeting, the Debtors signed their Electronic Declaration declaring **_under penalty of perjury_** that they had read the original SOFA and Schedules, the voluntary petition, and the master mailing list (matrix).[32]   [Debtors' Ex. No. 43].   Damani then electronically filed the Debtors' Chapter 7 petition in this Court at 4:53 p.m. on April 18, 2011 (the Petition Date).  [Henleys' Ex. No. 11, at 1].

61.     Shortly after filing their petition, Ms. Henley telephoned Hurst to inform him of the Debtors' bankruptcy filing; she made this call at 5:03 p.m.  [Henleys' Ex. No. 24, at 2]; [Tape Recording, 6/11/2012 Trial at 2:20:39–2:21:39 p.m.].   Hurst advised Ms. Henley to e-mail him a copy of the bankruptcy case number, and informed her that he would call Tapp immediately. [*Id.* at 2:22:43–2:23:13 p.m.]; [Debtors' Ex. No. 12].   Hurst later called Ms. Henley at 6:34 p.m. [Debtors' Ex. No. 12].   After speaking with Hurst, Ms. Henley testified that she was satisfied that Tapp had notice of the Debtors' bankruptcy filing.  [Tape Recording, 6/11/2012 Trial at 2:23:20–2:23:37 p.m.].   The Court expressly finds that Ms. Henley's belief was misplaced, and further finds that Tapp did not, in fact, receive notice of the Debtors' bankruptcy filing at any time on April 18, 2011.

---

[32] During trial, Mr. Henley testified that he assisted Ms. Henley with the paperwork, but that Ms. Henley ultimately handled all of the filing and paperwork with Damani.  [June 15 2012, Tr. 148:4–7].  To the extent that Mr. Henley somehow wants this Court to absolve him of any misconduct because Ms. Henley spent more time with Damani, this Court declines to do so.  See In re Tully, 818 F.2d 106, 111 (1st Cir. 1987) ("A debtor cannot, merely by playing ostrich and burying his head deeply enough into the sand, disclaim all responsibility for statements which he has made under oath.").

62.     On April 18, 2011, the Debtors also requested that Damani send Tapp and the Carooms' Texas attorney, Keith Remels (Remels),[33] notification of their bankruptcy filing.   [Tape Recording, 6/13/2012 Trial at 2:22:40–2:22:59 p.m.].  Damani, however, did not notify Remels and Tapp of the Debtors' bankruptcy filing until April 19, 2011 at 5:44 p.m.  [Caroom/Trustee Ex. No. 27]; [B. Henley Dep. Ex. No. C-13]; [Carooms' Ex. No. C-09].  Damani's notification to both of these attorneys came in the form of a telefax; Damani never telephoned either Remels or Tapp to give them notice. [Caroom/Trustee Ex. No. 27]; *see also* [B. Henley Dep. Ex. No. C-13]; [Tape Recording, 6/11/2012 Trial at 4:43:50–4:44:38 p.m.].

63.     On the evening of April 18, 2011, Ms. Caroom and Nancy Pryor (Pryor), a Public Defender in Arkansas, communicated throughout the evening through text messages and phone conversations.  [Henleys' Ex. No. 23, at 57–58]; [Tape Recording, 6/13/2012 Trial at 5:23:31–5:24:04  p.m.].   Ms. Caroom and Pryor exchanged the following text messages and phone conversations:[34]

- At 7:45 p.m., Pryor sent text messages to Ms. Caroom.
- At 7:55 p.m., Pryor sent two text messages to Ms. Caroom.
- At 7:56 p.m., Ms. Caroom sent a text message to Pryor.
- At 7:58 p.m., Ms. Caroom called Pryor and the call lasted for seven minutes.
- At 8:04 p.m., Pryor sent a text message to Ms. Caroom.
- At 8:50 p.m., Pryor sent a text message to Ms. Caroom.

[Henleys' Ex. No. 23, at 57–58].

64.     On the evening of April 18, 2011, Officer Gunter and Mr. Caroom talked over the phone for less than one minute at 7:59 p.m.  [Henleys' Ex. No. 27, at 29].

---

[33] Remels handles general corporate work for Mr. Caroom's company, X-tra Light.  [Tape Recording, 6/13/2012 Trial at 10:45:33–10:45:43 a.m.].  While he has primarily represented X-tra Light, he has been representing the Carooms in the lawsuit that they filed in Houston, Harris County, Texas to domesticate the Judgment issued in  the Arkansas Lawsuit.

[34] Once again, the parties introduced no exhibits containing the contents of these text messages or the substance of these phone calls.

65.     On the evening of April 18, 2011 at 8:30 p.m., Ms. Henley sent several text messages to Hurst.  [Henleys' Ex. No. 24, at 10].  The next morning, on April 19, 2011 at 8:46 a.m., Ms. Henley called Hurst and spoke with him for less than seven minutes.  [*Id.* at 3].

66.     On April 19, 2011 at 10:13 a.m., Officer Gunter called Mr. Caroom and the call lasted three minutes.  [Henleys' Ex. No. 27, at 29].  Officer Gunter called Mr. Caroom again at 10:16 a.m. and the call lasted nine seconds.  [*Id.*].

67.     On April 19, 2011, Pryor and Ms. Caroom exchanged several phone calls and text messages between 12:01 p.m. and 12:16 p.m.  [*Id.* at 6–7, 58–59].[35]

68.     On April 19, 2011, at approximately 2:30 p.m., several HPD officers arrested the Debtors with the assistance of Officer Gunter.  [Henleys' Ex. No. 22, at 7]; [Tape Recording, 6/13/2012 Trial at 2:09:40–2:10:15 p.m.].  The HPD officers arrested the Debtors as they were exiting from a hotel in Houston, where they had been staying in an effort to minimize their chances of being taken into custody.  Upon their arrests, Ms. Henley told the arresting officers that they had filed bankruptcy.  [Tape Recording, 6/11/2012 Trial at 2:37:35 p.m.].  Despite Ms. Henley's informing the arresting officers that her husband and she had filed bankruptcy, HPD kept the Debtors in custody and transported them to jail.  The Debtors then spent one night in incarceration.  [*Id.* at 3:17:40–3:18:51 p.m.].

69.     On April 19, 2011, Officer Gunter and Mr. Caroom exchanged several phone calls and text messages shortly before and after the Debtors' arrests.  [Henleys' Ex. No. 27, at 30]; [*Id.* at

---

[35] The parties introduced no exhibits concerning the substance for any of the phone calls occurring on April 18 and April 19, 2011.

133].  Officer Gunter and Mr. Caroom exchanged the following phone calls and text messages at the following times[36]:

- At 2:06 p.m., Officer Gunter sent two text messages to Mr. Caroom.  [*Id.*].
- At 2:45 p.m., Officer Gunter called Mr. Caroom and the call lasted less than one minute. [*Id.* at 30].
- At 2:59 p.m., Officer Gunter called Mr. Caroom and the call lasted less than one minute. [*Id.*].
- At 3:05 p.m., Officer Gunter sent a text message to Mr. Caroom.  [*Id.* at 133].

70.     While handcuffed and sitting in the squad car, Ms. Henley, using her cell phone, called Hurst's office and left a message for Hurst, who was in a trial at the Garland County Courthouse in Hot Springs, Arkansas (the Hot Springs courthouse) to the effect that her husband and she had just been arrested.  [Tape Recording, 6/11/2012 Trial at 2:51:00–2:54:00 p.m.].

71.     Immediately after the Debtors were handcuffed and placed into an HPD squad car, Officer Gunter walked up to the squad car, and, using his cell phone camera, took photographs of the Debtors sitting handcuffed in the squad car.  [*Id.* at 2:47:50–2:48:16 p.m.].

72.     At 3:16 p.m. and 3:17 p.m., Officer Gunter sent to Mr. Caroom, by text message, pictures of the Debtors handcuffed in the back seat of the squad car.  [Henleys' Ex. No. 13]; [Henleys' Ex. No. 14].  Mr. Caroom then forwarded the pictures of the Debtors to his friend, Chauncy Taylor, who the Carooms knew was in contact with Ms. Henley's ex-husband.  [Taylor Dep. 7:2–9].  Mr. Taylor then sent the pictures of Ms. Henley to her ex-husband, Linn Gleghorn (Gleghorn), via Facebook.  [*Id.* at 8:20–9:2]; [Gleghorn Dep. 9:25–10:3].

73.     After Officer Gunter took the pictures of the Debtors, he got into a surveillance van with Vigil.  [June 15, 2012 Tr. 109:12–16].  Vigil then drove Officer Gunter to a Ferrari dealership in Houston to meet with Mr. Caroom and one other HPD officer, whose name is Officer Eric Powell.  [*Id.* at 113:1–22].

---

[36] Once again, the parties introduced no exhibits containing the contents of these text messages or the substance of these phone calls.

74.     Mr. Caroom met Officer Gunter, Vigil, and Powell at the Ferrari dealership.   [*Id.*].
Officer Gunter informed Mr. Caroom that the Debtors had told the officers, while being
apprehended, that they should not be arrested because they had filed for bankruptcy.   [Tape
Recording, 6/13/2012 Trial at 3:26:43–3:27:13 p.m.].   Mr. Caroom responded by stating that he
needed to further investigate the veracity of the Debtors' statement.   [*Id.* at 3:19:58–3:20:39
p.m.].

75.     On April 19, 2011, Officer Gunter called Mr. Caroom at 4:18 p.m. and at 4:38 p.m.
[Henleys' Ex. No. 27, at 30].   The first call lasted less than three minutes and the second called
lasted less than two minutes.   [*Id.*].

76.     Hurst testified that on April 18, 2011, he informed Tapp of the Debtors' intent to file
bankruptcy. [Hurst Dep. 18:5–19:9].   Tapp, on the other hand, testified that Hurst did not inform
him of the Debtors' intent to file bankruptcy on April 18, 2011.   [June 12, 2012 Tr. 13:3–16:20].
However, Tapp also testified that he had had conversations prior to April 18, 2011 where Hurst
"suggested repeatedly" that the Debtors would be filing a bankruptcy petition.   [*Id.* at 33:1–12].
Tapp further testified that Hurst made these suggestions prior to the Arkansas Court's issuance of
its Body Attachment Order on the Debtors.   [*Id.* at 33:7–34:15].   This Court finds that, at most,
Hurst mentioned to Tapp on April 18, 2011 that the Debtors *would* be filing a bankruptcy
petition, but that it is more likely that any such conversation took place prior to April 18, 2011.
The Court further finds that Hurst never informed Tapp on April 18, 2011 that the Debtors had in
fact filed a bankruptcy petition on that day.

77.     On April 19, 2011, Tapp was at the Hot Springs courthouse at various hearings unrelated
to the Lawsuit.   On April 19, 2011, Hurst was also at the Hot Springs courthouse at a trial
unrelated to the Lawsuit.   Hurst testified that he believes he saw Tapp at this courthouse on the

28

morning of April 19, 2011, and told him that the Debtors had filed their Chapter 7 petition on the previous afternoon.  [Hurst Dep. 21:13–22:15].  Tapp testified that he was at the Hot Springs courthouse on April 19, 2011, but that Hurst and he never spoke on that day, and that Hurst never told him that the Debtors had filed their Chapter 7 petition the previous day.[37]  This Court finds that Hurst did not in fact see Tapp at the Hot Springs courthouse on April 19, 2011, and further finds that Hurst did not verbally inform Tapp on that day that the Debtors had filed their Chapter 7 petition the previous day.

78.     On April 19, 2011, while the Debtors were in jail in Houston, HPD Officer Barrera (Barrera) searched NCIC for additional warrants issued for the Debtors.  [Henleys' Ex. No. 22, at 12].  Barrera determined that no other warrants existed.   [*Id.*].  Barrera obtained a warrant confirmation and sent a copy to the office of the Harris County District Clerk, along with a Fugitive From Justice Affidavit, for preparation of the Debtors' extradition documents.  [*Id.*].

79.     Judge John Homer Wright of Division I in the Arkansas Court (Judge Wright) testified that on April 19, 2011, he was the presiding judge in a criminal jury trial for DUI in which Hurst

---

[37] On June 12, 2012, Tapp appeared at trial as a witness.  On this day, he testified that on April 19, 2011 he was at a courthouse trying a suit in Malvern, Arkansas all day, and that therefore it was impossible for Hurst to have notified him on the morning of April 19, 2011 at the Hot Springs courthouse that the Debtors had filed their Chapter 7 petition the previous afternoon.  [Tape Recording, 6/12/12 Trial at 3:36:10–3:38:00 p.m.].

However, after he gave this testimony on June 12, 2012, counsel for the Debtors filed a motion for sanctions on the grounds that Tapp had committed perjury.  [Adv. Doc. No. 122].  This motion attached affidavits of certain individuals giving testimony that Tapp was not in the Malvern, Arkansas courthouse on April 19, 2011, but was in fact at the Hot Springs courthouse on that day.  [*Id.*].  On July 13, 2012, this Court held a hearing on this motion for sanctions, and Tapp appeared at this hearing and gave testimony.  Tapp recanted his initial testimony and admitted that, in fact, he was at the Hot Springs courthouse on April 19, 2011.  [Tape Recording, 7/13/12 Hearing at 10:27:15–10:49:54 a.m.].  He very credibly testified that he gave his initial testimony based upon information given to him by his secretary as to his whereabouts on April 19, 2011.  [*Id.*].  He further testified that after reviewing the motion for sanctions, he checked with his secretary, and both of them discovered that she had given Tapp incorrect information as to his whereabouts on April 19, 2011 due to her incorrect reading of his calendar.  [*Id.*].  Tapp was very apologetic for his initial testimony and apologized for not better preparing himself.  [*Id.*].

At the July 13, 2012 hearing, Tapp, however, did <u>not</u> recant his initial testimony to the effect that Hurst and he never met on April 19, 2011, and that Hurst never verbally told him on that day that the Debtors had filed their Chapter 7 petition the previous day.   [*Id.* at 10:32:00–10:34:00 a.m.].  This Court found Tapp to be a very credible witness and found that he was simply sloppy in preparing for the testimony that he gave at the trial on June 12, 2012.  The Court issued an Order on July 20, 2012 denying the motion for sanctions in its entirety.  [Adv. Doc. No. 146].

served as defense counsel.  [Wright Dep. 7:23–8:3]. He stated that the trial lasted until 3:30 p.m. and that he departed the courthouse for home at approximately 4:00 p.m.  [*Id.* at 16:6–16:8]. According to phone records, Judge Wright made a four minute phone call at 4:06 p.m. to Tapp's law office; Judge Wright made this call on his cell phone.  [Wright Dep. Ex. No. 6].  Judge Wright does not recall any additional information about this phone call, including whether he spoke with Tapp, or the reason for the call.  [Wright Dep. 19:21–24:11].  Judge Wright does not have any recollection of the substance of any conversations with Hurst or Tapp on April 19, 2011 [*Id.* at 20:17–21:18].  Judge Wright does recollect that he first definitively became aware of the Debtors' bankruptcy filing on the morning of April 20, 2011.  [*Id.* at 8:22–8:25].

80.     On April 19, 2011, at 4:36 p.m., Hurst, having returned to his office after completion of the DUI trial, filed a Suggestion of Bankruptcy in the Lawsuit pending in Judge Wright's court. [*Id.* at 9:8–10]; [Wright Dep. Ex. No. 3].  Hurst then faxed a copy of the Suggestion of Bankruptcy to Tapp, which arrived at approximately 4:52 p.m.  [June 12, 2012 Tr. 21:1–6]. Damani also sent a similar fax to Tapp's office at 5:44 p.m. [Tape Recording, 6/12/12 Trial at 3:44:15–3:46:00 p.m.].  Tapp, however, who had also been at the Hot Springs courthouse throughout the day, did not return to his office after finishing his court hearings; therefore, he did not see and read the faxes which Hurst and Damani sent at 4:52 p.m. and 5:44 p.m. respectively. [Tape Recording, 7/13/12 Hearing at 10:42:00–10:47:00 a.m.].

81.     Tapp testified that although Hurst claimed that they spoke before 9:00 a.m. on April 19, and that Hurst alerted Tapp of the Debtors' Chapter 7 bankruptcy filing, the two men in fact did not speak on that day.  [Tape Recording, 7/13/12 Hearing at 10:32:00–10:34:00 a.m.].  Tapp also testified that even though Hurst filed a Suggestion of Bankruptcy at 4:36 p.m. on April 19, 2011, Tapp did not actually see this Suggestion of Bankruptcy until the following morning—April 20,

2011.  [June 12, 2012 Tr. 16:11–20]; [Hurst Dep. 28:24–29:1]; [Wright Dep. Ex. No. 3].  Nor did Tapp see either of the faxes from Damani or Hurst that arrived late in the day on April 19 until the morning of April 20, 2011.  [Tape Recording, 6/12/12 Trial at 3:44:15–3:46:00 p.m.].  The Court finds that Tapp's recollection is more credible than Hurst's recollection; therefore, the Court finds that Hurst did not verbally inform Tapp on April 19, 2011 that the Debtors had filed their bankruptcy petition on April 18, 2011.  Further, the Court finds that Tapp first became aware of the Debtors' bankruptcy filing when, on the morning of April 20, 2011, he arrived at his office and discovered the telefaxes that Hurst and Damani had sent in the early evening of April 19, 2011 [Tape Recording, 6/13/2012 Trial at 10:49:11–10:49:40 a.m.]; thus, the Court finds that Tapp did not receive notice of the Debtors' bankruptcy filing until the morning *after* the Debtors' arrests.  Moreover, the Court finds that Judge Wright first became aware of the Debtors' bankruptcy filing when, on the morning of April 20, 2011, he arrived in his chambers and discovered the Suggestion of Bankruptcy that Hurst had filed at 4:36 p.m. the previous day. [Wright Dep. 8:22-25].

82.     Ms. Caroom testified she first learned of the Debtors' bankruptcy filing on April 20, 2011.  [Tape Recording, 6/13/2012 Trial at 5:21:07–5:21:35 p.m.].  She received notice of the bankruptcy filing through an e-mail message she received from Tapp's office.  [Tape Recording, 6/13/2012 Trial at 5:21:07–5:21:35 p.m.].

83.     On April 19, 2011, at 6:27 p.m., an Officer Ross (Ross) contacted John Henley, one of Mr. Henley's brothers, to inform him that the Debtors were in jail, and that John Henley would need to pick up the Debtors' children from school.  [Henleys' Ex. No. 22, at 9].  John Henley informed Ross that he would indeed pick up the Debtors' children from school and take care of them until the Debtors were released from jail.  [*Id.*].

84.    On April 20, 2011, at approximately 8:00 a.m., Judge Wright arrived at his chambers, reviewed the Suggestion of Bankruptcy, and then immediately sent Tapp and Hurst a letter by telefax, plus a copy of Hurst's Suggestion of Bankruptcy.    [June 12, 2012 Tr. 17:16–18:6]; [Wright Dep. Ex. No. 4].    Both Hurst and Tapp, who were at their respective law offices, received and reviewed Judge Wright's telefax communication almost immediately after their respective offices received the fax.   In the letter, Judge Wright informed Hurst that he (i.e., Hurst) needed to prepare an order for Judge Wright's signature "staying further proceedings and lifting enforcement of the contempt order pending further action by the bankruptcy court."  [June 12, 2012 Tr. 16:11–20]; [Wright Dep. Ex. No. 4].   Shortly thereafter, Tapp and Hurst went to Judge Wright's chambers.  [June 12, 2012 Tr. 17:16–18:6].  Hurst presented Judge Wright with the order that Judge Wright had requested in his letter; Judge Wright then signed this order. [Wright Dep. Ex. No. 5].  Tapp and Hurst visited with Judge Wright for approximately fifteen minutes to discuss the Suggestion of Bankruptcy.   [June 12, 2012 Tr. 17:21–18:4].   Judge Wright's Order Lifting Enforcement of Contempt and Order to Stay was file stamped and docketed at 8:30 a.m.  [Wright Dep. Ex. No. 5].  This order lifted the Body Attachment Order.

85.    Once the Debtors were in jail, the Debtors obtained a Houston criminal defense attorney, Mike DeGuerin.  [Henleys' Ex. No. 22, at 12].

86.    On the morning of April 20, 2011, Officer Barrera and an Officer Midyett transported the Debtors from the Houston City Jail to Harris County Criminal Court at Law No. 10 before Judge Sherman Ross.  [*Id.*].  Upon arrival, Judge Ross received a copy of the order lifting the Body Attachment Order signed by Judge Wright earlier in the morning.  [*Id.*].  A release order and affidavit for dismissal were presented to Judge Ross, who then signed the dismissal, releasing

both Debtors from jail on April 20, 2011 at approximately 1:00 p.m.   [Tape Recording, 6/11/2012 Trial at 3:34:50–3:35:00 p.m.].

87.     On May 8, 2011, the Debtors and Damani were scheduled to attend the § 341 meeting of creditors (meeting of creditors) in the Debtors' Chapter 7 Case.[38]  [Caroom/Trustee Ex. No. 34]. The Debtors did not appear; therefore, the Trustee continued the meeting until May 20, 2011. [Caroom/Trustee Ex. No. 34]; [Tape Recording, 6/26/2012 Trial at 10:19:30–10:19:41 a.m.].

88.     On May 20, 2011, the Debtors and Damani attended the continued meeting of creditors. [Caroom/Trustee Ex. No. 35].  At the beginning of the meeting, the Trustee asked the Debtors if "each of [them had] read the Schedules and [SOFAs] that [were] filed in this case."  [*Id.* at 2].

---

[38] 11 U.S.C. § 341 sets forth that:

(a) Within a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors.

(b) The United States trustee may convene a meeting of any equity security holders.

(c) The court may not preside at, and may not attend, any meeting under this section including any final meeting of creditors. Notwithstanding any local court rule, provision of a State constitution, any otherwise applicable nonbankruptcy law, or any other requirement that representation at the meeting of creditors under subsection (a) be by an attorney, a creditor holding a consumer debt or any representative of the creditor (which may include an entity or an employee of an entity and may be a representative for more than 1 creditor) shall be permitted to appear at and participate in the meeting of creditors in a case under chapter 7 or 13 [11 USCS §§ 701 et seq. or 1301 et seq.], either alone or in conjunction with an attorney for the creditor. Nothing in this subsection shall be construed to require any creditor to be represented by an attorney at any meeting of creditors.

(d) Prior to the conclusion of the meeting of creditors or equity security holders, the trustee shall orally examine the debtor to ensure that the debtor in a case under chapter 7 of this title is aware of--
  (1) the potential consequences of seeking a discharge in bankruptcy, including the effects on credit history;
  (2) the debtor's ability to file a petition under a different chapter of this title;
  (3) the effect of receiving a discharge of debts under this title; and
  (4) the effect of reaffirming a debt, including the debtor's knowledge of the provisions of section 524(d) of this title [11 USCS § 524(d)].

(e) Notwithstanding subsections (a) and (b), the court, on the request of a party in interest and after notice and a hearing, for cause may order that the United States trustee not convene a meeting of creditors or equity security holders if the debtor has filed a plan as to which the debtor solicited acceptances prior to the commencement of the case.

Both Debtors replied, "Yes sir."   [*Id.*].   The Trustee then asked the Debtors if any changes, alterations or deletions needed to be made.  [*Id.*].  Ms. Henley responded, "No Sir."  [*Id.*].

89.    During the meeting of creditors, the Trustee asked the Debtors about the lien disclosed in "Schedule A – Real Property."  [*Id.* at 4].  The Debtors insisted that the Lots were secured by a lien held by Diamond Bank.  [*Id.*].  The Debtors did not disclose that the lien was in fact attached to the Anderson Property and not to the Lots.  [Tape Recording, 6/27/2012, Trial at 12:54:44– 1:00:00 p.m.].

90.    The Trustee also discovered a problem with the Debtors' Schedules.  [Caroom/Trustee Ex. No. 35, at 2–3].  Specifically, the Debtors failed to disclose their bank accounts in their Schedules even though the Debtors had provided their bank statements to the Trustee.[39]  [*Id.*].

91.    Towards the end of the meeting of creditors, the Carooms' attorney, Peter Johnson (Johnson), asked the Debtors about the sale of their jet skis.  [*Id.* at 12].  When Johnson asked the Debtors the sale price of the skis, Ms. Henley began to respond ". . . we sold them for the value of what they . . ." [*Id.*].  Mr. Henley then interjected and answered, "To pay off the loan."  [*Id.*].  In fact, the Debtors did not disclose the amount for which they sold their jet skis until pressed at trial.[40]  In addition, the Debtors never disclosed this transfer on their original or amended SOFA.  [Caroom/Trustee Ex. No 1, at 33]; [Caroom/Trustee Ex. No 2, at 4–6].

92.    The Debtors sold their jet skis for approximately $20,500.00 in June of 2010—within one year of the Petition Date.  [Tape Recording, 6/27/2012 Trial at 6:54:40–6:55:57 p.m.].   The

---

[39] In the meeting of creditors, Ms. Henley testified under oath that the Debtors had two bank accounts.  [June 15, 2012 Tr. 64:12–65:3].  Yet, during trial, Mr. Henley testified that he disagreed with his wife's testimony and that they did not have two bank accounts open as of the Petition Date.  [June 15, 2012 Tr. 146:23–147:7].

[40] During trial, the Court asked Ms. Henley how much the Debtors received when they sold their jet skis.  [Tape Recording, 6/27/2012 Trial at 6:54:44–6:55:05 p.m.].  At first, Ms. Henley testified that the Debtors received $500.00 less than what the lien was on the jet skis.  [*Id.*].  The Court then asked Ms. Henley the amount of the lien on the jet skis.  [*Id.*].  Ms. Henley informed the Court that the lien on the jet skis was $21,000.00.  [*Id.*].  Thus, the skis sold for $20,500.00.

Debtors borrowed the money to purchase the jet skis with the intent of taking title in their names, rather than in the name of HDC, Inc. [*Id.* at 6:54:40–6:57:13 p.m.]. And, in fact, the titles for the jet skis were issued in the Debtors' names. [*Id.* at 6:55:57–6:57:13 p.m.]. The Debtors did not disclose the sale of these jet skis in either their original or amended SOFA. [Caroom/Trustee Ex. No. 1, at 33]; [Caroom/Trustee Ex. No. 2, at 4–6].

93.     The Trustee continued the meeting of creditors to May 27, 2011. [Caroom/Trustee Ex. No. 2, at 15–16].

94.     Damani requested that the Debtors come to his office to address the concerns the Trustee raised during the meeting of creditors held on May 20, 2011. [June 14, 2012 Tr. 76:18–21]. During that meeting, the Debtors informed Damani that their daughters owned two cars—a Mazda Miata and a Volkswagen Bug. [*Id.* at 76:4–14].

95.     On May 25, 2011, Damani filed the amended Schedules on the Debtors' behalf. [*Id.* at 80:16–18]. The Debtors did not sign an Electronic Declaration stating that they had reviewed these amended Schedules. [*Id.* at 80:19–21]. They testified that they did not review these amended Schedules before Damani filed them on their behalf. [*Id.* at 79:14–15]. However, the Debtors paid Damani an additional $500.00 to file the amended Schedules. [Tape Recording, 6/26/2012 Trial at 2:44:35–2:44:56 p.m.]. The Court finds that Damani prepared the amended Schedules based upon information given to him, and statements made, by the Debtors during and after their meeting with him following the May 20 meeting of creditors. The Court further finds that the Debtors authorized Damani to file the amended Schedules.

96.     The amendments to "Schedule A – Real Property" were as follows. First, the Debtors disclosed real property located at 1718 Nichols, Little Rock, Arkansas. [Caroom/Trustee Ex. No. 5, at 1]. Second, the Lots, which were disclosed in the Debtors' original Schedule A, were

excluded from the Debtors' amended Schedule A.  *Compare* [Caroom/Trustee Ex. No. 1, at 10], *with* [Debtors' Ex. No 99, at 1].  The amendments to "Schedule D – Creditors Holding Secured Claims" were as follows:  first, the Debtors disclosed solely an outstanding loan from Diamond Bank secured by their personal vehicle (i.e, the 2008 Jeep Rubicon).  [Caroom/Trustee Ex. No. 6, at 1].  Second, the loan from Diamond Bank secured by the Lots, which was disclosed in the Debtors' original Schedule D, was excluded from the Debtors' amended Schedule D.  *Compare* [Caroom/Trustee Ex. No. 1, at 17], *with* [Debtors' Ex. No. 100, at 1].  But, the Debtors amended "Schedule F – Creditors Holding Unsecured Nonpriority Claims" to disclose the loan from Diamond Bank secured by the Lots.[41] [Debtors' Ex. No. 101, at 3].

97.     On May 27, 2011, the Debtors attended the continued meeting of creditors. [Caroom/Trustee Ex. No. 36].  Prior to this meeting, the Debtors completed their § 341(a) questionnaire.[42]  [Caroom/Trustee Ex. No. 15].  On page three of the questionnaire, next to item 7, "I read, signed and understand the questions and information contained in my Schedules, Statement of Financial Affairs and this written Sworn Testimony," the Debtors checked the space marked "YES." [Caroom/Trustee Ex. No. 15, at 3]; [June 14, 2012 Tr. 77:17–23].  On the same page of the questionnaire, next to item 8, "I personally signed my Bankruptcy Petition, Bankruptcy Schedules and Statement of Affairs, and Means Test Analysis prior to my attorney filing them with the Bankruptcy Court," the Debtors checked the space marked "YES."

---

[41] During the meeting of creditors on May 20, 2011, the Trustee questioned the Debtors and Damani about the "common law lien" on the Lots disclosed in Schedule D.  [Caroom/Trustee Ex. No. 35, at 4].  The Trustee insisted that since Diamond Bank had failed to perfect the lien on the Lots (i.e., it placed the lien on the Anderson Property and not on the Lots), the Lots were not encumbered.  [*Id.*].  With this information, Damani amended the Debtors' Schedules and disclosed the outstanding loan from Diamond Bank for the Lots on "Schedule F – Creditors Holding Unsecured Nonpriority Claims."  [Debtors' Ex. No. 101, at 3].

[42] The questionnaire is a document that all of the Chapter 7 trustees in the Southern District of Texas collectively drafted several years ago and use at meetings of creditors to reduce the time expended on the record asking debtors fundamental questions about the accuracy of the documents that they have filed.

[Caroom/Trustee Ex. No. 15, at 3]; [June 14, 2012 Tr. 77:24–78:6].  On the last page of the Debtors' questionnaire, both Debtors signed their names underneath the following language:

> I have read the foregoing and understand the questions.  If represented by an attorney, I have reviewed the foregoing with assistance of counsel.  The answers to the questions are mine.  The answers are based on my personal knowledge and are true and correct.

[Caroom/Trustee Ex. No. 15, at 5]; [June 14, 2012 Tr. 77:8–16].  At the top of the last page of the questionnaire, the following language was handwritten on the document:  "changes have been made to schedules since filing.  Trustee has notice."  [Caroom/Trustee Ex. No. 15, at 5].  The Court finds that this text was written on the document by Damani before the Debtors signed the questionnaire.  The meeting of creditors was again continued until July 8, 2011.  [Caroom/Trustee Ex. No. 36, at 3].

98.    On June 29, 2011, the Trustee's attorney, Glenna Crews (Crews) sent a letter to the Debtors requesting documents concerning the Fraudulent Transfer Suit, the Anderson Property, the Lots, and the Airport Road Property.[43]

99.    On June 30, 2011, the Trustee filed a Motion to Extend Time to Object to Discharge and Dischargeability (the Trustee's Motion).  [Adv. Doc. No. 28].  In the Trustee's Motion, the Trustee informed this Court that he was investigating several potentially fraudulent transfers, including the transfer of the Anderson Property[44] and the Debtors' transfer of both real and personal property to Jim Henley, one of Mr. Henley's brothers.  [Adv. Doc. No. 28, at 2].

---

[43] The June 29, 2011 letter was not introduced as evidence at trial; however, the Court finds that Crews sent a letter to the Debtors requesting documents for certain transfers included in the Debtors' original SOFA.  [Debtors' Ex. No 56].  The Debtors responded to Crews' questions in a letter sent on July 11, 2011, and this letter was introduced at trial.  [*Id.*].

[44] Before the meeting of creditors, the Trustee received information about the transfer of the Anderson Property from one of the Carooms' attorneys.  [Tape Recording, 6/27/2012 Trial at 4:29:03–4:30:24 p.m.].

100.    On July 11, 2011, Ms. Henley sent a letter to Crews in response to her June 29, 2011 letter.[45]  [Debtors' Ex. No. 56].  In the Debtors' response, the Debtors addressed the transfer of the Anderson Property, the transfer of the Lots, the transfer of the Airport Road Property, the Fraudulent Transfer Suit, the cashier's check that the Debtors received from Jim Henley in the amount of $13,965.00 for his purchase of the 2001 Harley Davidson and two trailers (one twenty-foot enclosed trailer and one sixteen-foot open trailer), the personal tax returns filed for the years 2009 and 2010, and two years of business and personal bank statements.  [Debtors' Ex. No. 53].  At no point in this letter did the Debtors discuss the other assets they purported to own in the Financial Statement.

101.    On July 12, 2011, Jim Henley's attorney, Timothy J. Henderson (Henderson), wrote a letter to Crews to discuss the Anderson Property and the circumstances surrounding the transfer of the Anderson Property.  [Debtors' Ex. No. 58].  However, at no point in this letter did Henderson address the other assets included in the Financial Statement.

102.    On July 13, 2011, Damani, on the Debtors' behalf, filed an Objection to the Trustee's Motion (the Objection).  [Caroom/Trustee Ex. No. 11].  In the Objection, Damani addressed the transfer of the Anderson Property.  [*Id.*].  Damani further addressed the Trustee's allegations that the Debtors effectuated fraudulent transfers.  [*Id.*].  Additionally, the Objection asserted that the Debtors supplied the Trustee with documents to prove the transfers of the assets disclosed in the original SOFA.  [*Id.*].  The documentation that the Debtors produced, however, was only for the

---

[45] The Court finds that Crews' letter was sent on June 29, 2011, despite the fact that the Debtors indicated that their letter was in response to documents requested in June 29, **2010** letter from Crews.  The Debtors did not file for bankruptcy until April 18, 2011.  Only after that date did the Trustee come into the picture.  Therefore, the Court finds that the Debtors incorrectly typed the date of Crews letter and that the Crews letter was in fact sent June 29, 2011, not June 29, 2010.  [Debtors' Ex. No. 56].

transfers disclosed in the Debtors' original SOFA.[46]  The Debtors did not produce documentation for the disposition of each and every asset described in the Financial Statement.

103.    On July 28, 2011, Johnson, the attorney for the Carooms, filed a response in support of the Trustee's Motion.  [Adv. Doc. No. 36, at 1].

104.    On August 2, 2011, this Court set a hearing for August 31, 2011 at 11:00 a.m. to consider the Trustee's Motion.  [Adv. Doc. No. 37].

105.    On August 24, 2011, Damani received via fax a letter from Crews, requesting that the Debtors file amended Schedules immediately.  [Caroom/Trustee Ex. No. 20].   Crews had discovered, from reviewing the Financial Statement which she attached to her letter to Damani, that the Debtors had failed to disclose $2.0 million worth of assets in their Schedules and SOFA.[47]  [Caroom/Trustee Ex. No. 20]; [Tape Recording, 6/26/2012 Trial at 10:15:58–10:16:38 a.m.]; [Caroom/Trustee Ex. No. 7].  The Carooms—not the Debtors—had provided the Financial Statement to Crews.[48]   [Tape Recording, 6/27/2012 Trial at 4:35:41–4:36:01 p.m.]; [Caroom/Trustee Ex. No 20, at 1].  In the Financial Statement, the Debtors purported to have $2,032,620.00 worth of assets as of June 26, 2009. [Caroom/Trustee Ex. No. 7, at 2].  Moreover, in the Financial Statement, the Debtors also represented that the Anderson Property was their homestead.  [Tape Recording, 6/14/2012 Trial at 10:46:16–10:48:49 a.m.].  Upon receiving Crews' letter and the Financial Statement, Damani called the Debtors to his office to confront

---

[46] In the original SOFA, the Debtors disclosed transfers of only the following assets:  (1) a 2001 Harley Davidson motorcycle; (2) a twenty-foot by eight-foot open trailer; (3) a sixteen-foot enclosed trailer; and (4) the Lots. [Caroom/Trustee Ex. No. 1, at 33].

[47] This figure was derived from the Debtors' Financial Statement, in which the Debtors purported to have $2,032, 620.00 in assets as of June 26, 2009.  [Caroom/Trustee Ex. 7].

[48] The Carooms obtained a copy of the Financial Statement by subpoenaing Diamond Bank during the Lawsuit pending in Arkansas.  [Tape Recording, 6/27/2012 Trial at 9:41:07–9:41:35 a.m.].  Once the Debtors filed their Chapter 7 petition, the Carooms contacted the Trustee to communicate with him about various issues concerning the Debtors; and at some point during the communications with the Trustee and his counsel, the Carooms provided the Financial Statement to the Trustee.  [Tape Recording, 6/27/2012 Trial at 4:35:41–4:36:01 p.m.].

39

them about the Financial Statement and their failure to disclose to him all of the assets described therein.  [Tape Recording, 6/26/2012 Trial at 10:16:38–10:16:55 a.m.]; [Caroom/Trustee Ex. No. 7].  The Debtors told Damani that they did not know that the SOFA and Schedules required them to disclose these assets.   [Tape Recording, 6/26/2012 Trial at 10:03:23–10:05:12 a.m.]; [Caroom/Trustee Ex. No. 7].   Damani explained to the Debtors that they had to amend their SOFA to disclose how they disposed of all of the assets described in the Financial Statement.[49] [Tape Recording, 6/26/2012 Trial at 10:03:23–10:05:12 a.m.]; [Caroom/Trustee Ex. No. 7]; [Caroom/Trustee Ex. No. 2].

106.   On August 25, 2011, Damani and Ms. Henley met at his office and reviewed the Financial Statement line by line.  [Tape Recording, 6/27/2012 Trial at 5:39:16–5:40:16 p.m.].  Ms. Henley informed Damani that she would provide the Trustee, Crews, and Damani with a detailed letter explaining the disposition of assets described in the Financial Statement.  [*Id.*].

107.   After meeting with Damani, Ms. Henley wrote a letter giving detailed information about the assets shown on the Financial Statement.  [Debtors' Ex. No. 62]; [Tape Recording, 6/14/2012 Trial at 5:20:37–5:21:01 p.m.].   In this letter, Ms. Henley explained that the Debtors were "forced to sell [the assets in the Financial Statement] in a down market to survive."  [Debtors' Ex. No. 62, at 1].   She further explained that the Debtors sold the assets in the Financial Statement "to pay lawyer fees, and [to] support [their] family."[50]  [*Id.*].  She also asserted that the

---

[49] During trial, Damani used the terms Schedules and Statement of Financial Affairs (SOFA) interchangeably.  The Court finds that Damani was referring to the Debtors' SOFA when discussing the documents that needed to be amended, because Damani only filed an amended SOFA on the Debtors' behalf.  [Caroom/Trustee Ex. No. 2].

[50] Item 2 in the SOFA requires that Debtors disclose "Income **other than from employment or operation of business** [received during the *two years* preceding the commencement of the Debtors' case]."  [Caroom/Trustee Ex. No. 1, at 31].  The Debtors, to this day, have never completely disclosed the income that they received from the sale of their assets.  For example, in their amended SOFA filed on August 30, 2011, the Debtors disclosed a series of garage sales—or, what the Debtors called "in-house" sales—occurring between May and June 2010.  They listed nine categories of items sold (i.e., "rugs, chairs, kid's bikes, clothing, baby furniture, aquarium, lots of home décor, wheelchair, and other misc. household items"), and indicated that these items were sold for between $10.00 and

Debtors "paid every subcontractor in [their] construction business in 2009 and 2010, which total[ed] to over $100,000.00."  [Debtors' Ex. No. 62, at 1].

108.    On August 29, 2011, Ms. Henley went to Damani's office to hand deliver a copy of the letter she had written to Crews.  [Tape Recording, 6/27/2012 Trial at 5:40:16–5:41:07 p.m.]; [Debtors' Ex. No. 62].  She also mailed a copy of her letter to the Trustee and to Crews.  [Tape Recording, 6/27/2012 Trial at 5:40:16–5:41:07 p.m.].  Damani advised the Debtors that he was going to use all of the information he received from the Trustee and in Ms. Henley's letter to Crews to amend and file the Debtors' amended SOFA.  [*Id.*].

109.    In their written response to Crews, the Debtors disclosed that the following assets,[51] which appeared on the Financial Statement, were sold for the following amounts on the following dates by the Debtors prior to the Petition Date[52]:

- 2003 Dodge Ram Truck—Sold for $2,400.00 (December 2009)
- 1994 Toyota Runner Truck—Sold for $2,500.00 (2009)
- 1978 Jeep CJ7—Sold for $2,000.00 (March 10, 2010)
- 1979 Jeep Indian Cherokee—Sold for $3,500.00 (Approximately May 2010)
- 1984 Porsche—Sold for $5,500–$6,500.00 (May 2010)
- 1952 Ford Truck—Sold for $7,500.00 (May 2010)
- 2001 Harley Davidson—Sold for $10,915.00 (December 2010)
- 20-foot x 8-foot Enclosed Trailer—Sold for $2,450.00 (December 2010)
- 16-foot Open Trailer—Sold for $600.00 (December 2010)
- 2001 Polaris 500—Sold for approximately $2,300.00 (June 2010)
- 2005 Honda 4-Wheeler—Sold for $2,200.00 (April 2010)
- 2003 Yamaha 500 4-Wheeler—Sold for $2,300.00 (May 2010)

$250.00 per asset.  However, the Debtors made no attempt to estimate the total amount they received, saying they "Do not remember the total amount."  [Caroom/Trustee Ex. No. 2, at 6].  As a result, neither the Trustee nor this Court is able to properly determine the Debtors' income.

[51] The income the Debtors earned from their February 2011 garage sale was not included in this letter; however, the Debtors eventually disclosed this income in their amended SOFA filed on August 30, 2011.  *Compare* [Caroom/Trustee Ex. No. 2, at 6], *with* [Debtors' Ex. No. 62, at 4–7].  The Debtors estimated that they received $4,000.00.  [Caroom/Trustee Ex. No. 2, at 6].

[52] Ms. Henley testified that HDC, Inc. owned all of the assets sold at the various garage, "in-house," and "designer" sales; however, none of the exhibits introduced at trial support her testimony.  [Tape Recording, 6/27/2012 Trial at 6:35:25–6:38: 37 p.m.].

- Can Am 4-Wheeler—Sold for $6,500.00 (June 2010)
- Craftsman Tractor—Sold for $900.00 (June 2010)
- Chris Craft Cabin Cruiser—Sold for $8,000.00 (July 2010)
- 2006 Hot Springs Spa—Sold for $3,200.00 (2008)
- 1995 VIP 20-foot Ski Boat[53]—Sold for $8,500.00 (April 2010)
- Silk Rug—Sold for $1,500.00 (May 2010)
- Silk Rug—Sold for $1,600.00 (May 2010)
- Silk Rug—Sold for $1,200.00 (May 2010)
- 2.75 carat wedding ring—$5,200.00 (May 2010)
- 2007 Men's Rolex Watch—Sold for $3,200.00 (March 2010)
- Various Furnishings—$10.00–$250.00 (May/June 2010)
- 2 lots on Kathy Lane and Marion Anderson (March 2010)
- 1 acre of commercial land on 70 West—Sold for $30,000.00 (March 2010)

[Debtors' Ex. No. 62, at 4–7].

110.    Of the assets discussed in Ms. Henley's letter to Crews, the following were sold, either at garage sales, or at what Ms. Henley testified were "designer" sales,[54] by the Debtors within one year of the Petition Date[55]:

- 1984 Porsche—Sold for $5,500.00–$6,500.00 (May 2010)
- 1952 Ford Truck—Sold for $7,500.00 (May 2010)
- 2001 Polaris 500—Sold for approximately $2,300.00 (June 2010)
- 2005 Honda 4-Wheeler—Sold for $2,200.00 (April 2010)
- 2003 Yamaha 500 4-Wheeler—Sold for $2,300.00 (May 2010)
- Can Am 4-Wheeler—Sold for $6,500.00 (June 2010)
- Craftsman Tractor—Sold for $900.00 (June 2010)
- Chris Craft Cabin Cruiser—Sold for $8,000.00 (July 2010)
- 1995 VIP 20-foot Ski Boat—Sold for $8,500.00 (April 2010)
- Silk Rug—Sold for $1,500.00 (May 2010)
- Silk Rug—Sold for $1,600.00 (May 2010)

---

[53] This asset is *not* the same as the jet skis discussed in Finding of Fact Nos. 91 and 92.

[54] The Debtors adamantly testified that these items were sold in the ordinary course of business; however, the Court finds that this was not the case. The Carooms' attorney, Johnson, pointed out during closing arguments that the advertising receipts produced by the Debtors indicate the opposite. [Debtors' Ex. No. 62, at 19–21]. Some of the assets offered for sale—such as bicycles, toys, a lawnmower, and a wheelchair—were clearly not "designer" items. This Court finds that the Debtors were not selling designer items, and that the sale of these assets was not in the ordinary course of business.

[55] Item 10 of the SOFA requires that the Debtors disclose all transfers, **not** made in the ordinary course of business or employment, effectuated within *two years* of the Debtors' bankruptcy filing. Ms. Henley's letter included the approximate date of sale for each asset. [Debtors' Ex. No. 62, at 4–7].

- Silk Rug—Sold for $1,200.00 (May 2010)
- 2.75 carat wedding ring—$5,200.00 (May 2010)
- Various Furnishings—$10.00–$250.00 (May/June 2010)

[*Id.* at 4–6].

111.   Ms. Henley attached advertising receipts to her letter to Crews.   [*Id.* at 19–21].   The advertising receipts, dated May 20, 2010, June 3, 2010, and June 17, 2010, were for Friday and Saturday designer and garage sales that the Debtors held.[56]   The assets advertised were miscellaneous home furnishings, bikes, toys, children and adult clothing, a lawnmower, an aquarium, a wheelchair, and a shower chair.   [*Id.* at 19–21].   In the June 17, 2010 advertisement, the Debtors advertised the Friday and Saturday sales as "huge moving sale[s]."   [*Id.* at 21].

112.   In her letter to Crews, Ms. Henley also attached certain bills of sale evidencing the sales of some of the assets described in the letter that were sold within one year prior to the Henley's Chapter 7 filing, namely: the 2001 Polaris 500; the Can Am 4-Wheeler; the Chris Craft Cabin Cruiser; and the 1995 VIP 20-foot Ski Boat.   [*Id.* at 16–17, 22–23].

113.   Ms. Henley also attached a bill of sale evidencing the sale of the 1978 Jeep CJ7, which was sold within two years of the filing of the Debtors' petition.   [*Id.* at 15].

114.   The handwritten bills of sale that Ms. Henley submitted to Crews do not indicate that HDC, Inc. owned or sold any of the following assets:   the 1978 Jeep CJ7; the 2001 Polaris 500; the Can Am 4-Wheeler; the Chris Craft Cabin Cruiser; and the 1995 VIP 20-foot Ski Boat.   [*Id.* at 15–17, 22–23]; [Tape Recording, 6/27/2012 Trial at 6:35:20–6:38:38 p.m.; 6:45:44–6:49:14 p.m.].

---

[56] Ms. Henley testified that the designer sales took place inside the Anderson Property, while the garage sales took place in the Anderson Property's garage.  [Tape Recording, 6/27/2012 Trial at 5:57:47–5:58:23 p.m.].  She further testified that when some of the customers requested high-end items at the Debtors' garage sales,  she would take them inside the Anderson Property to sell them jewelry and other home furnishings.  [Tape Recording, 6/27/2012 Trial at 5:58:23–5:58:55 p.m.].

115.    The handwritten bill of sale for the 1978 Jeep CJ7 lists David Henley as the seller. [Debtors' Ex. No. 62, at 15]; [Tape Recording, 6/27/2012 Trial at 6:45:44–6:49:14 p.m.].  The handwritten bill of sale for the 2001 Polaris 500 lists David Henley as the seller.  [Debtors' Ex. No. 62, at 16].  The handwritten bill of sale for the Can Am 4-Wheeler lists David Henley as the seller.  [*Id.* at 17].  The handwritten bill of sale for the 1984 Chris Craft Cabin Cruiser lists David and Belinda Henley as the sellers.  [*Id.* at 22].  Finally, the handwritten bill of sale for the 1995 VIP 20-foot Ski Boat also lists David and Belinda Henley as the sellers.  [*Id.* at 23].

116.    Ms. Henley's 2.75 carat diamond wedding ring was a personal item that the Debtors sold at one of their garage sales.  [Tape Recording, 6/27/2012 Trial at 6:31:00–6:31:30 p.m.].  This ring was not owned by HDC, Inc. or any other entity, but rather was owned by Ms. Henley.  [*Id.* at 6:31:00–6:31:30 p.m.].

117.    On August 30, 2011, the day before the hearing on the Trustee's Motion, Damani filed the Debtors' amended SOFA.  [Tape Recording, 6/26/2012 Trial at 4:19:00–4:20:26 p.m.].  The Debtors claim that they did not sign or review these amendments; however, the Debtors paid Damani an additional fee to file the amended SOFA.  [June 15, 2012 Tr. 75:14–23].  Moreover, the assets disclosed in the amended SOFA are the same assets that Ms. Henley discussed in her letter to Crews.  [June 14, 2012 Tr. 75:13–23]; *Compare* [Debtors' Ex. No. 62, at 4–7], *with* [Caroom/Trustee Ex. No. 2, at 4–6].

118.    On August 31, 2011, at 11:00 a.m., Damani appeared before this Court for the hearing on the Trustee's Motion and disclosed to this Court that the Debtors had amended their SOFA. [Tape Recording, 6/26/2012 Trial at 4:19:00–4:20:26 p.m.].

119.    In their amended SOFA, in response to item 1, "Income from employment or operation of business," the Debtors' response was: "$0.00 2009 and 2010 tax returns are currently being

prepared."  [Caroom/Trustee Ex. No. 2, at 1].  The Debtors, however, had already filed their

personal tax returns and the tax returns for Aqua-Lock with the IRS on May 12, 2011.[57]

[Debtors' Ex. No. 53]; [Debtors' Ex. No. 81].  Therefore, this representation was false.

120.    In their amended SOFA, in response to item 10, "Other Transfers," the Debtors disclosed

the following assets and information about the value that they received for each asset:

- 2003 Dodge Ram—value received $2,400.00 (December 2009)
- 1994 Toyota Runner Truck—value received $2,000.00 (2009)
- 1978 Jeep CJ7—value received $2,000.00 (March 10, 2010)
- 1979 Jeep Indian Cherokee—value received $3,500.00 (Approximately May 2010)
- 2000 Mazda Miata—minor child's car (September 2009)
- 1974 VW Bug—minor child's car[58] (2009)
- 1984 Porsche—value received $5,500.00–$6,500.00 (May 2010)
- 1952 Ford Truck—value received $7,000.00–$7,500.00 (May 2010)
- 2001 Polaris 500—value received $2,300.00 (June 2010)
- 2005 Honda 4-Wheeler—value received $2,200.00 (April 2010)
- 2003 Yamaha 500 4-Wheeler—value received $2,300.00 (May 2010)
- Can Am 4 Wheeler—value received $6,500.00 (June 2010)
- Craftsman Tractor—value received $900.00 (June 2010)
- Chris Craft Cabin Cruiser—value received $8,000.00 (July 2010)
- 1995 VIP 20-foot Ski Boat—value received $8,500.00 (April 2010)
- Three Silk Rugs—value received $4,300.00 (May 2010)
- 2.75 carat wedding ring—value received $5,200.00 (May 2010)
- 2007 Men's Rolex Watch—value received $3,200.00 (March 2010)
- Miscellaneous furnishings—value received ranged from $10–$250.00 per item (May/June 2010)
- Open garage sale for misc small value items—value received approximately $4,000.00 (February 2011)

[Caroom/Trustee Ex. No. 2, at 4–7].

---

[57] The tax returns for HDC, Inc. were not introduced into evidence at trial.

[58] The Debtors disclosed the 2000 Mazda Miata and 1974 VW Bug in response to item 10 of their amended SOFA; however, the Debtors did not disclose the value received for these vehicles.  [Caroom/Trustee Ex. No. 2, at 5].  They also informed Damani, after their meeting of creditors held on May 20, 2011, that their minor children owned these vehicles even though the Debtors included them on the Financial Statement.  [Tape Recording, 6/14/2012 Trial at 11:24:33–11:25:46 a.m.].  Ms. Henley further testified that these vehicles were not owned by HDC, Inc.  [Tape Recording, 6/27/2012 Trial at 6:35:25–6:38:37 p.m.].  Thus, the Debtors initially represented to this Court, the Trustee and their creditors that they held title to these vehicles; eventually, however, they changed their position and now represent that their children hold title to these vehicles.  [Caroom/Trustee Ex. No. 2, at 5].

121.     In their amended SOFA, the Debtors' response to item 18, "Nature, location and name of business," remained unchanged.[59]   [*Id.* at 8]; [Caroom/Trustee Ex. No. 1, at 35–36].   Mr. Henley's car repair business was not disclosed in the Debtors' amended SOFA or Schedules. [Caroom/Trustee Ex. No. 2, at 8]; [June 15, 2012 Tr. 42:21–43:3].   Additionally, Ms. Henley's jewelry design and interior design businesses were not disclosed.   [Caroom/Trustee Ex. No. 2, at 8].

122.     In their amended SOFA, in response to item 19c, asking the Debtors to "List all firms or individuals who at the time of the commencement of this case were in possession of the books or account and records of the debtor.  If any of the books of account and records are not available, explain," the Debtors' response remained the same.[60] [Caroom/Trustee Ex. No. 1, at 36].   The Debtors made no attempt to recover their lost personal and business records for Aqua-Lock and HDC, Inc.

123.     In their amended SOFA, in response to item 19d, "List financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom a financial statement was issued by the Debtor within **two years** immediately preceding the commencement of this case," the Debtors again filled in the box by marking "NONE."  [Caroom/Trustee Ex. No. 2, at 8].  This representation was false, as the Debtors had, in fact, provided the Financial Statement to Diamond Bank on June 26, 2009, which was within two years prior to the Petition Date.

---

[59] The Debtors' initial and amended response to item 18 stated, "Henley Design & Construction, Inc.; 32-0190790; 3035 Marion Anderson, Hot Springs National Park, AR 71913; General contractor; closed February 2011," and "Aqua-Lock, Inc.; 62-1670046; 111 Leola Street, Hot Springs National Park, AR 71913; waterproofer; July 2009—January 2011."

[60] The Debtors' original response to item 19c stated, "records were lost during recent move."  [Caroom/Trustee Ex. No. 1, at 36].

124.    The Debtors never filed an amended "Schedule B – Personal Property,"[61] to disclose the two bank accounts that the Debtors had on the Petition Date in response to item 2.    *See* [Caroom/Trustee Ex. No. 35, at 2].    The Debtors also never amended their response to item 13, "Stock and interest in incorporated and unincorporated businesses."[62]    Thus, the Debtors did not disclose their ownership interest in HDC, Inc., Henley Design or Aqua-Lock in their Schedules. [Caroom/Trustee Ex. No. 1, at 13].    The Debtors also did not amend their response to item 21, "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims."[63]    Thus, the Debtors did not disclose their pre-petition counterclaims against the Carooms pending in the Lawsuit in Arkansas.

125.    Damani became concerned over both the Debtors' veracity and the complexity of their case.    [Tape Recording, 6/26/2012 Trial at 2:38:07–2:39:00 p.m.]; [*Id.* at 10:26:34–10:27:20 a.m.].    He, therefore, sent the Debtors an e-mail informing them that he wanted to withdraw from representing them and advising them to find substitute counsel.    [Debtors' Ex. No. 66, at 2].

126.    On September 29, 2011, Damani filed an Emergency Motion to Withdraw as Counsel for the Debtors.    [Adv. Doc. No. 49, at 1].    On October 3, 2011, this Court denied Damani's Emergency Motion to Withdraw as Counsel for failure to give notice to the creditors and the Trustee pursuant to Bankruptcy Local Rule 9013-1.    [Adv. Doc. No. 50].    On October 24, 2011, Damani filed a Motion to Substitute Bankruptcy Counsel on behalf of the Debtors.    [Adv. Doc. No. 53].    Damani informed this Court that the Debtors had retained Leonard H. Simon (Simon), a seasoned bankruptcy attorney at the Houston law firm of Pendergraft & Simon, LLP.    [*Id.* at 2].

---

[61] Item 2 of Schedule B – Personal Property," required that the Debtors disclose all checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives.    [Caroom/Trustee Ex. No. 1, at 11].

[62] The Debtors' original response to item 13 of Schedule B was:  "NONE."  [Caroom/Trustee Ex. No. 1, at 13].

[63] The Debtors' original response to item 21 of Schedule B was:  "NONE." [Caroom/Trustee Ex. No. 1, at 13].

Damani's Motion to Substitute Bankruptcy Counsel was agreed to by Simon.  [*Id.* at 3].  On November 3, 2011, this Court granted Damani's Motion.  [Adv. Doc. No. 54].  Simon thereafter became counsel of record for the Debtors in place of Damani.  [*Id.*].

127.   On August 30, 2011, the Carooms and the Trustee filed the following pleading: "Complaint of Rodney Tow, Trustee, Joined by Creditors Jerry and Mary Caroom, Objecting to the Discharge of the Debtors under 11 U.S.C. § 727; and Jerry and Mary Caroom's Objection to Discharge of Debts under 11 U.S.C. §§ 523(a)(2) and 523(a)(4)" (the Complaint).  [Adv. Doc. No. 1].  On September 30, 2011, the Debtors filed the following pleading:  "Defendants David Henley and Belinda Henley's Original Answer to Plaintiffs' Complaint, and Counterclaim Against Jerry Caroom and Mary Caroom" (the Answer).   [Adv. Doc. No. 10].   The counterclaims alleged by the Debtors included:  (1) violation of the automatic stay; (2) abuse of process; (3) malicious prosecution; and (4) defamation.

128.   On October 7, 2011, the Carooms filed the following pleading:  "Plaintiffs' Jerry and Mary Caroom's Motion to Dismiss Counterclaims," as well as an answer to the Debtors' counterclaims.  [Adv. Doc. Nos. 11 & 12].

129.   On December 20, 2011 at 10:30 a.m., this Court held a hearing and granted in part and denied in part the Plaintiffs' Jerry and Mary Caroom's Motion to Dismiss Counterclaims.  The Court dismissed, without prejudice, the counterclaims for malicious prosecution, abuse of process, and defamation.  [Tape Recording, 12/20/2011 Hearing at 10:36:07–10:44:13 a.m.]. The Court ruled that these post-petition state law causes of action should be tried in the Harris County District Court, not the bankruptcy court.  However, this Court did not dismiss the counterclaim regarding the alleged violation of the automatic stay by the Carooms, as this cause of action is governed by an express provision of the Code, namely § 362(k). [Adv. Doc. No. 22].

130.    On May 25, 2012, the Plaintiffs filed an "Amended Joint Motion for Summary Judgment on Section 727 Objections to Discharge for False Oaths."  [Adv. Doc. No. 76].  On June 1, 2012, the Debtors filed their Response to Plaintiffs' Amended Joint Motion for Summary Judgment on Section 727 Objections to Discharge for False Oaths (the Response).  [Adv. Doc. No. 82].

131.    In a four-page order, the Court denied the Amended Joint Motion for Summary Judgment (the Summary Judgment Order).  [Adv. Doc. No. 100].

132.    On June 11, 2012, the Court began trial on the § 362 Action.  On June 14, 2012, the Court began trial on the § 727 Action. On June 26, 2012, in the § 727 Action the Court heard the Debtors' oral motion for a directed verdict; it was subsequently denied.  [Adv. Doc. No. 113]. Thereafter, the Debtors put on their case-in-chief in the § 727 Action.

133.    After hearing closing arguments on both the § 727 Action and the § 362 Action, the Court took both matters under advisement.

134.    On July 3, 2012, the Debtors filed their Expedited Motion For Entry of Order Directing J. Sky Tapp to Show Cause Why He Should Not Be Sanctioned and Punished for Committing Perjury (the Tapp Show Cause Motion).  [Adv. Doc. No. 122].  On July 11, 2012, the Carooms filed a response in opposition thereto, and on July 13, 2012, this Court heard arguments on the Tapp Show Cause Motion.  The Court denied the Tapp Show Cause Motion on July 20, 2012. [Adv. Doc. Nos. 146 & 150].

### III.   CREDIBILITY OF WITNESSES

#### A.   Witnesses Who Testified During That Portion of the Trial Regarding the § 727(a) Action

Five witnesses testified during the trial on the § 727(a) Action:  (1) Belinda Henley, Debtor/Defendant; (2) David Henley, Debtor/Defendant; (3) Jim Henley, the brother of David Henley; (4) Anis Damani, former Chapter 7 counsel for the Debtors; and (5) Rodney Tow, the

Chapter 7 Trustee/Plaintiff.  Set forth below are the Court's findings regarding the credibility of these witnesses.

**Rodney Tow (Chapter 7 Trustee/Plaintiff)**

Among other issues, the Trustee testified concerning the following:  the oaths made by the Debtors at the meeting of creditors; the records produced in the Debtors' Chapter 7 case; the assets excluded from the Debtors' Schedules; and the inaccurate information provided in the SOFA.  The Court finds the Trustee to be a very credible witness, and gives substantial weight to his testimony.

**Jim Henley (Brother/Brother in-law of the Debtors)**

Jim Henley, who is a very successful and sophisticated entrepreneur, testified primarily on issues regarding the Anderson Property.  Jim Henley is also closely related to the Debtors— he is David Henley's brother.  His relationship to the Debtors is an important factor in this Court's credibility determination.  While Jim Henley directly answered most of the questions posed by all parties, he was careful to ensure that his testimony and responses would not harm the Debtors' case, as the following Q&A between Jim Henley and Peter Johnson (counsel for the Carooms) demonstrates:

JOHNSON: Mr. Henley, the payments on the $305,000.00 mortgage were made from the rental payments of an exact same amount sent to you by your brother and your sister-in-law; isn't that true?

JIM HENLEY: The payments on the mortgage came from my checking account to Summit Bank.

JOHNSON: And you received deposits in your checking account in an exact amount from your brother and your sister-in-law each month as well, didn't you?

JIM HENLEY: I've testified to that sir.

JOHNSON:                  Okay.   An then you have the property listed for
                          $695,000.00 for sale, and did you have any agreement
                          with them that you would split the profit on that property
                          that you made - - that you would make?

JIM HENLEY:               Again, this - - we never anticipated that you would be
                          asking us this question.   Our agreement was between
                          brothers and we had not discussed a disposing of the
                          house.  So I had no agreement with him on the funds.

[June 15, 2012 Tr. 235:14–236:5].

Due to Jim Henley's relationship to the Debtors, the Court finds that Jim Henley,

although credible, was also very careful not to give testimony that could damage the Debtors'

case-in-chief.  Accordingly, this Court finds Jim Henley to be a credible, but practiced witness.

This Court, therefore, gives some—but not substantial—weight to his testimony.

**Anis Damani (Former Counsel to the Debtors)**

Among other issues, Anis Damani testified on issues concerning the Debtors' bankruptcy

filing, the preparation and the filing of the Debtors' Schedules and SOFA, the events and

communications that occurred at the Debtors' meeting of creditors, and the issues surrounding

the Debtors' Financial Statement.  While Damani proved himself to be a somewhat unorganized

and inexperienced attorney, this Court finds that Damani is, nevertheless, very credible; he

answered most of the questions posed to him forthrightly, even if certain answers embarrassed

him.[64]  [Finding of Fact No. 42].  Therefore, this Court gives substantial weight to his testimony,

---

[64] Damani, who graduated from law school in 2008, opened his own firm in December of 2010, just five months
before he represented the Debtors in their Chapter 7 case.  [Tape Recording, 6/26/2012 Trial at 2:40:43–2:40:56
p.m.].  He therefore lacks the extensive experience that the Debtors' present counsel has.  Nevertheless, Damani did
have an internship with a bankruptcy judge in Arkansas, so at the time he took on this representation, he was not
wholly devoid of experience in ensuring that all of his debtor/clients—including the Debtors here—file complete
and accurate Schedules and SOFA.
          The Court distinguishes between Damani's clear understanding of the need for his clients to file complete
and accurate Schedules and SOFA, on the one hand, and his ignorance of the applicable Local Rule of the Southern
District of Texas requiring each debtor's counsel to file signed original Declarations of Electronic Filing with the
Clerk's office.  His ignorance of the Local Rule has no bearing on his honest efforts to ensure that the Debtors filed

and to the extent that his testimony contradicted the testimony of either or both of the Debtors, the Court gives substantially more weight to his testimony than to the testimony of the Debtors.

**Belinda Henley (Debtor)**

Belinda Henley (Ms. Henley) is a licensed general contractor specializing in construction and interior design.  [June 14, 2012 Tr. 52:4–18].  She is licensed by the American Society of Quality Control, is recognized as a quality engineer by the American Society of Quality Control, and obtained a degree in industrial management, with an emphasis in industrial engineering, from the University of Arkansas at Little Rock.  [Finding of Fact No. 1].  Because she is sophisticated, well-educated and capable of understanding complex scientific and business concepts, it is quite logical to infer that she also appreciates the difference between truths and lies.  *See In re Graham*, 199 B.R. 157, 159–60 (Bankr. N.D. Ohio 1996); *see also In re W. World Funding, Inc.*, 52 B.R. 743, 753 (Bankr. D. Nev. 1985) (noting that the court may determine whether a witness can discern the difference between truth and lies).

During trial of the § 727 Action, Ms. Henley testified on two separate occasions, once as an adverse witness in the Plaintiffs' case-in-chief, and second during the Debtors' case-in-chief. Both times, she frequently answered questions evasively and ambiguously.  Even when the questions required only simple answers, Ms. Henley's responses required the Trustee's, Carooms', and even her own counsel to ask follow-up questions to obtain clarity and coherence for the record.

---

complete and accurate Schedules and SOFA.  His efforts convince this Court that, although inexperienced and ignorant of certain Local Rules, he is honest and made every effort to tell the truth.

Finally, the Court notes that after Damani's testimony revealed that he was ignorant of the Local Rules, this Court held a separate hearing on this issue in which the United States Trustee, and the Trustee in this case, appeared. Their presentation to this Court, plus Damani's testimony at this hearing, confirms this Court's finding that Damani is honest and that his testimony should be given substantial weight.  [Adv. Doc. No. 77].

For example, when Ms. Henley was asked, by her own counsel, Simon, whether the Debtors maintained any cash in their two bank accounts on the Petition Date, she evaded the question posed, responding: "I disclosed all banking information." [June 14, 2012 Tr. 70:14–22]. Because Ms. Henley answered many of her questions in this manner, this particular response prompted the Court to address Ms. Henley directly:

| | |
|---|---|
| THE COURT: | Just answer the question. |
| MS. HENLEY: | Oh. |
| THE COURT: | You need to focus on the question that's asked of you, ma'am. |
| MS. HENLEY: | Okay. |
| THE COURT: | I'm not going to tolerate you wandering off in [sic] tangent.  It's a simple question:  Did you have any money in those bank accounts?  Yes or no? |
| MS. HENLEY: | Okay.  I'd have to see the statement to answer that honestly. |

[*Id.* at 70:23–71:8].

Indeed, throughout the trial, Ms. Henley frequently failed to answer the question that was asked, or made self-serving statements unresponsive to the question that was posed.  The following four exchanges illustrate this behavior:

Example 1:  Here, Ms. Henley attempts to avoid admitting that her husband and she failed to disclose that they gave the Financial Statement to Diamond Bank.  They should have made this disclosure in response to item 19d of the SOFA:

| | |
|---|---|
| JOHNSON:<br>(Counsel   for   the<br>Carooms) | Now I want to look at the next question here and would you read that question into the record? |
| MS. HENLEY: | D? |
| JOHNSON: | Yes. |
| MS. HENLEY: | List all financial institutions, creditors and other parties, |

|  |  |
|---|---|
|  | including mercantile and trade agencies, to whom a financial statement was issued by the debtor within two years immediately preceding the commencement of this case. |
| JOHNSON: | And how did you answer that? |
| MS. HENLEY | I answered "NONE." |
| JOHNSON: | Ok, and if we go back to exhibit 7 [i.e., the Financial Statement] that we just visited here . . . at page 2 at the bottom tell the Court when that is dated. |
| MS. HENLEY: | It's dated June 26, 2009. |
| JOHNSON: | Is that within two years before you filed your bankruptcy proceeding? |
| MS. HENLEY: | Yes. |
| JOHNSON: | And you didn't put that on the Schedules in response to question #19 on your Statement of Financial Affairs, did you? |
| MS. HENLEY: | No, I did not have a copy. |
| COURT: | Wait a minute.  That's not the question.  The question is "Did you list it?"  The question is not, "Did you have a copy?"  The question was, "Did you list the financial institutions to which you gave exhibit 7?" |
| MS. HENLEY: | No. |

[Tape Recording, 6/27/12 Trial at 6:15:15-6:18:17 p.m.].

Example 2:   After admitting that she and Mr. Henley "remodeled" the Anderson

Property, Ms. Henley was ambiguous about those improvements.

|  |  |
|---|---|
| JOHNSON: (the Carooms' counsel) | And how much money did you spend remodeling that home, Ms. Henley? |
| MS. HENLEY: | Jim Henley remodeled the home. |
| JOHNSON: | Jim Henley?  Was he living in Arkansas at that time? |
| MS. HENLEY: | No. |
| THE COURT: | Hold on a minute.  How much money was spent on it? You didn't answer that question. |
| MS. HENLEY: | Um.  How much money did *I* spend on it? |

| | |
|---|---|
| JOHNSON: | How much money was spent to improve the home, regardless of who spent the money? |
| MS. HENLEY: | Oh, I don't know. |

[June 15, 2012 Tr. 50:8–14].

<u>Example 3</u>:

| | |
|---|---|
| JOHNSON: | I'm showing you now Exhibit Henley 28. Do you see that? |
| MS. HENLEY: | Yes, I do. |
| JOHNSON: | Okay. And that is a second complaint against you and your husband, and also Mr. Jim Henley, isn't that correct? |
| MS. HENLEY: | Yes, it is. |
| JOHNSON: | Okay. And that has a number, a case number at the top that's identified as CV-2011-292 IV; is that correct? |
| MS. HENLEY: | Yes. |
| JOHNSON: | Okay. Did you - - when did you become aware that this was a second lawsuit against you? |
| MS. HENLEY: | I was never served this document. |
| JOHNSON: | Did Mr. Hirsh [sic] tell you that -- |
| THE COURT: | Hold on a minute. That's not quite the question he asked you, Ms. Henley. |
| MS. HENLEY: | Oh, okay. |
| THE COURT: | When did you become aware of this lawsuit, not when you were served, when the lawsuit was served on you. Your answer to that would be never. The question is when did you become aware of this? |
| MS. HENLEY: | Probably in the summer, probably May of 2011, June, it was after our bankruptcy. I'm perfectly sure of that. It was after our bankruptcy. |

[June 15, 2012 Tr. 60:9–61:5].

Example 4:

| | |
|---|---|
| JOHNSON: | Okay. Well, let's look at Trustee/Caroom Exhibit 2. This is the amendment that Mr. Damani filed for you back in August 30 of 2011, correct? |
| MS. HENLEY: | That this is the Statement of Financial Affairs? |
| JOHNSON: | Right, that's what it says on there, Statement of Financial Affairs amended, do you agree? |
| MS. HENLEY: | Yes, I did not sign that. |
| JOHNSON: | Well, move to strike the last part of that. |
| THE COURT: | Sustained. |

[June 15, 2012 Tr. 66:11–20].

The Court finds that, consistently, Ms. Henley gave testimony that she believed would aid the Debtors' case, rather than testimony that was both responsive and true.

In addition to her evasive and nonresponsive answers, Ms. Henley's testimony frequently contradicted itself on important issues, as the example below demonstrates.

| | |
|---|---|
| MURRAY:<br>(Trustee's counsel) | How did you conclude the amount of money you earned in those businesses? |
| MS. HENLEY: | Just by keeping a notepad and writing those - - those totals down as we bought and sold items, very informal. |
| MURRAY: | Those notepads weren't among those items that were lost in the move? |
| MS. HENLEY: | I do not have those. There are records of checks as well that are recordings of that that we used. |
| MURRAY: | To be clear, for your 2009 tax return you used a notepad that you didn't have in Arkansas but you did have in Houston? |
| MS. HENLEY: | Um . . . any of the items that we would've gone through that we would've listed out that we would've sold we would've listed those and we would've gone through our check account and we |

would've listed all those checks so any of those items that were bought and sold yes.

MURRAY:          Move to strike.  Nonresponsive.

COURT:           Sustained.

MURRAY:          I'll re-ask my question.  Is it your testimony that your 2009 tax return, that to fill out that form you would've relied on a notepad that you didn't have in Arkansas but did have in Houston?

MS. HENLEY:      I would've relied on several sources.

MURRAY:          I asked about the notepad.  Did you rely on the notepad to fill out your 2009 tax return?

MS. HENLEY:      I don't remember.

MURRAY:          I thought just a second ago you said that that's how you knew how much money you made from your business and that that's how you filled out your tax return.

MS. HENLEY:      That's how I would keep a record as we would sell things.  I would write them down like the informal like the handwritten bills of sales.

MURRAY:          So for sales in 2009 those were written down in a notepad?

MS. HENLEY:      I would have a copy of those bills of sale I do not have a notepad that actually has each one of those listed out.

MURRAY:          So did you use a notepad to fill out your 2009 tax return or not?

MS. HENLEY:      What notepad are you referring to?

MURRAY:          The one you brought up in response to my first question.

MS. HENLEY:      Um . . . no.  Not a not a specific notepad that has every item listed in there. No.  That's how we'd keep a record of when we're selling items.

MURRAY:          So there is no notepad?

MS. HENLEY:      No.

[Tape Recording, 6/27/2012 Trial at 5:51:05–5:53:45 p.m.].  Thus, in under three minutes of

sworn scrutiny, Ms. Henley managed to both create *and deny* the existence of this notepad.

Ms. Henley also contradicted her testimony regarding the qualification requirements for

the Anderson Property loan.  Ms. Henley initially testified as follows:

| | |
|---|---|
| MURRAY: | And you testified previously that this was an Asset List you prepared in connection with an application for a loan; isn't that right? |
| MS. HENLEY: | Yes. |
| MURRAY: | And among the assets that you list as being owned by you are a personal home at 3035 Marian [sic] Anderson [i.e., the  Anderson Property].  Do you see that at the bottom of the first page? |
| MS. HENLEY: | Yes, I do. |
| MURRAY: | If I understood your attorney's opening argument correctly, it's your position that you did not own the home at that time; is that right? |
| MS. HENLEY: | Yes. |
| MURRAY: | So can you explain to me why you were telling the bank that you did own, but you're telling the Court now that [you] didn't? |
| MS. HENLEY: | Yes. |
| MURRAY: | Please explain. |
| MS. HENLEY: | Okay. We - - it was a condition with Jim Henley.   He quitclaimed the house to us and our end of the agreement was obviously to get financing . . . |
| | . . . |
| MS. HENLEY: | Okay.  So the - - *when he quitclaimed the house to us, it was for us to get financing for it . . .* |

[June 14, 2012 Tr. 59:10–60:23] (emphasis added).   Later, Ms. Henley changed her story,

claiming the quitclaim deed was unnecessary for financing:

| | |
|---|---|
| MURRAY: | And the Marian [sic] Anderson house [i.e., the Anderson Property] - - and I don't think we disagree, I'm just trying to clarify your testimony.  It was that your understanding was you needed to get the title quitclaimed to you first and then you would use that to apply for the loan? |
| MS. HENLEY: | No.  I'm not understanding, I guess, what you're saying.  Maybe you can say it to me one more time.  You're not wanting me to discuss— |
| MURRAY: | No. |
| MS. HENLEY: | - - just the application.  Okay. |
| MURRAY: | No.  No. |
| MR. SIMON: | I'm going to object. |
| MURRAY: | I'm trying to be careful with the questions. |
| MS. HENLEY: | Okay. |
| THE COURT: | Ms. Henley, it's only your understanding that before you could apply for a loan you needed to have the Quitclaim Deed executed so you and your husband had title to the property? |
| MS. HENLEY | Before I applied for the loan did I need the Quitclaim Deed?  My mind is going blank.  I'm sorry.  I'm trying to process this.  *Before I applied for the loan did I need a Quitclaim Deed?  No.* |
| THE COURT: | Okay, Mr. Murray, she has answered your question.  You can ask the next question please. |
| MURRAY: | Thank you. |

[June 15, 2012 Tr. 41:1–42:4] (emphasis added).

Ms. Henley also narrated answers to questions that called for simple "yes" or "no" answers, and she did so in an effort to shift responsibility away from her husband and herself. For example, when asked a straightforward question about lost business records, Ms. Henley, rather than answering "yes" or "no", gave a response that insinuated that the U.S. Postal Service was responsible for the loss of the records (although the Debtors introduced no documentary evidence to which Ms. Henley referred):

> MURRAY: On your original Schedules you indicated that business records related to Aqua Lock and Henley Design and Construction were lost in the move; is that correct?
>
> MS. HENLEY: There were some records lost on shipments that were made to us from - - my daughter, Christina, shipped us boxes of all of our documents and those were lost. And then when we received them they were in new boxes and not all the documents were in those, and it's documented through the U.S. Postal Service.

[June 15, 2012 Tr. 37:23–38:6].

In sum, there are simply too many discrepancies, contradictions, misrepresentations, and self-serving statements that Ms. Henley has made under oath. The Court therefore finds that Ms. Henley is not credible, and gives very little weight to her testimony in the § 727 Action.

**David Henley (Debtor)**

David Henley (Mr. Henley) holds a degree in business from Southern Arkansas State University. [June 14, 2012 Tr. 87:21–23]; [Finding of Fact No. 1]. He co-owned and operated HDC, Inc. with Ms. Henley. [Finding of Fact No. 2]. He also worked with the subcontractors for HDC, Inc. [June 15, 2012 Tr. 87:24–88:2]. Mr. Henley is a sophisticated person. Given his background, it is also reasonable for the Court to infer that Mr. Henley can tell the difference between truth and lies. *See In re W. World Funding, Inc.*, 52 B.R. at 753.

During trial, Mr. Henley attempted to shield himself from any inaccuracies by claiming that Ms. Henley handled all of the documentation, as evidenced by the Q&A between counsel for the Carooms and Mr. Henley:

| | |
|---|---|
| JOHNSON: | And so you would be probably the more competent one to do these kinds of Schedules because, in fact, you have a degree in finance don't you? |
| MR. HENLEY: | I have a degree in business, but my wife did handle all the documentation and she filled out every document on that. |

[June 15, 2012 Tr. 139:24–140:3].

Mr. Henley also gave evasive answers to the most direct questions:

| | |
|---|---|
| JOHNSON: | Did you ever take an accounting course in college with that course in - - that degree in business? |
| MR. HENLEY: | I believe I had Accounting 1. |
| JOHNSON: | Okay.  And do you know what a balance sheet is? |
| MR. HENLEY: | I do. |
| JOHNSON: | Is that what this [i.e., the Financial Statement] is? |
| MR. HENLEY: | I'm not a professional accountant. |

[June 15, 2012 Tr. 170:6–12].

Mr. Henley's testimony also conflicted with his wife's testimony.  For example, Ms. Henley told the Trustee at the meeting of creditors held on May 20, 2011 that the Debtors had two bank accounts open on the Petition Date.  [June 15, 2012 Tr. 64:12–65:3].  Yet, on June 15, 2012, the following exchange occurred between Mr. Henley and counsel for the Carooms:

| | |
|---|---|
| JOHNSON: | Mr. Henley, when you filed bankruptcy, did you have any bank accounts open? |
| MR. HENLEY: | When I filed bankruptcy? |

JOHNSON:               Yes, on April 18, 2011.

MR. HENLEY:            *I did not.*

[June 15, 2012 Tr. 145:21–25] (emphasis added).[65]

In addition, Mr. Henley's testimony regarding the sale of a 2.75 carat wedding ring and 2007 Men's Rolex watch conflicted with the dates reported in the Debtors' amended SOFA filed on August 30, 2011. Originally, Mr. Henley swore under oath that the Debtors sold the both the Rolex and the wedding ring at a garage sale held in May 2010. Yet, in his testimony at trial he contradicted this date:

JOHNSON:               Okay. And when we look at the page that is being shown here, it talks about other transfers, and under those other transfers I want you to look on page 5 of Caroom/Trustee Exhibit, and on the same question and at the very bottom of this page it talks about - - it talks about in May of 2010 a 2.75 carat wedding right that was sold for $5200. Do you see that?

MR. HENLEY:            Yes, sir, I do.

JOHNSON:               And was that sold at that same [garage] sale that you just discussed in your testimony?

MR. HENLEY:            That's correct.

JOHNSON:               Okay. Now I want to move now to the next page on this same exhibit, and at the top of that it says a 2007 men's Rolex watch was sold for $3200 in **March of 2010**; is that the sale you just discussed in your testimony?

MR. HENLEY:            That is correct.

[June 15, 2012 Tr. 162:11–163:3] (emphasis added).

---

[65] This contradiction is particularly mystifying considering that the Debtors gave the Trustee copies of their bank statements for these accounts at the meeting of creditors. *See* [June 15, 2012 Tr. 146:12–147:4] (quoting Mr. Henley as he read the transcript from the meeting of creditors held on May, 20, 2011 where the Trustee asked the Debtors for their bank statements: "I am looking for the bank statement for April 18, and I see a February, but I don't see any . . . here is the March . . . I want the bank statement that covers for all the bank accounts. How many bank accounts do you have?").

Mr. Henley was also nonresponsive and evasive particularly when it came to the issue of owning the Anderson Property, as reflected by the following Q&A that he had with counsel for the Carooms:

| JOHNSON: | There you go.  Now take a look, if you would - - all right. You have Exhibit 24 [i.e., the loan application] in front of you? |
|----------|----------|
| MR. HENLEY: | Uh-huh. |
| JOHNSON: | All right.  Looking at the middle of that document, and it says - - it has an address on here, correct? |
| MR. HENLEY: | That is correct. |
| JOHNSON: | Okay.  And then it asks you - - it asks over here - - if I can read that, if I can read the writing here - - own or rent. And you're telling me that you think that does not apply to the home that you live in? |
| MR. HENLEY: | One, I did not fill this out.[66] |
| JOHNSON: | That's not the question. |
| MR. HENLEY: | Ask me again. |
| JOHNSON: | Is your testimony that that - - checking that box does not apply to the home you were living in? |
| MR. HENLEY: | No, we were applying for a loan on the land. |
| JOHNSON: | Did you own that land that you were applying for the loan on? |
| MR. HENLEY: | I did own that land. |
| JOHNSON: | So this - - but your testimony is that when you filled this out, or whoever filled it out before you signed it, when it says rent or own and you check own, that meant that that wasn't the place you were living, but it was some piece of property that you were borrowing money on? |

---

[66] It is instructive that in an effort to convince this Court that he is blameless, Mr. Henley responded by stating that he did not fill out the loan application.  He did, however, sign this loan application—a fact that he wants this Court to conveniently overlook.

MR. HENLEY:         You'll have to ask me that question again because that was a double - - in my opinion, I did not—

[June 15, 2012 Tr. 167:3–168:3].  In fact, Mr. Henley continued to evade Johnson's questions:

JOHNSON:           Mr. Henley, the Exhibit Number 7, Caroom/Trustee 7 that we're looking at on the screen, at the bottom of that first page it says, "Personal home, 3035 Marian [sic] Anderson, $975,000," and it follows up on the next page with a description of the property.  Do you see that?

MR. HENLEY:         Uh-huh.

JOHNSON:           Is it your testimony - -

THE COURT:         We need a yes or no.

MR. HENLEY:         Yes, sir.

THE COURT:         All right.

JOHNSON:           Is it your testimony that you were not telling the recipient of that Financial Statement that you owned that home?

MR. HENLEY:         This is not the same - - no.

JOHNSON:           That's not the question I asked.

MR. HENLEY:         I'm sorry.  Ask me the question again.

JOHNSON:           Are you telling the recipient of this Financial Statement in Trustee 07 that you owned this home?

MR. HENLEY:         I do not own this home.

JOHNSON:           That's not my question.   My question is, in this Financial Statement on the board in Exhibit Trustee 07, when you describe the Marian [sic] Anderson Road property on there as personal home, is it your testimony that you're not claiming that that's your personal home that you own?

MR. HENLEY:         I'm claiming it's not my home.

| | |
|---|---|
| JOHNSON: | That's what you're claiming in this Statement? |
| MR. HENLEY: | I was asked - - we went in to apply for a loan and this is not this.  This is for two parcels of land.  We applied for a loan on the house.  We went in and spoke to Sharon Delgado (i.e., the loan officer at Diamond Bank), and Sharon Delgado gave us a list of items that we must get done to be able to purchase the home.  One of them was to get a quitclaim deed from Jim Henley, a second one was that she was going to check our credit scores, and which you brought up earlier and it showed a bunch of tax liens on mine, and she said, "you must clear all that up."  And a third one was we needed to get our taxes pulled together. |
| JOHNSON | Objection, non-responsive - - |
| THE COURT: | I'll sustain.  I'll sustain. |

[June 15, 2012 Tr. 168:11–169:25].

When Mr. Henley recognized that he could no longer avoid providing evasive or non-responsive answers, he resorted to responding "I don't know:"

| | |
|---|---|
| JOHNSON: | Do you understand that when you tell creditors on a balance sheet about assets and liabilities, you're putting your assets and your liabilities on there? |
| MR. HENLEY: | I don't know. |
| JOHNSON: | I mean if you didn't own 3035 Marian [sic] Anderson [i.e., the Anderson Property], why would you put it on here as one of your assets in this balance sheet? |
| MR. HENLEY: | I don't know. |

[June 15, 2012 Tr. 170:13–20].

However, when Mr. Henley was asked a question, the answer to which he believed would benefit him, he responded directly, as evidenced by the following Q&A that he had with his own trial counsel:

| SIMON: | Were you - - when you placed this piece of property on this Financial Statement, were you acting under the advice of your banker? |
| MR. HENLEY: | Yes. |
| SIMON: | Okay. And did you believe that you were doing anything wrong or improper by listing this property on this balance sheet? |
| MR. HENLEY: | Absolutely not. She asked us to. |

[June 15, 2012 Tr. 171:1–8].

In sum, there are simply too many discrepancies, contradictions, misrepresentations, and self-serving statements that Mr. Henley has made under oath. The Court therefore finds that Mr. Henley is not credible, and gives very little weight to his testimony.

**B. Witnesses Who Testified During That Portion of the Trial Regarding the § 362(k) Action**

Twelve witnesses testified during the trial on the § 362(k) Action: (1) Belinda Henley, Debtor/Counter-plaintiff; (2) David Henley, Debtor/Counter-plaintiff; (3) Jerry Caroom, Creditor/Counter-defendant; (4) Mary Caroom, Creditor/Counter-defendant; (5) J. Sky Tapp, Arkansas counsel for the Carooms; (6) Keith Remels, Houston, Texas counsel for the Carooms in Harris County District Court; (7) David Gunter, Houston Police Department Officer; (8) Connie Spence, Assistant Harris County District Attorney; (9) Royce Henley, Mr. Henley's Sister-In-Law; (10) Jude Vigil, Houston Police Department Officer; (11) Q. Byrum Hurst, Arkansas counsel for the Henleys; and (12) The Honorable John H. Wright, the presiding Judge in the Lawsuit in Arkansas. Set forth below are the Court's findings concerning the credibility of these witnesses.[67]

---

[67] The Debtors also deposed (1) Sue Branstetter, Deputy with the Garland County Sheriff's Department; (2) Chauncey Taylor, a friend of Mr. Caroom and Ms. Henley's ex-husband; (3) Natasha Hicky, 911 Dispatcher for Garland County Sheriff's Department; (4) Linn Gleghorn, Ms. Henley's ex-husband; (5) and Melvin Holland,

**Belinda Henley (Debtor/Counter-plaintiff)**

As already set forth above, the Court finds Ms. Henley to lack credibility with respect to her testimony in the § 727 Action.  With respect to the § 362 Action, however, the Court finds Ms. Henley to be more credible.  Her testimony in the § 362 Action to a large extent concerned her recollection of the actions which the police officers took to arrest her husband and her, and the miserable hours they spent thereafter in jail.  *See* [Finding of Fact No. 68].  Considering the circumstances of her arrest, the Court finds that Ms. Henley was truthful in this respect.  The Court gives considerable weight to her testimony on these issues.

**David Henley (Debtor/Counter-Plaintiff)**

As already set forth above, the Court finds Mr. Henley to lack credibility with respect to his testimony in the § 727 Action.  With respect to the § 362 Action, however, the Court finds Mr. Henley to be more credible.  His testimony in the § 362 Action to some extent concerned his recollection of the actions which the police officers took to arrest his wife and him, and their resulting incarceration.  *See* [Finding of Fact No. 68].  Considering the circumstances of his arrest, the Court finds that Mr. Henley was truthful in this respect.  The Court gives considerable weight to his testimony on these issues.

**Jerry Caroom (Mr. Caroom/Creditor)**

Mr. Caroom is a very successful and sophisticated businessman.  He owns companies in Arkansas and Texas.  Because he is a well-educated person who is capable of understanding business concepts, it is logical to infer that he understands the difference between truths and lies.

---

Deputy with the Garland County Sheriff's Department.  The transcripts of these deposition were admitted into evidence.  The Court has reviewed these transcripts and finds that the testimony given by these individuals is, for the most part, credible—although the testimony of these individuals did little to assist this Court in making its rulings in the § 727  Action and the § 362 Action.

The deposition transcripts of Hurst and Judge Wright were also admitted into the record.  Additionally, video taped recordings of their deposition testimony were provided, and this Court did review these recordings.  Their testimony did definitely assist this Court in making its rulings in the § 362 Action.

See In re Graham, 199 B.R. at 159–60; see also In re W. World Funding, Inc., 52 B.R. at 753 (noting that the Court may determine whether a witness can discern the difference between truth and lies).

Mr. Caroom and his wife contracted with the Debtors to build the Caroom Home. [Finding of Fact No. 9]. Mr. Caroom and his wife subsequently filed the Lawsuit against the Debtors in an Arkansas Court. As a result of the Debtors' failure to comply with an order of the Arkansas Court, that Court issued the Body Attachment Order for contempt. [Finding of Fact Nos. 19 & 21]. The Debtors' counterclaim arises from Mr. Caroom's involvement in the Debtors' arrests after the Body Attachment Order was issued.

At trial, Mr. Caroom testified as an adverse witness during the Debtors' case-in-chief. During his testimony, he answered some questions evasively and ambiguously. For certain questions requiring only simple answers, Mr. Caroom's responses required that the Debtors' counsel, Simon, ask follow-up questions to determine Mr. Caroom's relationship with Officer Gunter and involvement in the Debtors' arrests, as well as Mr. Caroom's knowledge of the Debtors' bankruptcy.

For example, before trial, Mr. Caroom's counsel, Johnson, verified Officer Gunter's phone number on Mr. Caroom's phone records. [April 3, 2012 Tr. 7:23–8:14]. However, when asked at trial about telephone conversations between Mr. Caroom and Officer Gunter on April 18, 2011 at 10:52 a.m., Mr. Caroom responded that he was unsure that the phone number represented on the phone records was, in fact, Officer Gunter's number. [Id. at 6:7–8:14]. Thus, to confirm Officer Gunter's telephone number at trial, Simon had to request that Mr. Caroom take his cell phone out and read the numbers saved under Officer Gunter's name in on

the record.  [*Id.* at 8:17–10:15].  It was not until after this exercise that Mr. Caroom conceded

that a number listed on his phone record was, in fact, Officer Gunter's phone number.  [*Id.*].

      As another example of Mr. Caroom's less than stellar credibility is the Q&A he had with

counsel for the Debtors about the photographs that he received from Officer Gunter of the

Debtors sitting handcuffed in the squad car immediately after their arrest.  Mr. Caroom conceded

that he received these photographs from Officer Gunter, but then very slowly and cautiously

answered the following questions:

| | |
|---|---|
| SIMON: | Why did you send [the pictures received from Officer Gunter] to Chauncey Taylor? |
| MR. CAROOM: | . . .<br>[Twelve second pause] |
| | . . .<br>Uh, friends of the family knew, were asking, they were interested, they were interested in what we were doing. |
| SIMON: | That was a friend of Belinda Henley's ex-husband, correct? |
| MR. CAROOM: | I don't know. |

[Tape Recording, 4/03/2012 Hearing at 1:23:50–1:24:36 p.m.].

      It is noteworthy that Mr. Caroom did not directly respond to why he sent the photographs

to Chauncey Taylor.  Mr. Caroom tried to evade answering Simon's direct question by slowly

concocting the answer that "friends of the family . . . were interested in what we were doing,"

and then stating that he does not know that Chauncey Taylor is a friend of Ms. Henley's ex-

husband.  The Court does not believe one word of Mr. Caroom's testimony.  Rather, the Court

finds that Mr. Caroom knew exactly why he sent the pictures to Chauncey Taylor.  He knew that

Chauncey Taylor was a friend of Ms. Henley's ex-husband, Linn Gleghorn, and that Taylor

would forward those pictures to Gleghorn—and that is exactly what happened.  [Finding of Fact

No. 72]. And, that is exactly what Mr. Caroom wanted; namely, to create disharmony between Ms. Henley and her ex-husband.[68]

The above examples underscore that Mr. Caroom's credibility—at least on certain issues—is no better than the credibility of the Debtors during their testimony in the § 727 Action.

On the other hand, Mr. Caroom was credible on certain key points. For example, he testified that he first learned that the Debtors could have filed bankruptcy when he met Officer Gunter, Officer Vigil and another HPD officer at the Ferrari dealership on the afternoon of April 19, 2011 (shortly after the arrest of the Debtors).[69] He heard one of these individuals say that Ms. Henley, when being arrested, stated that they had filed for bankruptcy the previous day. Mr. Caroom continued by testifying that he did not trust the Henleys, and wanted to investigate to see if what Ms. Henley said was, in fact, true. [Tape Recording, 6/13/2012 Trial at 3:26:43–3:27:13 p.m.]. He then testified that he thereafter attempted to contact his counsel, and subsequently, definitively learned on April 20, 2011 that the Debtors had filed a bankruptcy petition on April 18, 2011.

In sum, given all of Mr. Caroom's testimony, the Court finds him to be credible on some issues and not credible on others; overall, the Court gives some weight to his testimony.

---

[68] Mr. Caroom knew that Ms. Henley and Gleghorn had two children during their marriage and that Ms. Henley had custody of these children. [Tape Recording, 6/13/12 Trial at 3:53:50–3:54:25 p.m.]. Mr. Caroom—and, it should be emphasized, Ms. Caroom—knew full well what potential trouble they were stirring up when Mr. Caroom sent those pictures to Taylor. In fact, at trial, Mr. Caroom testified that he called Gleghorn to inform him about his ex-wife's arrest, and Mr. Caroom stated that he initiated this call in order to be a "Good Samaritan." [*Id.*]. Stirring up disharmony among ex-spouses, particularly when there are children involved, hardly comes within the spirit of the "Good Samaritan" parable.

[69] Mr. Caroom was already in Houston on matters relating to his company, X-tra Light. Its principal offices are located in Houston. He testified that it is his custom to come to Houston on Tuesdays and to leave Houston for Arkansas on Thursdays. [Tape Recording, 6/13/12 Trial at 4:12:13–4:14:25 p.m.]. The Debtors' arrest occurred on a Tuesday, so it seems quite plausible that Mr. Caroom's presence in Houston on April 19, 2011 was not out of the ordinary. What does appear to be unusual is that Officer Gunter, plus two of his colleagues, while on duty as HPD officers, would meet with Mr. Caroom at a local Ferrari dealership. And, indeed, counsel for the Debtors pointed to this meeting to argue that Officer Gunter was an agent of the Carooms. Unusual though the meeting at the Ferrari dealership may be, for the reasons set forth in this Memorandum Opinion, the Court concludes that Officer Gunter was not an agent of the Carooms.

**Mary Caroom (Ms. Caroom/Creditor)**

Ms. Caroom is a licensed attorney in the State of Arkansas.  [Tape Recording, 6/13/2012 Trial at 5:20:19–5:20:21 p.m.].  In 2003, she clerked for a federal judge.  [*Id.* at 5:20:22–5:20:23 p.m.].  Although she is currently unemployed, Ms Caroom has previous experience working in a commercial law office.  [*Id.* at 5:20:34–5:20:38 p.m.].  There is no question that she understands the difference between truths and lies.

At trial, Ms. Caroom testified about her knowledge of the Debtors' bankruptcy filing and arrests, as well as her involvement in the Debtors' arrests.  The Court finds Ms. Caroom to be very credible on all issues about which she testified.  There are no examples of evasion or inconsistencies.  Accordingly, the Court gives substantial weight to her testimony.

**J. Sky Tapp (Arkansas Counsel for the Carooms)**

J. Sky Tapp (Tapp) is licensed to practice law in the State of Arkansas.  [Finding of Fact No. 37].  He represents the Carooms against the Debtors in the Lawsuit in Arkansas.  [*Id.*].  On June 12, 2012, Tapp testified in this Court primarily about his knowledge of the Lawsuit and his communications with Q. Byrum Hurst; the Debtors' counsel in Arkansas; the intent of the Debtors to file for bankruptcy; and about the actual filing of the Debtors' bankruptcy petition. [Finding of Fact Nos. 76, 77 & 81].  Tapp was consistently clear and credible.  He stated that he had conversations with Hurst prior to April 18, 2011, in which Hurst suggested the Debtors would be filing a bankruptcy petition.  [*Id.*].  However, in one instance, Tapp's testimony directly conflicted with Hurst.  Tapp stated that Hurst did <u>not</u> inform him of the Debtors' actual bankruptcy filing on April 19, 2011, whereas Hurst testified that he believed that he verbally informed Tapp of the filing on that date. [Finding of Fact No. 77].  The Court finds that Tapp is

more credible than Hurst on this point, and therefore finds that Hurst did <u>not</u> inform Tapp on April 19, 2011 that the Debtors had filed their Chapter 7 petition the previous afternoon.

The Court makes this finding for the following reasons.  First, Tapp was very convincing in the testimony he gave that he did not see or confer with Hurst on April 19, 2011 [Tape Recording, 6/12/2012 Trial at 3:34:54–3:37:20 p.m.]; whereas Hurst was somewhat equivocal in his testimony.  Second, the Debtors' contention that Judge Wright conferred with Tapp on the afternoon of April 19, 2011 about the Debtors' filing is mere speculation; the Debtors have not been able to prove this assertion to this Court's satisfaction.  According to phone records, on April 19, 2011 at 4:06 p.m., Judge Wright called Sky Tapp's office from his cell phone.  This call lasted approximately four minutes.  [Wright Dep. Ex. No. 6].  There is no evidence that this phone call related to the Debtors or the Carooms; rather, Judge Wright testified that he has known Tapp since the 7th grade, and that Tapp is one of the "most active attorneys in this community," with many cases in Wright's division.  [Wright Dep. 7:7–9, 11:22–23].  In fact, *no one* remembers the topic of the phone call, or even if Wright spoke to Tapp directly.  [*Id.* at 19:21–23:17].

Yet even assuming this phone call related directly to the Debtors and their bankruptcy petition, this phone call occurred an hour and half *after* the Debtors' arrests.  [Finding of Fact No. 68].  This communication does not demonstrate that Tapp had notice of the Debtors' bankruptcy petition *prior to* the Debtors' arrests.  The earliest evidence of Hurst giving notice to Tapp remains the April 19, 2011 4:52 p.m. fax from Hurst, which Tapp read the next morning. [Finding of Fact No. 80].

Finally, this Court wants to emphasize that it believes that Tapp is a very credible witness despite the incorrect testimony that he gave on one point when he testified on June 12, 2012.  On

that date, he testified that there was no way that Hurst could have verbally informed him on April 19, 2011 of the Debtors' bankruptcy filing. [Tape Recording, 6/12/2012 Trial at 3:34:54–3:37:20 p.m. & 3:58:39–3:59:39 p.m.]. He was very firm in testifying that such communication could not have occurred because he testified that on April 19, 2011, he was in a hearing at a courthouse in Malvern, Arkansas—which is approximately thirty miles from the Hot Springs courthouse where Judge Wright sits and where Hurst was trying a case in Judge Wright's court on that day. [Tape Recording, 6/12/2012 Trial at 3:35:05–3:36:00 p.m.]; [Hurst Dep. 20:21–22:18]. After Tapp gave this testimony, counsel for the Debtors—through a thorough investigation that he conducted—learned that Tapp was, in fact, not in Malvern, Arkansas on April 19, 2011, but rather at the Hot Springs courthouse. [Adv. Doc. No. 122]. Counsel for the Debtors thus filed a motion to show cause why Tapp should not be sanctioned and punished for committing perjury. [*Id*.].

On July 13, 2012, this Court held a hearing on this motion. Tapp was the only witness; and thirteen exhibits were introduced for demonstrative purposes only. The Court listened carefully to Tapp explain why the testimony he gave on June 12, 2012—i.e., that he was in Malvern, Arkansas on April 19, 2011—was incorrect. Tapp very credibly testified that in preparing for the testimony that he knew he would be giving on June 12, 2012, he relied too heavily upon the information that Karen Copelin, his secretary/paralegal, had provided to him. [Tape Recording, 7/13/2012 Trial at 11:34:01–11:34:54 a.m.]. She had, unfortunately, informed him that on April 19, 2011 he was in Malvern at a hearing when, in fact, this hearing took place on March 9, 2011. Tapp testified that she simply erred in giving him this information, and that he relied upon it in initially testifying before this Court that he was in Malvern on April 19, 2011 and that therefore Hurst could not possibly have spoken with him on that day. [*Id*. at 10:27:21–

10:30:50 a.m.].  Tapp acknowledged that he should have done a more thorough job himself to prepare for his initial testimony and that his failure to do so was the fundamental reason for the inaccurate testimony that he gave about being in Malvern, Arkansas on April 19, 2011.

As set forth in this Court's order of July 20, 2012 denying the Debtors' motion to sanction and punish Tapp, the Court found that Tapp's testimony was very credible and gave substantial weight to it.  [Adv. Doc. No. 146].  Tapp's sloppiness on this one point by no means equates to any intent to mislead this Court; nor does it undermine his testimony on other issues about which he testified.  Indeed, at the July 13 hearing, Tapp strongly reiterated that aside from this one mistake, he stood by all of his other testimony that he gave on June 12, 2012—including his testimony that Hurst never verbally informed him at the Hot Springs courthouse on April 19, 2011 that the Debtors had filed their bankruptcy petition the previous afternoon.  [Tape Recording, 7/13/2012 Trial at 10:45:57–10:49:41 a.m.].  The Court finds that Tapp was forthright in his testimony and gives it substantial weight.

**Keith Remels (Houston Counsel for the Carooms and Mr. Caroom's company, X-tra Light)**

Keith Remels (Remels) is licensed to practice law in the State of Texas.  While he has primarily represented X-tra Light, he has been representing the Carooms in the lawsuit that they filed in Houston, Harris County, Texas to domesticate the Judgment issued by Judge Wright in Arkansas.  [Finding of Fact No. 62 n.30].  His testimony was fairly brief and primarily concerned his pre-petition attempts to serve process on the Debtors regarding the Harris County suit.  He testified that the Debtors were evading service of process.  [Tape Recording, 6/13/2012 Trial at 10:48:44–10:50:15 a.m.]. Remels also gave testimony to the effect that on April 19, 2011, sometime after 5:00 p.m., he received Damani's telefax informing him that the Debtors had filed a bankruptcy petition on April 18, 2011.  [Tape Recording, 6/13/2012 Trial at 10:48:44–10:50:15

a.m.].  The Court finds that Remels is a credible witness and gives substantial weight to his testimony.

**David Gunter (Houston Police Department Officer)**

David Gunter (Officer Gunter) is a seasoned Houston Police Department (HPD) officer presently assigned to the homicide division.  [Finding of Fact No. 25].  Officer Gunter is college educated and has a Bachelors of Science in criminal justice.  [Tape Recording, 6/12/2012 Trial at 1:21:22–1:21:54 p.m.].  He has worked within HPD's homicide division for approximately two years.  [Finding of Fact No. 25].  Throughout Officer Gunter's employment with the HPD, the Internal Affairs Division has investigated him approximately seven times.  [Finding of Fact No. 27].  Officer Gunter is currently relieved of active duty.  [*Id.*].  HPD is also currently investigating bigamy allegations against him.  [*Id.*].

The Court finds that some of the testimony that Officer Gunter gave is credible.  For example, the Court has no doubt that Officer Gunter's description of the steps he took to facilitate the issuance of the arrest warrant is accurate.  *See* [Finding of Fact Nos. 57, 58 & 59]. The Court also has no doubt that Officer Gunter's description of how the Debtors were arrested is accurate.  [Finding of Fact No. 68].

Nevertheless, the Court does not find Officer Gunter to be a totally credible witness.  For example, when asked why he took photographs of the Debtors being arrested and placed into the squad car, Officer Gunter stated that his boss at HPD wanted proof of the arrest.  *See* [Tape Recording, 6/12/2012 Trial at 2:27:30–2:28:35 p.m.].  The Court has some doubts about this testimony; a mere phone call from Officer Gunter to his superior ought to have sufficed.  But even more questionable is Officer Gunter's response to the question of why he sent the photographs to Mr. Caroom instead of his superior.  His response was that he made a mistake

75

and that he meant to send these photographs to his boss. [*Id.*]. The Court simply does not believe Officer Gunter on this point. HPD officers are not so sloppy that they send photographs of persons being arrested to private citizens unaffiliated with HPD. Moreover, Officer Gunter had received gifts from Mr. Caroom in the past and referred to Mr. Caroom as "his uncle." [Tape Recording, 6/12/2012 Trial at 1:26:08–1:26:58 p.m.]. Indeed, Mr. Caroom had promised Officer Gunter that he would help him pay for his future education. [*Id.*]. And, perhaps most telling, just a few minutes after the Debtors were arrested, Officer Gunter met with Mr. Caroom at a Ferrari dealership in Houston; and a few hours later, Officer Gunter had dinner with Mr. Caroom in Galveston. [June 15, 2012 Tr. 113:1–22]; [Tape Recording, 6/12/2012 Trial at 2:33:00–2:35:00 p.m.]. All of these facts underscore the close friendship that Officer Gunter has with Mr. Caroom—which in turn reflects a desire on Officer Gunter's part to assist Mr. Caroom in meeting the Carooms' objectives of having the Debtors arrested. Thus, the Court finds that Officer Gunter deliberately sent the photographs to Mr. Caroom and that, therefore, Officer Gunter did not tell the truth when he testified that he sent the photographs to Mr. Caroom by mistake.

All in all, the Court finds that Officer Gunter's testimony is accurate on some points, and inaccurate on others. Overall, the Court gives some weight to his testimony.

**Connie Spence (Harris County Assistant District Attorney)**

Connie Spence is an Assistant District Attorney (ADA) for Harris County, Texas in the Criminal Division. [Finding of Fact No. 30]. She has been an ADA in the criminal division for twenty-three years. [*Id.*]. Spence worked on cases with Officer Gunter prior to the Debtors' arrest while has was an HPD officer in the homicide division. [*Id.*]. At trial, Spence testified to her indirect involvement in the Debtors' arrests, and that she relied on information provided by

Officer Gunter to draft the necessary affidavits.  [Finding of Fact No. 57].  She also testified that:
(1) Officer Gunter is presently suspended due to allegations that he has committed bigamy; and
(2) Officer Gunter had told her in the past that he had an uncle (i.e., Mr. Caroom) who had told
him that he would pay for Officer Gunter's law school education.  [Finding of Fact No. 29].

Additionally, with respect to the arrest warrant, Spence testified that on the morning of
April 19, 2011, Officer Gunter came into her office and told her that his uncle had a lawsuit
against the Debtors in Arkansas based on fraud; that the court in Arkansas had held the Debtors
in contempt; and that this suit had become a criminal matter due to the Debtors' failure to abide
by the Arkansas Court's order to turn over financial information.  [Tape Recording, 6/12/2012
Trial at 11:41:50–11:43:15 a.m.].  Spence also testified that after listening to Officer Gunter, she
concluded that the Lawsuit was in a civil court, and that it was unusual for a warrant to be issued
under these circumstances.  [*Id.* at 11:45:00–11:47:15 a.m.]. Nevertheless, she testified that she
proceeded to prepare the appropriate documentation to facilitate the issuance of arrest warrants.
[*Id.* at 11:36:39–11:40:50 a.m.].

This Court finds Spence to be credible on all issues about which she testified.  The Court,
therefore, gives substantial weight to her testimony.

**Royce Ann Henley (Mr. Henley's Sister-In-Law)**

Royce Ann Henley is Mr. Henley's sister-in-law.  She is married to Mr. Henley's brother,
John Henley.  Her testimony was brief.  It primarily concerned her knowledge of the events
leading to the Debtors' arrest.  The Court finds Royce Ann Henley to be a credible witness on
these particular issues.  Accordingly, the Court gives substantial weight to her testimony.

**Jude Vigil (Houston Police Department Officer)**

Jude Vigil (Vigil) is a veteran HPD officer having served for approximately nineteen

years.   Currently he works with HPD's Criminal Intelligence Unit (CIU) of the Criminal Intelligence Division.  [Finding of Fact No. 31].  Vigil's involvement in the Debtors' arrest was in his official capacity as an HPD officer.  [Finding of Fact Nos. 55–57 & 73–74].  The Court finds that Vigil was a credible witness on all issues about which he testified.  Accordingly, the Court gives substantial weight to his testimony.

**Q. Byrum Hurst (Arkansas Counsel for the Henleys)**

Q. Byrum Hurst (Hurst) is a licensed attorney in the State of Arkansas.  [Finding of Fact No. 17].  Hurst represented the Debtors in the Lawsuit in Arkansas against the Carooms.  [*Id.*].  Hurst's testimony regarding his communication with Tapp is key to the Debtors' counterclaim that the Carooms violated the automatic stay.  The Court has both read the transcript of Hurst's deposition as well as seen and listened to the video tape of this deposition.  While the Court believes that Hurst is an honest individual, the Court also believes that his recollection of his communications with Tapp is off the mark.  Indeed, Hurst's answer to the question posed to him by the Carooms' attorney convinces this Court that his ability to recall is simply not as good as Tapp's recollection.  When asked as to whether Tapp was present at a conversation that Hurst believes occurred on April 19, 2011, during which Hurst thinks he disclosed the Debtors' filing of their bankruptcy petition, Hurst responded as follows:

> You know the time periods are somewhat vague.  I remember that I had a conversation with Judge Wright.  I can recall Judge Wright—we talked about the bankruptcy.  I think I told him that I had a bankruptcy number, but I didn't have a Stay Order, and I know at one point in time he called Sky (i.e., Tapp) is my recollection, with me standing there.  And then I don't remember if Sky came over to the courthouse or not.  It seems like we were in the office sometime, but I you know.

[Hurst Dep. 29:16–24].  Thus, on the issue as to whether Hurst verbally informed Tapp at the Hot Springs courthouse on April 19, 2011 that the Debtors had filed a bankruptcy petition the

previous day, the Court finds that Hurst's testimony is not very credible and gives significantly less weight to this testimony than to Tapp's testimony.  On this issue, the Court finds that the testimony of Tapp on April 19, 2011 is very credible, and therefore the Court gives substantial weight to his testimony.

Overall, based on the tentativeness of Hurst's testimony, this Court finds him a credible witness only on some issues about which he testified.  Accordingly, the Court gives only some weight to his testimony.

**The Honorable John H. Wright (Arkansas Judge in the Lawsuit)**

The Honorable John H. Wright (Judge Wright) is a Circuit Judge in Garland County, Arkansas.  Judge Wright presided over the Lawsuit between the Carooms and the Debtors. [Wright Dep. 5:5–10].  In his deposition testimony,[70] Judge Wright stated that he does not specifically recollect speaking to either Hurst or Tapp on April 19, 2011 about the Debtors' bankruptcy.  [Wright Dep. 8:4–19 & 12:1–21].  What he does remember is that on April 19, 2011, he conducted a DUI trial in which Hurst represented the defendant; that the trial was completed at approximately 3:30 p.m.; and that Judge Wright soon thereafter departed the courthouse for home.  [Wright Dep. 16:6–11 & 17:24–18:14].  He also testified that he became aware of the Debtors' bankruptcy filing when he arrived at his chambers on the morning of April 20, 2012; and that he must have learned about the filing by reading the Suggestion of Bankruptcy that Hurst had filed at 4:36 p.m. on April 19, 2011 (i.e., this Suggestion of Bankruptcy was filed by Hurst, or someone in his office, the previous afternoon approximately one hour after the DUI trial over which Judge Wright had presided and in which Hurst had appeared).  Further, Judge

---

[70] The attorneys for the Debtors and the Carooms deposed Judge Wright on August 14, 2012.  Counsel for the Carooms filed a copy of the deposition transcript on August 21, 2012, and this transcript is Adv. Doc. No. 154. Judge Wright's testimony is part of the record pursuant to this Court's order of July 18, 2012 [Adv. Doc. No. 144] and order of July 25, 2012 [Adv. Doc. No. 152].

Wright testified that upon learning of the Debtors' bankruptcy, he sent a fax letter to Tapp and Hurst in which he stated, "I have received a suggestion of bankruptcy which was filed yesterday. I am attaching a copy for Mr. Tapp.  Mr. Hurst should prepare an Order staying further proceedings and lifting enforcement of the contempt order pending further action by the bankruptcy court."  [Wright Dep. 9:11–10:4].  Further, Judge Wright testified that Hurst quickly presented such an order, which Judge Wright signed and which was entered on the docket in the Lawsuit at 8:30 a.m. on April 20, 2011.  [Wright Dep. 11:1–15].

The Court finds Judge Wright's testimony to be very credible and gives substantial weight to his testimony.

## IV.  CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  The particular disputes in this adversary proceeding are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (C), (I), and (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409(a).

### B.  Constitutional Authority to Sign a Final Order

Having concluded that this Court has jurisdiction over this adversary proceeding, this Court nevertheless notes that *Stern v. Marshall* sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders. 131 S. Ct. 2594 (2011). Therefore, this Court has a duty to inquire constantly into its constitutional authority to enter a final order for any matter brought before this Court.

The Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that therefore this Court has the authority to enter a final judgment. In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant. 131 S. Ct. 2594. Here, Rodney Tow, the Chapter 7 Trustee, (the Trustee) and two of the Debtors' creditors (the Carooms) filed a complaint under § 727, a cause of action unique to the Code. They request that this Court issue a judgment denying the Debtors' discharge. The Debtors, in their counterclaim, also filed a complaint under an explicit bankruptcy statute—§ 362(k)—asking that this Court find that the Carooms violated the automatic stay. This suit and countersuit are, therefore, based solely on express provisions of the Code. More importantly, the requested relief—that the Debtors be barred from receiving a discharge, and that the Carooms be found in violation of the automatic stay—is unique to the Code. Such relief is not possible to obtain under state law. As a result, this Court concludes that *Stern* is inapposite, and this Court is constitutionally authorized to enter a final judgment regarding the disputes at bar.

## C. The Plaintiffs[71] Have Demonstrated by a Preponderance of the Evidence that the Debtors are not Entitled to a Discharge.

Discharge is a privilege conditioned on the debtor's truthfulness; it is permitted when a debtor complies with the Bankruptcy Code by presenting himself honestly and fully to the

---

[71] In this Section, the Trustee and the Carooms, when appropriate, will be collectively referred to as the Plaintiffs.

Trustee and this Court. *In re Gartner*, 326 B.R. 357, 377 (Bankr. S.D. Tex. 2005) (citing *In re Juzwaiak*, 89 F.3d 424, 427 (7th Cir. 1996)). The Debtors here have consistently refused to be completely truthful. Instead, their deception extends well beyond the reasonable possibility of honest oversight. The Debtors' omissions and misrepresentations are simply too great to justify discharge.

A bankruptcy court may deny a debtor's discharge only if the plaintiff can show a violation of § 727(a) by a preponderance of the evidence. *See In re Womble*, 289 B.R. 836, 844 (Bankr. N.D. Tex. 2003) (reaffirming use of a preponderance of evidence standard to prove each of the elements within § 727). Establishing the elements of just one sub-section of § 727(a) is sufficient to deny the Debtors' discharge. *In re Moseman*, 436 B.R. 398, 405 (Bankr. E.D. Tex. 2010). Indeed, a finding of only a *single* debtor omission or misrepresentation is necessary. *Id.* ("[T]he Court must grant a discharge to a Chapter 7 debtor unless one or more of the specific grounds for denial of a discharge listed in paragraphs (1) through (12) of § 727(a) is proven to exist."). Here, as discussed below, there is ample evidence to support denial of the Debtors' discharge under any one of the following subsections:   § 727(a)(4)(A);  § 727(a)(4)(D); § 727(a)(3); § 727(a)(5); and § 727(a)(2)(A). The Plaintiffs' Objection to Discharge of the Debtors is, therefore, sustained.

1.   The Debtors' Discharge is Barred by § 727(a)(4)(A) for Knowingly and Fraudulently Making A False Oath

Debtors filing a Chapter 7 bankruptcy petition are continually and affirmatively required to disclose all of the following:  (a) a list of creditors; (b) a schedule of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs. *In re Gartner*, 326 B.R. at 367 (citing *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999)). These records must be complete and reliable. *Id.* at 367. A false statement or omission on the Schedules or

SOFA, or a false statement made by the debtor during the course of the bankruptcy proceedings may, then, constitute a false oath and bar the debtor's discharge under § 727(a)(4)(A).  Under this section, discharge is denied when, "the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A).  The burden is on the plaintiff to prove the debtor's sworn deception, and a successful objection requires proof that (1) the statement was made under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the statement was made with fraudulent intent to deceive; and (5) the statement materially related to the bankruptcy case.  *In re Gartner*, 326 B.R. at 367 (citing *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992)).

When the Debtors filed their bankruptcy petition, they were not only required to bare themselves and their finances to this Court, the Trustee, and their creditors, but they were also required to swear to the accuracy of their representations.  Indeed, the Debtors swore to their accuracy of their disclosures on multiple occasions.  First, the Debtors were required to read and review the Schedules and SOFA before filing these documents.  In both their original and amended SOFA and Schedules the Debtors swore, under penalty of perjury, to the accuracy of the information contained therein.[72]  The Debtors also swore to the truth of their representations at their meeting of creditors.  There, the Debtors completed the § 341(a) questionnaire,[73] a document used during this meeting.  Next to item 7, which reads, "I read, signed and understand the questions and information contained in my Schedules, Statement of Financial Affairs and this written Sworn Testimony," the Debtors checked the space marked "YES."  [Finding of Fact No.

---

[72] *See* OFFICIAL BANKRUPTCY FORM 6—Declaration Concerning Debtor's Schedules ("I declare under penalty of perjury that I have read the foregoing summary and schedules . . . and that they are true and correct to the best of my knowledge, information, and belief.").

[73] The questionnaire is a document that all of the Chapter 7 trustees in the Southern District of Texas collectively drafted several years ago and use at meetings of creditors to reduce the time expended asking debtors fundamental questions about the accuracy of the documents that they have filed.

97].  Second, on the same page of the questionnaire and next to item 8, which reads, "I personally signed my Bankruptcy Petition, Bankruptcy Schedules and Statement of Affairs, and Means Test Analysis prior to my attorney filing them with the Bankruptcy Court," the Debtors again swore:  "YES."  [*Id.*].  Third, on the last page of the Debtors' questionnaire, both Debtors signed their names below the following language:

> I have read the foregoing and understand the questions.  If represented by an attorney, I have reviewed the foregoing with assistance of counsel.  The answers to the questions are mine.  The answers are based on my personal knowledge and are true and correct.

[*Id.*].

Finally, the Debtors swore orally.  During the meeting of creditors, the Trustee confirmed with the Debtors that no additional changes needed to be made to their SOFA or Schedules.  [Finding of Fact No. 88].  Then during trial, the Debtors' counsel expressly admitted that the Debtors do not disavow their original Schedules and SOFA.  [Tape Recording, 6/27/2012 Trial at 4:40:10–4:40:51 p.m.].  Thus, at a minimum, each of the four representations and omissions discussed in separate subsections below satisfies the first *Beaubouef* element:  all were made by the Debtors *under oath*.  The Court now turns to the remaining elements required by *Beauboeuf*.[74]

i.  *The Debtors Omitted Transfers of Several Assets in Their Statement of Financial Affairs, Thereby Violating § 727(a)(4)(A)*

### a.  The Debtors Knowingly Omitted Material Assets

Any debtor who files a bankruptcy petition must disclose his assets and any transfers thereof.  This information, detailed in the SOFA, is vital to the administration of the Debtors' bankruptcy estate.  Item 10 of the SOFA requires the Debtors to "list all other property, other

---

[74] *Beaubouef* applies to causes of action brought under § 727(a)(4)(A), but not § 727(a)(4)(D), § 727(a)(3), § 727(a)(5) and § 727(a)(2)(A).  Accordingly, when this Court analyzes the causes of action brought by the Plaintiffs under § 727(a)(4)(D), § 727(a)(3), § 727(a)(5) and § 727(a)(2)(A), it will look to opinions other than *Beaubouef*.

than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." [Caroom/Trustee Ex. No. 1, at 33]. In addition to spending at least five hours with her counsel, [Finding of Fact Nos. 23, 41 & 60], Ms. Henley also testified that she underlined this language when discussing the document with Damani, underscoring her appreciation of both the question and the materiality of the request. [Finding of Fact No. 41]. Nevertheless, in the Debtors' original SOFA, the Debtors disclosed only four[75] transfers—with Jim Henley (i.e., Mr. Henley's brother) acting as transferee in each instance. [Finding of Fact No. 48]. Only *after* (1) the Carooms provided the Trustee with the Financial Statement; (2) the Trustee's counsel sent a letter and the Financial Statement to Damani asking for an explanation as to why the Debtors failed to disclose the assets on the Financial Statement; and (3) Damani himself confronted the Debtors with the Financial Statement did the Debtors write an explanation of the disposition of the following undisclosed assets:

- 2003 Dodge Ram Truck—Sold for $2,400.00
- 1994 Toyota Runner Truck—Sold for $2,500.00
- 1978 Jeep CJ7—Sold for $2,000.00
- 1979 Jeep Indian Cherokee—Sold for $3,500.00
- 1984 Porsche—Sold for $5,500–$6,500.00
- 1952 Ford Truck—Sold for $7,500.00
- 2001 Harley Davidson—Sold for $10,915.00
- 2001 Polaris 500—Sold for approximately $2,300.00
- 2005 Honda 4-Wheeler—Sold for $2,200.00
- 2003 Yamaha 500 4-Wheeler—Sold for $2,300.00
- Can Am 4-Wheeler—Sold for $6,500.00
- Craftsman Tractor—Sold for $900.00
- Chris Craft Cabin Cruiser—Sold for $8,000.00
- 1995 VIP 20-foot Ski Boat—Sold for $8,500.00[76]

---

[75] If the transfer of the two trailers is counted as a single transfer, then only four transfers were disclosed in the original SOFA. If the transfer of the two trailers is counted as two separate transfers then the Debtors listed five transfers. [Finding of Fact No. 48]. Testimony varied, with some witnesses counting this as a single transfer and others counting this as two transfers.

[76] This asset is *not* the same as the jet skis discussed in Finding of Fact Nos. 91 and 92.

- Silk Rug—Sold for $1,500.00
- Silk Rug—Sold for $1,600.00
- Silk Rug—Sold for $1,200.00
- 2.75 carat wedding ring—Sold for $5,200.00
- 2007 Men's Rolex Watch—Sold for $3,200.00
- Various Furnishings—Sold for $10.00–$250.00

[Finding of Fact Nos. 105 & 109]. It was then that the Debtors finally authorized Damani to file an amended SOFA. [Finding of Fact Nos. 105, 108, & 117]. It strains credulity that the Debtors would fail to appreciate the significance of over $78,000 worth of asset sales, particularly after spending such a lengthy amount of time with their counsel. [Finding of Fact Nos. 23, 41 & 60]. Rather, this Court finds that the Debtors falsely failed to disclose assets material to their bankruptcy case, thereby satisfying the second and fifth *Beauboeuf* elements. *In re Beauboeuf*, 966 F.2d at 178.

### b. The Debtors' Omission of these Assets was Intentionally Fraudulent

The Debtors claim that they did not disclose these asset sales in response to item 10 because these assets were sold in the ordinary course of HDC, Inc.'s business, and therefore their non-disclosure was not an intentional omission. The Court rejects both contentions: that the omission was unintentional, and that the assets were sold in the ordinary course of HDC, Inc.'s business. Indeed, the evidence suggests that the Debtors conjured up this explanation as a trial strategy. For example, in response to item 18, "Nature, location and name of business," on the Debtors' original and amended SOFAs, the Debtors disclosed both HDC, Inc. and Aqua-Lock. [Finding of Fact No. 52]. However, underneath the section entitled "NATURE OF BUSINESS," the Debtors described HDC, Inc. as a "General contractor" and Aqua-Lock as a "waterproofer." [*Id.*]. Neither of these descriptions encompasses selling jewelry, cars, trucks, motorcycles, or silk rugs. In fact, the Debtors never even mentioned jewelry, cars, trucks, motorcycles, or silk

rugs anywhere in the "NATURE OF BUSINESS" section of the SOFA.  [*Id.*].  Nor is the interior

design business, which Ms. Henley claimed was *yet another* business she operated, disclosed in

the SOFA.  [Tape Recording, 6/27/2012 Trial at 6:23:00–6:23:13 p.m.].  The Debtors only

disclosed their jewelry, car-flipping and interior design businesses at trial in an effort to convince

this Court that:  (1) they sold the jewelry, cars, trucks, motorcycles, and silk rugs in the ordinary

course of business; and (2) therefore, they did not need to disclose the disposition of these assets.

*See* [Tape Recording, 6/27/12 Trial at 6:22:50–6:23:35 p.m.].  This tactic will not work.  The

Debtors' failure to disclose these businesses was not unintentional; rather, it was deliberate.

They did not want the Carooms—who, it must be remembered, are creditors—or any one else for

that matter to know that they had sold all of these assets; and they assuredly did not want the

Carooms to know that they had spent the sale proceeds without paying a dime to the Carooms.

Thus, their statements at trial were nothing more than an ad hoc explanation for their failure to

disclose sales of assets that generated tens of thousands of dollars.

Additionally, the Debtors claim that HDC, Inc. owned and sold the missing personal

assets in the ordinary course of its business.[77]  [Finding of Fact Nos. 109 n.51 & 110 n.53].  To

determine if a transaction is within the ordinary course of business, bankruptcy courts in the Fifth

Circuit have considered objective industry standards as well as the prior course of dealings

undertaken by the parties.  *See Mossay v. Hallwood Petroleum, Inc.*, No. 3:96–CV–2898–P, 1997

---

[77] Ms. Henley testified that in June of 2010, HDC, Inc. was defunct, but in that same month owned and sold the
undisclosed assets in a series of garage sales.  *See* [Finding of Fact No. 14] (noting that the Debtors relocated from
Hot Springs, Arkansas to Houston, Texas because their business failed).  Ms. Henley also testified that HDC, Inc.
owned the assets included in the Financial Statement while the Debtors included their stock interest in HDC, Inc.
itself as an asset in the same document.  [Caroom/Trustee Ex. No. 7]; [Finding of Fact No. 8].  If *HDC, Inc.* owned
these assets (i.e., the jewelry, cars, trucks, motorcycles and silk rugs), then the *Debtors* could not have owned these
assets and these assets should not have individually been listed on the Financial Statement.  But, if the Debtors really
owned these assets, as they represented on the Financial Statement, then HDC, Inc. could not possibly have sold
these assets in the ordinary course of its business because HDC, Inc. did not itself own these assets.  The Debtors
simply cannot have it both ways.  By concocting the "HDC, Inc. owned these assets and sold them in the ordinary
course of business" argument in the heat of trial, the Debtors have been hoist by their own petard.

U.S. Dist. LEXIS 16553, at *15–16 (N.D. Tex. Apr. 28, 1997); *Estate of SPW Corp. v. A.P.V. Equipment, Inc. (In re SPW Corp.)*, 96 B.R. 683, 686 (Bankr. N.D. Tex. 1989). The subjective factors taken into account when determining which transfers are "ordinary" include the timing of the transactions, the circumstances under which the transfer was made, the amount that was paid in the transaction, and the manner of payment. *In re SPW Corp.*, 96 B.R. at 687.

Applying these factors, there are several reasons to question the Debtors' "ordinary course of business" assertion in this case. First, the undisclosed sales of the assets occurred directly out of the Debtors' home garage just before they relocated to Houston. [Finding of Fact No. 111]. Second, at trial, Ms. Henley testified that HDC, Inc. owned all of the assets sold at these various sales. [Tape Recording, 6/27/12 Trial at 6:22:50–6:23:35 p.m.]. Yet, HDC, Inc. was in the general contracting business, and these assets were entirely unrelated to general contracting. [Finding of Fact No. 109]; [Debtors' Ex. No. 62]. There is no evidence that HDC, Inc. dealt in silk rugs, for instance.

The Debtors would have this Court believe that Ms. Henley was in the jewelry business and that Mr. Henley was in the car/truck/motorcycle flipping business—and that these businesses were in effect divisions of HDC, Inc. [Tape Recording, 6/27/12 Trial at 6:22:50–6:23:35 p.m.]. This explanation is yet another disingenuous story invented to justify the Debtors' failure to disclose the numerous sales of the jewelry, cars, trucks, and motorcycles. It will not work.

Ms. Henley has never been a jewelry designer or owner of a jewelry sales business. *See Schmidt v. Cantu (In re Cantu)*, No. 08-70260, 2011 WL 672336, at *8–9 (Bankr. S.D. Tex. 2011) (finding that the debtors were not jewelry dealers despite the size (i.e., $134,575.00 in jewelry sales) and frequency of their jewelry sales two years before their bankruptcy filing). In fact, Ms. Henley only claims to have ever sold two jewelry items: the 2.75 carat wedding ring

and the Men's Rolex watch.  [June 15, 2012 Tr. 72:18–23]; [Tape Recording, 6/27/12 Trial, at 6:30:59-6:31:26 p.m.].  Additionally, both of these sales were "private," rather than through established "channels of distribution."  *See* [Tape Recording, 6/27/12 Trial, at 6:30:59-6:31:26 p.m.]; *In re G.S. Distrib.*, 331 B.R. 552, 559 (Bankr. S.D.N.Y. 2005) (holding that private sales of over $5 million in jewelry did not meet the ordinary course of business test as the Debtor had limited jewelry industry experience, no other experience in private sales, and no business plan for this "private sales program").  As such, the Court does not find that the sale of the 2.75 carat wedding ring and Rolex watch were within the ordinary course of her business.

Furthermore, Mr. Henley never testified that he was a car salesman.  In fact, the testimony concerning Mr. Henley's business—which came solely from *Ms.* Henley [Tape Recording, 6/27/12 Trial at 6:44:56–6:49:34 p.m.]—suggests that Mr. Henley flipped cars (and perhaps trucks and motorcycles) as a hobby.  [June 14, 2012 Tr. 181:24–182:7].  Moreover, even assuming the truth of Ms. Henley's story, Mr. Henley's vehicle-flipping income should have been reported in response to item 2, "Income other than from employment or operation of business." [Caroom/Trustee Ex. No. 2, at 2].  It was not.  [Finding of Fact No. 46].  Instead, the Debtors disclosed only the income received from Jim Henley in the amount of $21,000.00 ($3,500.00 monthly) and the child support received from Ms. Henley's ex-husband in the amount of $15,360.00 ($640.00 monthly).  [*Id.*].

Additionally, all of these assets were sold within a three month span, with the Debtors admitting that they conducted these sales prior to their move from Hot Springs, Arkansas to Houston, Texas.  In fact, one of the Debtors' advertisements promoted a "moving sale."  [Finding of Fact No. 111].  A moving sale is not within the ordinary course of business, and "going out of business" seems, by any "industry standards" definition, outside the everyday course.  *See*

*Mossay v. Hallwood Petroleum, Inc.*, 1997 U.S. Dist. LEXIS 16553, at *15–16; *In re Berman*, 100 B.R. 640, 648 (Bankr. E.D.N.Y. 1989) (concluding that the debtor's "Clearance Sale," advertisements, as well as his store's subsequent closure, indicated that the debtor's sales were outside the ordinary course of business).  Even accepting the Debtors' "ordinary course of business" explanation for the non-disclosure, any of the income generated from the sales of these assets sold should have been disclosed in response to item 1, "Income from employment or operation of business . . . received during the two years immediately preceding [the] calendar year [in which the Debtors filed bankruptcy]."  [Finding of Fact No. 45].  Instead, the Debtors reported their income as $0.00 for the years of 2009 and 2010.  [Caroom/Trustee Ex. No 1, at 30].

Finally, at trial, Ms. Henley claimed that HDC, Inc. not only owned the twenty omitted assets, but also the two trailers disclosed in the original SOFA.  [Finding of Fact Nos. 48 & 109].  It strains credulity that in their original SOFA, the Debtors would choose to include some, but not all, of the assets belonging to HDC, Inc.  The Court, therefore, finds that the Debtors did not sell these items in the ordinary course of business, and their failure to disclose the sales of the assets in response to item 10 in the original SOFA constitutes a knowing and intentional false oath, satisfying the third and fourth elements under *Beauboeuf*.  Thus, as all of the elements of *Beauboeuf* are met, this omission violated § 727(a)(4)(A).

### c. The Debtors' Defenses to § 727(a)(4)(A) Fail

During closing arguments, counsel for the Debtors argued that they received insufficient notice of the § 727(a) claims before trial.  This Court does not agree.  There has been no surprise or insufficient pleading that would warrant dismissal of these claims.  *See In re Cooper*, 399 B.R.

90

637, 645 (Bankr. E.D. Ark. 2009) (citing FED. R. BANKR. P. 7009(b)).[78]   In the Complaint, the

Plaintiffs plead a § 727 violation, claiming that, "[t]he original response to question #10 in the

Statement of Financial Affairs filed by the Debtors . . . once more conspicuously [failed] to list . .

. assets Debtors, by their own admission in unfiled documents, owned within the two years prior

to filing of the case."  [Adv. Doc. No. 1, at 4]; [Finding of Fact No. 127].   Attached to the

Complaint, the Plaintiffs also included a list of assets prepared by the Debtors, the sales of which

were not disclosed in the original SOFA.  [Adv. Doc. No. 1, Ex. B, at 29–30].

    The Debtors themselves responded to this allegation in the Response that they filed to the

Plaintiffs' Amended Joint Motion for Summary Judgment.  [Adv. Doc. No. 82]; *see* [Finding of

Fact No. 130].   There, in a section entitled "Section 727(a)(4)," the Debtors categorically

admitted the first two *Beaubeouf* elements:  that their statements and omissions were made under

oath, and that they materially related to the bankruptcy case.  [*Id.* at 5].   While the Debtors

contested the other *Beauboeuf* factors, none of the Debtors' arguments related to the

insufficiency of the pleadings.  [*Id.* at 5–9].   Indeed, in the Answer, the Debtors admitted "that

their original response to Question No. 10 on the Statement of Financial Affairs did not list their

former residence located at 3035 Marion Anderson Road and <u>that it did not disclose the transfer

of certain other items of personal property</u>."   [Adv. Doc. No. 10, at 3] (emphasis added).   The

emphasized language shows that the Debtors knew very well that the Plaintiffs had raised the

issue about their failure to disclose the sales of the various personal property assets described in

the Financial Statement.

---

[78] As a claim alleging fraud, § 727(a)(2)(A) must conform to FED. R. BANKR. P. 7009(b), which applies FED. R. CIV.
P. 9(b) to adversary proceedings.  Rule 9(b) states the rule for § 727(a)(4)(A) pleadings. "[I]n alleging fraud or
mistake, a party must state *with particularity* the circumstances constituting fraud or mistake.  Malice, intent,
knowledge, and other conditions or a person's mind may be alleged generally."  FED. R. CIV. P. 9(b) (emphasis
added).

Moreover, in the Summary Judgment Order, this Court put the Debtors on further notice of these issues. [Finding of Fact No. 130]. The Court specifically recognized that a material issue existed regarding this knowing and fraudulent "omission of $69,800 worth of [new] assets."[79] [Adv. Doc. No. 100, at 3]. Accordingly, the Court finds the Debtors' closing argument defense to be meritless.

In sum, all of the elements of *Beauboeuf* are met; the Debtors intentionally failed to disclose numerous transfers of their assets, all of which materially relate to their bankruptcy case and were effectuated within two years prior to the Petition Date, *see* [Finding of Fact No. 120]. Accordingly, for this separate and independent reason, the Court will deny the Debtors' their discharge.

> ii. *The Debtors Failed to Disclose the Transfer of the Anderson Property in Violation of § 727(a)(4)(A)*

### a. Omission of the Anderson Property was a Knowing False Oath

In addition to the Debtors' failure to disclose the sales of the above-described personal property in response to item 10, the Debtors also failed to disclose a *real* property transfer within the same item of their SOFA. *See* [Finding of Fact No. 48]. Nowhere in their response to item 10, or in fact anywhere in their SOFA, did the Debtors mention or disclose the conveyance of the Anderson Property to Jim Henley. [*Id.*]. Instead, in their original SOFA, the Debtors disclosed only four transfers, leaving out the Anderson Property transfer entirely. This omission not only constitutes an affirmative "false statement[] that the undisclosed information did not exist," but

---

[79] This number is calculated by adding the value the Debtors reportedly received for seventeen assets not disclosed on the original SOFA, but that were added to the amended SOFA under item 10 "Other Transfers." In the amended SOFA, the Debtors also modified the value of assets which were included in the original SOFA. For example, the Debtors originally stated that they sold their trailers for $13,900. In their amended SOFA, the Debtors stated that they sold them for only $3,050. Accounting for these amendments, as well as for the seventeen additional assets, the Debtors omitted a total of $58,865 in transfers from their original SOFA ($192,765 (i.e., amended SOFA transfers) - $133,900 (i.e., original SOFA transfers)).

also relates materially to their bankruptcy case, thereby satisfying the second and fifth *Beauboeuf* elements. *In re Gartner*, 326 B.R. at 367 (internal citation omitted); *see also In re Beauboeuf*, 966 F.2d at 178 (requiring that the debtor make a false oath that materially relates to the bankruptcy case to violate § 727(a)(2)(A)).

Nevertheless, the Debtors argue that the third prong of the *Beauboeuf* test fails. [Adv. Doc. No. 82, at 5–6].[80] The Debtors claim that they did not *knowingly* omit a permanent transfer of the Anderson Property. They believed the transfer was merely "conditional." [*Id.*]. This argument is nonsensical. [Adv. Doc. No. 139, at 8]. The December 2007 deed effectuating the transfer does not contain any language that would suggest that the conveyance was conditional. Rather, its language unequivocally reflects that the transfer was unconditional:

> That I James B. Henley, an unmarried person, GRANTOR, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by DAVID HENLEY AND BELINDA HENLEY, husband and wife, as tenants by the entirety, GRANTEES, do hereby *grant, convey and quitclaim* unto said Grantees, and unto their heirs and assigns forever, all of my right, title, equity and estate in and to the following . . . subject to any existing easement and restrictions of record, if any. To have and to hold the same unto the said Grantees, and unto their heirs and assigns forever, with all tenements, appurtenances and herditaments thereunto belonging.

[Finding of Fact No. 4 n.5] (emphasis added).

Moreover, the fact that the Debtors deeded the Anderson Property back to Jim Henley when they failed to qualify for financing contradicts this "conditional" assertion. Rather, the

---

[80] In the Response, the Debtors concede that statements and omissions regarding the Anderson Property were made under oath, and related materially to the bankruptcy case. [Adv. Doc. No. 82, at 5]. This Court also notes that the determination of whether an omission is material is not a decision for the Debtors to make. *Sullivan v. Sullivan (In re Sullivan)*, 204 B.R. 919, 942 (Bankr. N.D. Tex. 1997) (citations omitted). Nor does the materiality of an omission depend on the value of the asset, or whether the omission was detrimental to creditors. *Manning v. Watkins (In re Watkins)*, No. 09-21095, 2012 Bankr. LEXIS 3084, at *2 (Bankr. N.D. Ind. July 6, 2012). A statement is considered material for purposes of this section if it relates to the Debtors' estate, involves the discovery of assets, or concerns the disposition of the Debtors' assets or their "entitlement to discharge." *See In re Mosher*, 417 B.R. at 781–82. This Court, therefore, affirmatively finds that the transfer of the Anderson Property related materially to the Debtors' bankruptcy case.

reason the Debtors deeded the Anderson Property back to Jim Henley was precisely because they believed that the December 2007 deed effectuated an unconditional—rather than conditional—transfer.  *See* [Finding of Fact No. 13].  This belief, therefore, rendered the item 10 omission of the Anderson Property a known falsity, in violation of the third *Beauboeuf* prong.  *In re Beauboeuf*, 966 F.2d at 178 (denying the debtor's discharge, in part, because the debtor made a knowingly false statement).

### b. The Debtors Omitted the Anderson Property Conveyance with Fraudulent Intent

The Debtors also dispute the existence of fraudulent intent under the fourth prong of *Beauboeuf*.  [Adv. Doc. No. 82, at 5–9].  This Court finds otherwise.  "Fraudulent intent may be shown by a reckless disregard for the truth."  *See id.*; *see also In re Cline*, No. 09-45977-DML-7, 2010 WL 3944997, at *4 (Bankr. N.D. Tex. Oct. 6, 2010) ("The existence of more than one falsehood, together with [the Debtors'] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when [they] filed their amended Schedules, constitute[s] a reckless indifference to the truth and, therefore, the requisite intent to deceive.").  Here, the Debtors had an opportunity to clear up this and other omissions after the meeting of creditors held on May 20, 2011.[81]  [Finding of Fact No. 94].  The only amendments made to the SOFA, however, were those brought to light during that meeting. [Finding of Fact Nos. 95 & 96].  By refusing to disclose the transfer of the Anderson Property to Jim Henley on their amended SOFA, the Debtors intentionally deceived the Plaintiffs.

---

[81]  During the meeting of creditors, the Trustee asked the Debtors about the lien disclosed in "Schedule A – Real Property."  [Finding of Fact No. 89].  The Debtors insisted that the Lots were secured by a lien held by Diamond Bank.  [*Id.*].  The Debtors did not disclose that the lien was in fact attached to the Anderson Property and not to the Lots.  Attempting to hide the existence of the Anderson Property lien from the Trustee is no small point.  By misrepresenting to which property the lien attached, the Debtors obscured equity in both the unencumbered Lots as well as in the undisclosed Anderson Property, both of which the Trustee could have liquidated and used the sale proceeds to pay the Debtors' creditors.

Moreover, the Debtors stood to reap a windfall from this non-disclosure, and by failing to disclose the Anderson Property transfer in their Schedules and SOFA, the Debtors essentially hid this asset from their creditors and the Trustee.  *See Love v. Tyson*, 677 F.3d 258, 262 (5th Cir. 2012).  As such, the Debtors' omissions act to shift the burden of proof.  It is up to the *Debtors* to demonstrate that the non-disclosure of the Anderson Property from the Schedules and SOFA was inadvertent.  *Id.*  Stated differently, the Debtors' fraudulent intent to conceal the Anderson Property transfer from their creditors in their Schedules or SOFA is "self-evident."  *Id.* (stating that the "motivation sub-element is almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court.  Motivation in this context is self-evident because of potential financial benefit resulting from nondisclosure.").[82]   The Debtors have failed to demonstrate that their omission of the Anderson Property transfer was inadvertent.  Accordingly, denial of the Debtors' discharge is justified under § 727(a)(4)(A) as each of the elements of *Beauboeuf* are met.

### c. The Debtors' Defense Fails

As a defense, the Debtors assert that the Complaint filed by Plaintiffs fails to properly allege this cause of action and violates the particularity requirements for pleadings alleging fraud under the Federal Rules of Civil Procedure.  *See In re Cooper*, 399 B.R. at 645 (citing FED. R. BANKR. P. 7009(b)).  This Court disagrees.  The Court finds that the Complaint specifically alleges not only § 727(a)(4)(A) as a cause of action justifying denial of discharge, but also refers extensively to the Anderson Property.  [Adv. Doc. No. 1, at 3–5, 7–8].  In Background Fact No.

---

[82] In *Love*, the asset that the debtor failed to disclose was a lawsuit; whereas, here, the omitted disclosure was the transfer of the Anderson Property.  The Court sees no reason, however, why this different fact pattern should lead to a different result.  Accordingly, the Court concludes that *Love*'s teaching that non-disclosure makes fraudulent intent to be self-evident is just as applicable to omissions in the SOFA as it is to omissions in the Schedules.  *Love*, 677 F.3d at 261 ("Love did not disclose his claims against Tyson and affirmatively stated 'NONE' on Schedule B, item 21, which required the identification of '[o]ther contingent and unliquidated claims of every nature.'").

10, the Complaint states as follows:  "[The] home with the address 3035 Marion Anderson Road, Hot Springs, AR 71913 [i.e., the Anderson Property] is not listed in either Schedule . . . The Debtors' response to SOFA Question #10 describes only the transfer of vacant lots."  [*Id.* at 2–3]. The Debtors addressed these issues in both the Answer, where they admitted "that their original response to Question No. 10 on the Statement of Financial Affairs did not list their former residence located at 3035 Marion Anderson Road and that it did not disclose the transfer of certain other items of personal property," [Adv. Doc. No. 10, at 3], as well as the Response. There, the Debtors discussed the Anderson Property in an entire section, entitled: "Section 727(a)(4)."  [Adv. Doc. No. 82, at 5–9].

Moreover, in the Summary Judgment Order, this Court cited "omission of the Anderson Property in the Schedules" as a cause of action with remaining material issues of fact.  [Adv. Doc. No. 100, at 3].  Under the *Love v. Tyson* rationale, this Court fails to see how the Debtors could contend that they did not receive adequate notice of this claim.  By setting out the Debtors' failure to disclosure the Anderson Property, the Debtors were also given notice of the underlying "motivation sub-element."  *See Love*, 677 F.3d at 626.  In other words, by referencing the Debtors' "omission," the Summary Judgment Order also acted as sufficient notice of the fraudulent intent allegations.  *Id.*; FED. R. BANKR. P. 7009(b).

In sum, this Court finds that the Plaintiffs have proved by a preponderance of the evidence that the Debtors, under oath, intentionally failed to disclose the transfer of the Anderson Property in violation of § 727(a)(4)(A), meeting each of the elements of the *Beauboeuf* test. Accordingly, for this separate and independent reason, the Court will deny the Debtors' their discharge.

     *iii.*    *The Debtors Failed to Disclose the Name of the Financial Institution (i.e., Diamond Bank) to Whom They Gave the Financial Statement, Further Violating § 727(a)(4)(A).*

### a. Nondisclosure of Diamond Bank was a Knowing and Intentional False Oath

In addition to their item 10 omissions, in item 19d the Debtors failed to disclose Diamond Bank as a financial institution to which the Debtors gave the Financial Statement; this non-disclosure constitutes a third false statement under § 727(a)(4)(A).  On June 26, 2009, the Debtors delivered the Financial Statement to Diamond Bank to obtain a loan to purchase the Anderson Property from Jim Henley. [Finding of Fact Nos. 5 & 6].  The Debtors remained in constant contact with Diamond Bank, and indeed prior to the bankruptcy filing were aware that this bank had a copy of the Financial Statement.  [Finding of Fact No. 54].  However, upon filing their bankruptcy petition, the Debtors answered question item 19d in both their original and amended SOFAs by stating:  "NONE."  [Finding of Fact Nos. 54 & 123].

Item 19d is very clear.  It expressly requires that the Debtors disclose each financial institution to which they submitted financial statements within the two years prior to the Petition Date.  [*Id.*].  The Debtors' failure to disclose Diamond Bank in response to item 19d was not merely a false oath, but one that the Debtors knew was untrue.  This omission, therefore, violates both the second and third *Beauboeuf* elements.  *In re Beauboeuf*, 966 F.2d at 178.

### b. Nondisclosure of Diamond Bank was an Intentional Omission of Material Information

Disclosing Diamond Bank was essential to the Debtors' bankruptcy case, and their omission of this information therefore violated the fifth *Beauboeuf* prong.  *In re Beauboeuf*, 966 F.2d at 178.  "When a debtor files for [bankruptcy], he is required to literally open up all his records for the trustee's inspection." *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 605 (Bankr.

N.D. Tex. 2006) (internal citation omitted).  This includes disclosure of financial institutions to which the debtor has given a financial statement, as this information necessarily "involves the discovery of assets, [and] concerns the disposition of the [debtor's] property or entitlement to discharge."  *In re Mosher*, 417 B.R. at 781–82.  The Debtors here not only failed to disclose Diamond Bank, a financial institution to which they gave the Financial Statement; they have conceded that they also withheld the Financial Statement from the Trustee.  [Tape Recording, 7/18/12 Trial at 11:49:49–11:50:33 a.m.].

The Debtors, however, deny having any "evil" intent, and thus dispute that they violated the fourth *Beauboeuf* element.  *In re Beauboeuf*, 966 F.2d at 178.  They contend that because the Carooms knew about the Financial Statement, it is absurd to conclude that the Debtors had any fraudulent intent.  [*Id.*].  What the *Carooms* knew, however, is not the test.  This Court must consider what the *Debtors* knew.  Here, it is clear that the Debtors knew that they had given the Financial Statement to Diamond Bank within two years of the Petition Date.  [Finding of Fact Nos. 5 & 6].  This Court, therefore, concludes that the Debtors' knowing failure to disclose to the Trustee that they had given the Financial Statement to Diamond Bank establishes the Debtors' requisite intent to deceive.  *See Wildlife Farms II, LLC v. Robinson (In re Robinson)*, 368 B.R. 818, 824 (Bankr. E.D. Ark. 2007) (holding that a false answer to item 19d of the SOFA "clearly establish[ed] . . . the required preponderance that the [debtors'] false statements and omissions were made under oath knowingly, intentionally, and with fraudulent intent.").  As each of the elements of *Beauboeuf* are met, this Court will deny the Debtors' discharge under § 727(a)(4)(A).

### c. The Debtors Received Sufficient Notice of this § 727(a)(4)(A) Claim

The Debtors once again argue that the Complaint filed by the Plaintiffs fails to properly

allege a cause of action and does not comply with the requirement that allegations of fraud be pled with particularity. *See* Fed. R. Civ. P. 9(b); *In re Cooper*, 399 B.R. at 645 (with respect to a complaint's claims under § 727(a)(4)(A), "a party must state with particularity the circumstances constituting fraud . . .").

This Court again disagrees with the Debtors' argument. In the Complaint, the Plaintiffs specifically allege § 727(a)(4)(A) as a cause of action justifying denial of discharge, and refer to the non-production of the Financial Statement in Background Fact No. 12.[83]  [Adv. Doc. No. 1, at 3].  Though the Complaint did not expressly refer to item 19d or Diamond Bank, the Complaint identifies the Financial Statement (i.e., "On June 26, 2009 . . . [the] Debtors issued a financial statement").  [*Id.* at 5].  The Complaint also refers specifically to the Debtors' failure to disclose the assets included therein within their Schedules and SOFA.  [*Id.*].  The Plaintiffs thereby allege specific instances of false statements, "where the statements were made, and why the statements were fraudulent." *Hill v. Yoon (In re Yoon)*, 2011 Bankr. LEXIS 1211, at *6–7 (Bankr. S.D. Tex. Apr. 1, 2011).  Although the Plaintiffs do not specifically allege fraudulent intent, "they allege ample facts, including the pattern of alleged nondisclosures and concealment, that would allow an inference of fraudulent intent." *Id.*  The Plaintiffs, therefore, state a claim under § 727(a)(4)(A). *See also Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010) (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

Moreover, the Debtors demonstrated that they had notice in the Answer.  There, they admitted that the "'Asset/Liability' sheet (i.e., the Financial Statement) was given to Diamond Bank by the Defendants (i.e., the Debtors)."  [Adv. Doc. No. 10, at 3].  This Court confirmed

---

[83] "On June 26, 2009, a date within the two year period prior to the Petition Date, Debtors issued a financial statement showing a list of their assets—many of which are inexplicably neither listed in their Schedules or assets nor identified as having been transferred in response to Question 10 of the Statement of Financial Affairs."  [Adv. Doc. No. 1, at 5].

that the Debtors were on notice by issuing the Summary Judgment Order.  [Adv. Doc. No. 100, at 1]; [Finding of Fact No. 130].  In the Summary Judgment Order, the Court outlined the genuine issues of material fact.  [Adv. Doc. No. 100, at 3].  One such issue included whether the Debtors "knowingly or fraudulently" made a false oath or account, thereby quoting the statutory language of § 727(a)(4)(A).  [*Id.*].  The Summary Judgment Order also specifically referring to the Debtors' omission of financial information.  [*Id.*].  This Court finds that the Debtors had sufficient notice that *any* financial information not disclosed on their original SOFA and Schedules was at issue, including information regarding financial institutions to which the Debtors gave the Financial Statement.

Additionally, even if the Plaintiffs did not plead with sufficient particularity, the Debtors failed to raise such an objection before or with their Answer.  *See* [Adv. Doc. No. 10, at 5] (the Debtors did assert "waiver, estoppel and unclean hands" as defenses, but *not* the "particularity" defense).  Under Federal Rule of Civil Procedure 9(b),[84] the failure to raise an objection results in a waiver of this argument.  *In re Universal Factoring Co., Inc.*, 279 B.R. 297, 301 (N.D. Okla. 2002).

Finally, even assuming that the Debtors did not waive this argument, the Debtors' failure to disclose to which financial institutions they provided the Financial Statement remains relevant.  If they had truthfully answered item 19d and disclosed that they had given the Financial Statement to Diamond Bank, the Trustee would have become aware of this fact prior to the initial meeting of creditors—which, in turn, would have led him to request that the Debtors provide him with a copy of the Financial Statement.  With a copy in hand, he could have reviewed it and inquired at the meeting of creditors about what happened to all of the assets

---

[84] Rule 9(b) is made applicable by Bankruptcy Rule 7009.  FED. R. BANKR. P. 7009.

described therein, particularly those disposed between the date of the Financial Statement and Petition Date.  Instead, by failing to make this disclosure, the Debtors ensured that the Trustee remained clueless about the Financial Statement's existence, and thereby deprived the Trustee of the ability to examine the Debtors at the meeting of creditors about the disposition of the numerous assets described on the Financial Statement.

It was only after the Carooms gave the Trustee a copy of the Financial Statement— several weeks after the Trustee concluded the meeting of creditors—that the Trustee discovered the existence of this important document.  Thereafter, the Trustee's counsel sent a letter to the Debtors' attorney, Damani, demanding an explanation of what the Debtors did with the assets described on the Financial Statement.  [Finding of Fact No. 105].  Stated differently, the Debtors' untruthful answer to item 19d prevented the Trustee from fulfilling his duty to analyze all transactions involving the Debtors within two years prior to the Petition Date.  [Tape Recording, 7/18/12 Trial at 11:49:49–11:50:33 a.m.].  Thus, at the very least, this Court refers to this conduct to find that the Debtors' credibility is questionable.  *See* Section III (finding the Debtors not credible and giving little weight to their testimony).

In sum, the Debtors' defenses are unavailing, and this Court finds that the Plaintiffs have proved by a preponderance of the evidence that the Debtors, under oath, intentionally failed to disclose that they provided the Financial Statement to Diamond Bank.  All of the elements of *Beauboeuf* are met.  *See In re Beaubouef*, 966 F.2d at 178.  Accordingly, for this separate and independent reason, this Court will deny the Debtors their discharge.

     iv.    *In Violation of § 727(a)(4)(A), the Debtors Failed to Disclose Their Stock Interest in Their Businesses—HDC, Inc. and Aqua-Lock*

        **a. The Debtors Knowingly Failed to Disclose their Ownership Interests in Their Businesses**

The Debtors also failed to truthfully answer item 13 in Schedule B, thereby further violating § 727(a)(4)(A).  The Debtors' statements in item 13 were made under oath, exactly like the items 10 and 19d omissions discussed above.  Item 13 in Schedule B mandates that the Debtors itemize "stock and interests in incorporated and unincorporated businesses." [Caroom/Trustee Ex. No. 1, at 13].  Yet, here, the Debtors failed to disclose their stock interest in HDC, Inc. and Aqua-Lock.  Instead, the Debtors placed an "X" in the column entitled "NONE." [Finding of Fact No. 50].  At trial, the Debtors admitted ownership of both companies—HDC, Inc. and Aqua-Lock.  [Finding of Fact No. 2].  Indeed, they pointed to the existence of HDC, Inc. in an effort to convince this Court that the assets described in the Financial Statement were sold in the ordinary course of business!  To initially represent that no corporation exists, but then use the existence of that same corporation and its "ordinary course of business" to justify nondisclosure of the transfer of valuable assets is blatant deception.  Adding insult to injury, the Debtors, at trial, also attempted to convince this Court that they did not disclose what in their view were "ordinary course of business" sales of numerous assets described in the Financial Statement (such as jewelry and cars) because they (i.e., the Debtors) were in the jewelry business and the car-flipping business [Tape Recording, 6/27/12 Trial at 6:22:50-6:23:35 p.m.]; yet, neither of these two businesses were ever disclosed in either the original or amended Schedules or SOFA.  [Finding of Fact Nos. 44, 52 & 121].  As this information was material to the bankruptcy case, under all of these circumstances, this Court concludes that the Debtors made the sworn response in item 13 with knowing deception.  The Debtors thereby violated the second, third, and fifth elements of the *Beauboeuf* test.  *In re Beauboeuf*, 966 F.2d at 178.

### b. Knowing that the Complaint Alleged Nondisclosure, the Debtors' Omission of their Ownership Interests was Intentional

Since filing their original Schedules, the Debtors have never amended Schedule B to

reflect their ownership interests in HDC, Inc. and Aqua-Lock.  [Finding of Fact No. 124]; *see*

[Finding of Fact No. 96] (finding that the Debtors filed amendments to Schedules A, D, and F).

Instead, the Debtors have complained that they received insufficient notice of the Plaintiffs'

claim for this particular nondisclosure, and that the Plaintiffs failed to plead with sufficient

particularity.   However, in the Complaint, the Plaintiffs assert that "[t]he Debtors failed to

disclose both their business entity, 'Henley Design and Construction,' and their business known

as 'Aqua-Lock, Inc.' . . . ."  [Adv. Doc. No. 1, at 6].   And in the Answer, the Debtors

demonstrated that they had notice of this claim by denying the allegations contained in this

paragraph of the Complaint.  [Adv. Doc. No. 10, at 4].   As such, the Court concludes that the

Debtors received sufficient and proper notice of this particular cause of action.  *See* FED. R. CIV.

P. 9(b).[85]

More importantly, the Complaint, together with the Debtors' subsequent inaction and

failure to amend Schedule B, show that the Debtors' omission of their ownership interests was

intentional.  The Debtors knew these businesses—and their non-disclosure—were at issue.  Yet,

by never amending item 13 of the SOFA, the Debtors purposefully shielded their ownership

interests in HDC, Inc. and Aqua-Lock from the Trustee and from their creditors.  As a result, the

Debtors violated the fourth element of *Beauboeuf*.  *In re Beauboeuf*, 966 F.2d at 178.

In sum, this Court finds that the Plaintiffs have proven by a preponderance of the

evidence that the Debtors intentionally and knowingly evaded disclosure of their ownership

interests in HDC, Inc. and Aqua-Lock in violation of § 727(a)(4)(A).   Each of the five prongs

under the *Beauboeuf* test have been satisfied.   Accordingly, for this separate and independent

reason, the Court will deny the Debtors' their discharge.

---

[85] In the Response, the Debtors demonstrated that they had notice of the § 727(a)(4) claims by entitling an entire portion of the Response, "Section 727(a)(4)."  In this section, however, the Debtors did not discuss their failure to disclose Aqua-Lock and HDC, Inc. in the SOFA.  [Adv. Doc. No. 82, at 5-9].

2.  The Debtors' Discharge Under § 727(a)(4)(D) is Barred Because they Knowingly
Withheld Information and Records Related to the Bankruptcy Estate from the Trustee

i.  *The Debtors Knowingly Failed to Disclose their Bank Statements and also Failed
to Provide the Financial Statement to the Trustee*

Section 727(a)(4)(D) permits a court to deny a debtor's discharge if the debtor knowingly

and fraudulently withheld from the Trustee any recorded information related to the debtor's

property or financial affairs.  11 U.S.C. § 727(a)(4)(D).  The purpose of § 727(a)(4)(D) is to

"ensure that debtors provide all relevant information without the need for lengthy examination

and investigations into the affairs of the estate."  *Benchmark Bank v. Crumley (In re Crumley)*,

428 B.R. 349, 367–68 (Bankr. N.D. Tex. 2010); *see also Oldendorf v. Buckman*, 173 B.R. 99,

104 (E.D. La. 1994).  Thus, intentionality is not required.  The Debtors' *knowing* failure to

provide this information is sufficient to deny their discharge.  *In re Cline*, 2010 WL 3944997, at

*4.

In this case, the Debtors failed to divulge financial information in response to both item 2

and item 19d of the SOFA.  Item 2 requires the disclosure of any "Checking, savings or other

financial accounts," which in turn reveals the existence of recorded information related to the

debtor's property or financial affairs.  [Finding of Fact No. 49].  In response to this question, the

Debtors falsely marked, "NONE," thereby concealing two bank accounts that they had at the

time of their Chapter 7 bankruptcy filing.  [*Id.*].  Only later, at the meeting of creditors, did Ms.

Henley disclose the existence of these accounts.  [*Id.*].  Her later admission demonstrates that the

Debtors knew of the existence of these accounts.  Yet, by failing to disclose them in item 2, the

Debtors frustrated the Trustee's examination and investigation into the affairs of their estate, and

thwarted the very rationale for § 727(a)(4)(D).

Moreover, in item 19d, the Debtors neglected to disclose that they had provided Diamond

Bank with the Financial Statement.  [Finding of Fact No. 54].  Despite the Debtors' continued contact with Diamond Bank, the Debtors also failed to request a copy of the Financial Statement from Diamond Bank and, additionally, made no attempt to alert the Trustee to the availability of the Financial Statement.  [Finding of Fact Nos. 54 & 105].  Rather, in item 19d of the SOFA, which, as discussed above, expressly requires that debtors disclose the financial institutions to which they submitted financial statements, these Debtors knowingly marked "NONE."  [Finding of Fact No. 54].  This failure to disclose constitutes withholding from the Trustee information and records which relate to the Debtors' bankruptcy estate and their financial affairs.

Furthermore, while Ms. Henley wrote a letter to counsel for the Trustee to discuss the Financial Statement, this occurred only after Damani, the Debtors' counsel at the time, learned that the Trustee had already obtained a copy of the statement—from the Carooms—and then confronted the Debtors with this information.  [Finding of Fact Nos. 105 & 107].  With nothing left to hide, the Debtors had no choice but to discuss the assets described on the Financial Statement.  [Finding of Fact No. 107]. This Court finds that the Debtors knowingly and deliberately failed to disclose that they had provided the Financial Statement to Diamond Bank and also knowingly and deliberately failed to provide the Trustee with a copy of the Financial Statement in an effort to frustrate the Trustee's administration of their Chapter 7 estate.

ii.   *The § 727(a)(4)(D) Claim was Pled with Sufficient Particularity.*

As with the cause of action brought by the Plaintiffs under § 727(a)(4)(A), the Debtors' counsel asserted in his closing argument at trial that the Complaint fails to properly allege a cause of action under § 727(a)(4)(D), and that this Court should bar this cause of action from proceeding on grounds of insufficient particularity.  *See In re Cooper*, 399 B.R. at 645 (citing

FED. R. BANKR. P. 7009(b)).[86]  This Court declines to do so because the Complaint not only alleges a § 727(a)(4)(D) violation, but alerts the Debtors that claims related to "the failure of the Debtors to produce records of their financial affairs" are at issue.  [Adv. Doc. No. 1, at 3].

In fact, the Debtors addressed at least the item 19d allegations in the Answer, admitting that they gave the Financial Statement to Diamond Bank in 2009 to obtain financing to purchase the Anderson Property.  [Adv. Doc. No. 10, at 3].  To later contend at trial that they received insufficient notice of this issue constitutes "sandbagging."  *See* FED. R. BANKR. P. 7012(b) (applying FED. R. CIV. P. 12(b) to adversary proceedings); *see also United States v. Oldfield*, 859 F.2d 392, 397 (6th Cir. 1988) ("Rule 12 sharply restricts the defense tactic of 'sandbagging' that was available in many jurisdictions under common law pleading. Recognizing that there was a defect in the pleading, counsel would often forego raising that defect before trial . . . Federal Rule 12 eliminated this tactic. . . . ").

As importantly, the withholding of this information, at a minimum, undermines the Debtors' credibility, thereby leading this Court to find that the Debtors' credibility on most issues is suspect.  *See* Section III.

In sum, the Debtors' failure to disclose that they gave the Financial Statement to Diamond Bank is the very definition of intentional failure to disclose, and § 727(a) is meant to both prevent and punish this choice.  Accordingly, this Court concludes that the Debtors were on notice of this cause of action, and their discharge should be denied pursuant to § 727(a)(4)(D).

3. <u>Discharge is Barred by § 727(a)(3) Because the Debtors Unjustifiably Failed to Preserve Their Business and Financial Records</u>

Section 727(a)(3) requires that debtors keep and maintain sufficient records so that "the debtor's financial condition or business transactions *might* be ascertained."  11 U.S.C. §

---

[86] Applying FED. R. CIV. P. 9(b) to adversary proceedings.

727(a)(3) (emphasis added).  Stated differently, to understand and analyze the debtor's financial history, the trustee *must* be able to depend on the accuracy and completeness of the debtor's records.  *Hill v. Jones (In re Jones)*, 327 B.R. 297, 303 (Bankr. S.D. Tex. 2005).   Section 727(a)(3) forces debtors to present a full financial picture to the trustee, their creditors and the court.   *Id.* (citing 4 COLLIER ON BANKRUPTCY ¶ 727.03[1] (15th ed. 1979)).   The failure to maintain financial records justifies a denial of discharge.  *In re Gartner*, 326 B.R. at 375; *In re Jones*, 327 B.R. at 303 ("Unlike other subsections of 11 U.S.C. § 727, subsection (a)(3) does not require the Trustee to demonstrate any fraudulent intent by Jones to deceive his creditors or the Chapter 7 estate. . . Jones's mere negligence in failing to keep and produce records will suffice to bar his discharge." (citing *Union Planters Bank, N.A. v. Connor*s, 283 F.3d 896, 901 (7th Cir. 2002))); *In re Powers,* 112 B.R. 184, 190 (Bankr. S.D. Tex. 1989) (citing *Bartolotta v. Lutz*, 485 F.2d 227 (5th Cir. 1973)).

Sophisticated debtors are held to an even higher preservation standard.  *In re Jones*, 327 B.R. at 305.   Bankruptcy courts assume that these debtors should be more aware of the importance of maintaining and producing financial records.  *In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. Wis. 1996). Moreover, unlike § 727(a)(4) discussed above, § 727(a)(3) does not include the "knowingly" or "frequently" language.  *See* 11 U.S.C. §§ 727(a)(4)(A), (a)(4)(D).  From this exclusion, it follows that this subsection of the § 727(a) statute does not require a showing of intent or recklessness.  *In re Gartner*, 326 B.R. at 375–76.  Mere negligence in failing to keep and produce records will suffice to bar discharge.  *Bartolotta*, 485 F.2d at 229 n.2 (5th Cir. 1973) ("[I]t is sufficient that the bankrupt negligently failed to keep books, if his business is one requiring the keeping of books and records.").

In order to state a prima facie case under § 727(a)(3), the plaintiff must prove the

following: (1) the debtor failed to maintain and preserve adequate records; and (2) such failure makes it impossible to ascertain his or her financial condition and material business transactions. *In re Gartner*, 326 B.R. at 375 (citing *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003)).  Once these elements are satisfied, the debtor then has the burden of justifying the failure to maintain adequate records.  The bankruptcy court should consider all circumstances, including the uselessness of additional records, or the lack of the debtor's sophistication.  *Id.* at 375–76.  A debtor can maximize his chances of avoiding a denial of discharge under this provision by producing enough material to avoid *any* speculation about his financial condition. *See In re Juzwiak*, 89 F.3d at 424, 430.

In the suit at bar, the Plaintiffs have satisfied the prima facie elements of § 727(a)(3) and with respect to the records of the two entities owned by the Debtors—Aqua Lock and HDC, Inc.—the Debtors have failed to adequately justify their failure to maintain records.

### i. The Debtors Lost Records During Their Move to Houston, Making it Impossible for the Trustee to Determine Their Financial Condition

The Debtors clearly failed to keep and preserve documentation of their financial condition.  In fact, they concede that they lost a significant amount of their personal and business records during their move from Hot Springs, Arkansas to Houston, Texas.  [Finding of Fact No. 53].  Although the Debtors eventually filed and produced tax returns for themselves, personally, and for one business (i.e., Aqua-Lock), the Debtors have *never* produced tax returns for HDC, Inc.  [Finding of Fact No. 119].  Further, the Debtors did not produce any substantial business records for either Aqua-Lock or HDC, Inc.  [Finding of Fact No. 53].  The Debtors also contend that HDC, Inc., as opposed to the Debtors, owned a number of the assets which were sold at the garage and designer sales, but they have failed to provide records to substantiate this assertion. [Finding of Fact Nos. 114 & 115].

Further, during trial, the Debtors admitted that they failed to disclose or provide a copy of the Financial Statement submitted to Diamond Bank. Their excuse, they argued, was that they did not maintain a copy:

SIMON: At any time after the filing of bankruptcy and up until the time that Crews sent the August 26 letter to your attorney attaching this financial statement, and we'll go to that in a second, did you ever have a copy of this financial statement in your possession?

MS. HENLEY: No.

[Tape Recording, 6/27/2012 Trial at 9:43:04–9:43:58 a.m.]

As *Juzwiak* demonstrates, these lost and missing records made it impossible for the Trustee to determine the Debtors' financial condition. 89 F.3d at 425. In *Juzwiak*, the debtor owned a trucking company. *Id.* When he filed for bankruptcy, he produced some documents, including a checking account ledger, canceled checks and deposit slips. *Id.* at 426. However, this information insufficiently described the source of the debtor's income and expenses. *Id.* at 428. Without any additional documentation, the Trustee and the debtor's creditors were forced to guess about the debtor's financial status. *Id.*; *see also In re Hughes*, 353 B.R. at 500 (citing *Structured Asset Services, L.L.C. v. Self (In re Self)*, 325 B.R. 224, 241 (Bankr. N.D. Ill. 2005)) ("Records are not adequate if they do not provide enough information for the creditors or the trustee to ascertain the debtor's financial condition or to track his financial dealings with substantial completeness and accuracy for a reasonable period into the past.").

Similarly, neither this Court nor the Trustee nor any creditor can adequately ascertain the Debtors' financial status from the incomplete documents and flippant trial testimony they have provided. *In re Juzwiak*, 89 F.3d at 432–33. Considering the size and purported value of the Debtors' companies, more information is necessary. *See* [Finding of Fact No. 8]. For example, despite the Debtors' contention that their two companies were defunct, the Debtors provided no

evidence of HDC, Inc. and Aqua-Lock's dissolution or insolvency.[87]  *See* [Finding of Fact Nos. 8 & 14].  The Trustee has had to engage in expeditions to ascertain the Debtors' assets, sources of income, and overall financial condition.  [Finding of Fact Nos. 98 & 99]; *see also In re Jones*, 327 B.R. at 303 ("A debtor maximizes his chances of avoiding a denial of discharge under 11 U.S.C. § 727(a)(3) by producing sufficient records such that the creditors and trustee do not have to speculate as to the debtor's financial condition.").

The Debtors argue that they freely produced bank statements during their meeting of creditors.  [Finding of Fact No. 90].  However, even after this meeting, the Trustee continued to receive information regarding the Debtors' assets, including the Financial Statement.  And, the Trustee received this information not from the Debtors, but from the *Carooms*.  [Finding of Fact No. 105].  It is the *Debtors*' duty, not that of their creditors, to provide a full and accurate financial picture.  *See Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 900 (7th Cir. 2002).  As the Plaintiffs have shown, the Debtors failed to produce adequate documentation, and the "entire picture" remains obscured.  *Id.*

> ii.  *The Debtors' Excuses are Unacceptable, and Do Not Justify the Lost and Missing Records*

This Court finds that the Debtors' excuses for their failure to produce the books and records of their businesses are woefully insufficient.  *See In re Hughes*, 353 B.R. at 502 (finding that the debtor's justification for failing to keep records to avoid having his money garnished by the FDIC was insufficient).  First, the Debtors claim that they lost many of these records during

---

[87] Even if they had, those records would not automatically make the documents that the Debtors did produce adequate for purposes of § 727(a)(3). *Sherwood Fine Art v. Burrik (In re Burrik)*, 459 B.R. 881, 893 (Bankr. W.D. Pa. 2011) (finding that the insolvency records and records produced to explain the downfall of the debtor's business were not enough to make the meager records produced adequate for purposes of § 727(a)(3) because the records produced were "replete with gaps, . . . deplorably incomplete, and one [could] neither eliminate any number of other explanations for why the [debtor's business] [was] insolvent nor verify . . . that the downfall of the [debtor's business was] attributable to the two foregoing causes identified by [the debtor]").

their move to Houston, including the records of their 100% owned businesses—HDC, Inc. and Aqua-Lock.  [Finding of Fact No. 53].  However, "inexcusably lost records do not provide a defense to [a] § 727(a)(3) count."  *Fid. & Guar. Life Ins. Co. v. Fioravante Settembre (In re Settembre)*, 425 B.R. 423, 434 (Bankr. W.D. Ky. 2010).  To be excusable, the loss of books and records must be outside the debtor's control.

For example, in *Settembre*, the debtor provided incomplete records and, like the Debtors here, also claimed that he lost his documentation during a move.  *Id*. at 432–33.  The bankruptcy court in *Settembre* rejected this excuse, calling it "patently insufficient."  *Id.* at 433 (citing *PNC Bank, Nat. Ass'n v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 102–04 (Bankr. W.D. Pa. 2000) (finding the debtor's excuses insufficient because the debtor failed to show the records "were destroyed or lost due to some event beyond his control, such as fire or theft.").  Likewise here, the Debtors' records were not destroyed by theft or a fire or hurricane or some other Act of God.  Rather, these records were allegedly lost during the Debtors' move from Arkansas to Texas.  [Caroom/Trustee Ex. No. 1, at 36]; [June 15, 2012 Tr. 38:1–13]; [Finding of Fact No. 53].  Yet, the Debtors introduced no exhibits and adduced no credible testimony that the loss of their records was beyond their control.  There was, for example, no proof that the records were lost in a fire, hurricane, tornado, floor, windstorm, car crash, or truck crash; nor was there any proof that some third party stole these records.  There was only Ms. Henley's assertion that the records were lost.  Aside from the fact that this excuse, even if credibly stated, is insufficient as a matter of law, Ms. Henley's lack of credibility, *see* Section III, renders her statement to be the equivalent of "the dog ate my homework" excuse.  This explanation will not stand.  In sum, given the record developed at trial, this Court finds that the fault for the loss of the records belongs entirely to the Debtors.  [Finding of Fact No. 53].

111

Equally flimsy is the Debtors' excuse for the missing Financial Statement. The Debtors may not have personally maintained a copy of the Financial Statement. [Tape Recording, 6/27/2012 Trial at 9:43:04–9:43:58 a.m.]. However, they also made no attempt to alert the Trustee of this document's existence, nor did they request a copy from Diamond Bank themselves. [Finding of Fact No. 105]. These actions were within the Debtors' control, and the omission is simply unacceptable. *See In re Wells*, 426 B.R. at 598 (denying the debtor's discharge under § 727(a)(3) because, as the court stated, "Other than responding that he no longer had a copy of that financial statement, Wells did nothing to facilitate obtaining a copy of it from his bank." The debtor thereby "failed to justify his failure to keep and preserve adequate financial records.").

Yet, before denying the Debtors' discharge under § 727(a)(3), "[a]ny explanation given by the [Debtors] to explain any deficiency in [their] records must be evaluated both for its credibility and reasonableness under the circumstances of [the Debtors'] affairs and degree of sophistication and for the materiality of any insufficiency." *Trinity Hardwood Distributors, Inc. v. Hoefer (In re Hoefer)*, No. 08-42075, 2010 WL 1658323, at *7 (Bankr. E.D. Tex. Apr. 23, 2010) (citing *Grange Mut. Ins. Co. v. Benningfield (In re Benningfield)*, 109 B.R. 291, 293 (Bankr. S.D. Ohio 1989)).

The Court has already evaluated the Debtors' credibility in the § 727 Action and found it to be woeful. *See* Section III (detailing numerous examples of the Debtors' misrepresentations, contradictions, obfuscations, and evasions before this Court, and finding both Debtors not credible). Thus, the question is now whether the loss of the records is reasonable under the circumstances, including the level of the Debtors' sophistication. The Code does not delineate the characteristics of a "sophisticated debtor," but *Gartner* shed light on the meaning of this

112

term.  326 B.R. at 361.  This Court denied discharge, finding that the debtor—a college-educated geologist, who acted as a managing executive of at least nine companies—was sophisticated.  *Id.* at 375–76.  The debtor's high level of education justified a higher standard for the disclosure of records.  *Id.*; *see also In re Mosher,* 417 B.R. at 783 (determining that the debtor was sophisticated because he was president of four firms, incorporated a business, and participated in taking at least one security and manufacturing company public).[88]

Ultimately, "[this Court] has broad discretion in determining the sufficiency of the records provided and the consideration for [this Court] in making such a determination includes the [Debtors'] sophistication, educational background and business background, business experience, business acumen, and personal financial structure."  *In re Hughes*, 353 B.R. at 500 (citation omitted).  Here, Ms. Henley has several professional certifications and a college degree in Industrial Engineering.  [Finding of Fact No. 1].  She has purchased between six and eight properties during her adult life.  [*Id.*].  Moreover, she was the co-owner of HDC, Inc. and Aqua-Lock, and together with Mr. Henley, ran these businesses.  [Finding of Fact Nos. 2 & 8].  Meanwhile, Mr. Henley jointly owned and operated HDC, Inc. and Aqua-Lock with Ms. Henley.  [*Id.*].  He also has a college degree in Business.  [Finding of Fact No. 1].  Given their backgrounds, this Court finds that both of the Debtors are very sophisticated, and holds them to a high standard of recording and maintaining important financial records.  The Debtors failed to meet this standard under § 727(a)(3).

### iii.   The Debtors Waived Their Defense to § 727(a)(3)

In response to the claims made under § 727(a)(3), the Debtors argued at trial that the

---

[88] *See also In re Settembre*, 425 B.R. at 431 (finding that a college-educated individual who had worked in the highly regulated insurance industry for over 30 years and "ran an insurance agency replete with all the accompanying complexities and regulations" was a sophisticated debtor).

Plaintiffs failed to plead *any* facts supporting these issues.[89]  This Court disagrees.   Section 727(a)(3) need not be pled with specificity, *In re Gartner*, 326 B.R. at 375; *In re Yoon*, 2011 Bankr. LEXIS 1211, at *5–6 ("Actions under § 727(a)(3) are governed by the pleading requirements in Rule 8(a)(2), which [only] require[s] the allegations to plausibly give rise to an entitlement to relief.").   The exact nature of the missing, destroyed or concealed records is, therefore, not necessary.   Unquestionably, the missing financial records of the Debtors as well as of their wholly-owned companies (i.e., HDC, Inc. and Aqua-Lock) were at issue, and the Court finds that the Complaint gave the Debtors sufficient notice of this matter.

For example, besides quoting the exact language of § 727(a)(3) in Background Fact No. 20 on page 7 of the Complaint, the Plaintiffs also plead in Background Fact No. 8 that the "Trustee continued the meeting of creditors to give himself time to obtain documents to complete his investigation of potential concealment of assets . . ."  [Adv. Doc. No. 1, at 3].  The Trustee was particularly concerned with the "the failure of the Debtors to produce records of their financial affairs."  [*Id.*].  Finally, the Complaint also refers to HDC, Inc. and Aqua-Lock, noting that the Debtors failed to explain the value of the entities, or disposition of the $2.0 million in assets described in the Financial Statement—which is clearly a business record.[90]  [*Id.* at 6–7].

The Court itself also specified § 727(a)(3) as a cause of action when it ruled to deny the Motion for a Directed Verdict.  [Tape Recording, 6/26/12 Trial at 5:13:39–5:26:11 p.m.].  During the ruling, no objection was raised.  [*Id.*].  Only during closing arguments did the Debtors'

---

[89]  11 U.S.C. § 727(a)(3) provides that a debtor's discharge may be denied if the debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition might be ascertained.

[90]  The language in the Complaint reads as follows:  "The Debtors failed to disclose both their business entity, "Henley Design and Construction," (i.e., HDC, Inc.) and their business known as "Aqua-Lock, Inc." which they had valued in [the Financial Statement] as having a value of $545,000."  [Adv. Doc. No. 1, at 6-7].  The Debtors also "failed to explain . . .  the $2.0 million dollars in assets [including Aqua-Lock and HDC, Inc.] listed in [the Financial Statement]."  [*Id.*].

attorney raise an objection to the § 727(a)(3) claim. Yet, even then, he conceded that the Complaint asserts specific facts relating to the Financial Statement, HDC, Inc. and Aqua-Lock. [Tape Recording, 7/18/12 Trial at 12:16:00–12:18:46 p.m.]. Thus, the Court concludes that the Complaint alleges sufficient facts to give the Debtors' notice of the § 727(a)(3) claims.

Even were this Court to agree with the Debtors' argument and find that insufficient facts were pled to give the Debtors notice of the Plaintiffs' claim under § 727(a)(3), the Debtors failed to raise this objection at trial. Federal Bankruptcy Rule 7015(b) provides, in part, that when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. FED. R. BANKR. P. 7015(b).[91] While a party must place an opposing party on notice of a claim, this Court finds that the Debtors acquiesced to the Plaintiffs' presentation of the § 727(a)(3) claim against them. *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473 (5th Cir. 2009).

For example, during trial, the Debtors testified that they never had a copy of the Financial Statement in their possession:

| | |
|---|---|
| SIMON: (counsel for the Debtors) | At any time prior to August 24, 2011 did you have this asset liability sheet that attached to this letter in your possession? |
| MS. HENLEY: | No I did not. |

[Tape Recording, 6/27/2012 Trial at 9:44:08–9:44:37 a.m.]. The Debtors' counsel then asked Ms. Henley to read into the record Background Fact No. 21 of the Complaint, which quotes § 727(a)(3). She denied ever concealing, destroying, falsifying, or failing to keep or preserve any recorded information, "including books, documents, records, and papers, from which the

---

[91] Applying FED. R. CIV. P. 15 to adversary proceedings. Rule 15 states, "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after Judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial on that issue." FED. R. CIV. P. 15(b)(2).

debtor's financial condition or business transactions might be ascertained." *See* [Tape Recording, 6/27/12 Trial at 9:44:08–9:47:00 a.m.]. This evidence went directly to the § 727(a)(3) claim. The Debtors did not object to the introduction of this testimony; indeed, it was the Debtors' counsel who adduced Ms. Henley's testimony. *See* [*Id.*]. Thus, regardless of the sufficiency of the pleadings, the § 727(a)(3) claims were alternatively tried by consent; and the Debtors' failure to maintain and preserve the books and records of their businesses, as well as the Financial Statement, constitutes a violation of § 727(a)(3).

Finally, this Court notes that at trial, Ms. Henley admitted to both of the issues discussed above: that she and her husband lost their business records, *see* [Finding of Fact No. 53], and concealed the Financial Statement in item 19d. *See* [Tape Recording, 6/27/2012 Trial at 6:16:15–6:18:17 p.m.].[92] Hence, assuming that the Debtors did not try these issues by consent, their failure to disclose and preserve their financial records, at the very least, demonstrates their dubious credibility. *See* Section III.

---

[92] At the request of the Carooms' counsel, Ms. Henley read item 19d of the SOFA into the record. He then asked her about her response to that question:

| | |
|---|---|
| JOHNSON: (Counsel for the Carooms) | And how did you answer that? |
| MS. HENLEY | I answered "NONE." |
| JOHNSON: | Ok, and if we go back to exhibit 7 [i.e., the Financial Statement] that we just visited here . . . at page 2 at the bottom tell the Court when that is dated. |
| MS. HENLEY: | It's dated June 26, 2009. |
| JOHNSON: | Is that within two years before you filed your bankruptcy proceeding? |
| MS. HENLEY: | Yes. |
| JOHNSON: | And you didn't put that on the Schedules in response to question #19 on your Statement of Financial Affairs, did you? |
| MS. HENLEY: | No, I did not have a copy. |
| COURT: | Wait a minute. That's not the question. The question is "Did you list it?" The question is not, "Did you have a copy?" The question was, "Did you list the financial institutions to which you gave exhibit 7?" |
| MS. HENLEY: | No. |

[Tape Recording, 6/27/2012 Trial at 6:16:15–6:18:17 p.m.].

In sum, this Court finds that the Plaintiffs have proved by a preponderance of the evidence that the Debtors unjustifiably failed to preserve business and financial records material to their case. Accordingly, for this separate and independent reason, the Court will deny the Debtors' their discharge under 11 U.S.C. § 727(a)(3).

4. The Debtors Failed to Satisfactorily Explain the Loss of Their Assets, Justifying Denial of Discharge Under § 727(a)(5)

Under § 727(a)(5), discharge may be denied if the debtor fails to explain any loss or deficiency in his assets to meet his liabilities. 11 U.S.C § 727(a)(5). The Plaintiffs bear the initial burden of adducing evidence that demonstrates that the Debtors formerly owned substantial, identifiable assets that are now unavailable for distribution to creditors. *First Commercial Fin. Grp. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002). If this is proven, the Debtors then have the burden of establishing a "satisfactory" explanation for the asset reduction, eliminating speculation regarding the disposition of the assets. *First Texas Savings Ass'n v. Reed (In the Matter of Reed)*, 700 F.2d 986, 992–93 (5th Cir. 1983); *Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir. 1995). The Debtors' explanation "must consist of more than the vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir. 1966).

Here, the Debtors failed to explain the disposition of personal property assets in item 10 of the SOFA; according to the Complaint, they failed to account for approximately $2.0 million dollars of assets. [Adv. Doc. No. 1, at 7]. To later attempt to explain their disposition, the Debtors claimed that they sold most of these assets at a series of garage sales; they also produced

handwritten bills of sale for some—but not all—of the assets sold.[93] [Finding of Fact Nos. 112–115]. The Debtors also introduced into the record certain advertisements for these garage sales. [Finding of Fact No. 111]. Finally, Ms. Henley's letter to Crews (counsel for the Trustee) also attempted to explain the disposition of the assets. *See* [Finding of Fact No. 107] (finding that the Debtors claimed these assets were sold to pay their subcontractors, cost-of-living expenses, and attorney's fees).

Yet, the Debtors cannot overcome a § 727(a)(5) objection with mere general explanations. When substantial assets have disappeared from the estate, the debtor must produce supporting documentary evidence. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619–20 (11th Cir. 1984). Therefore, despite the Debtors' few handwritten bills of sale and printed garage sale flyers, the Debtors have not fulfilled their burden. They have not produced receipts, bank records, or copies of cancelled checks for any of these transactions; the assets' disposition remains unclear.

Nor have the Debtors provided any information regarding Aqua-Lock and HDC, Inc. They testified to both companies' insolvencies; however, the only information the Court received regarding their value was the Financial Statement. [Finding of Fact No. 8]. In this document, the Debtors represented Aqua-Lock's value at $548,685.00 as of May 31, 2009, and HDC, Inc.'s value at $187,000.00 as of June 26, 2009. [*Id.*]. The Debtors have not provided any documentation to explain either company's supposed catastrophic loss in value. [Finding of Fact Nos. 53 & 119]. Devoid of a satisfactory explanation for the significant reduction in the value of these two entities, the Debtors' discharge is denied under 11 U.S.C. § 727(a)(5).

---

[93] The Court finds it odd that the Debtors were able to produce bills of sale for *any* of the assets. A bill of sale is executed by the seller and delivered to the buyer evidencing transfer of title from the seller to the buyer. Typically the buyer, and not the seller, retains the original bill of sale as proof of ownership and proof that title has been relinquished by the seller to the buyer.

As under § 727(a)(3), the Debtors defend themselves by claiming that the Plaintiffs failed to plead sufficient facts, claiming "three-quarters of the things" elicited at trial were not in the Complaint.  [Tape Recording, 7/18/12 Trial at 12:16:00–12:18:35 p.m.].  This Court disagrees. Contrary to the Debtors' contention, the Plaintiffs pleaded § 727(a)(5), and the factual allegations supporting this claim, in the Complaint.

Section 727(a)(5) relates singularly to the Debtors' explanation for any deficiencies in the disclosure of the Debtors' assets or the disposition thereof.  As such, the Complaint in Background Fact No. 18 states that "the Debtors failed to *explain* or include in their response to Question #10 [of the SOFA, which requires debtors to 'DISCLOSE ALL *TRANSFERS* OF PROPERTY WITHIN TWO YEARS PRIOR TO THE FILING OF THE CASE'] the $2.0 million dollars in assets listed in the [Financial Statement]."  [Adv. Doc. No. 1, at 7].  Like § 727(a)(3), § 727(a)(5) need not be pled with specificity.  The Court's review of the Complaint leads this Court to find that the Plaintiffs sufficiently alerted the Debtors that their explanation of any transfers and overall diminution of any assets within two years of the Petition Date would be at issue in the trial.

Moreover, the Debtors received additional notice of this claim from the Court.  During the ruling on the Motion for a Directed Verdict, the Court detailed the individual § 727(a) Actions in the Complaint, and specifically referenced § 727(a)(5).  [Tape Recording, 6/26/12 Trial at 5:13:39–5:26:11 p.m.].  The Debtors did not raise any objection to this issue at that time. [*Id.*].  Rather, the first objection raised was during the Debtors' closing arguments, where the Debtors' attorney made a general objection to the pleadings.  [Tape Recording, 7/18/12 Trial at 12:16:00–12:18:35 p.m.].  No specific objection to § 727(a)(5) was made on the record, and in fact, the Debtors' attorney conceded during his objection that the Complaint did in fact make

specific factual allegations related to the Financial Statement.  [*Id.*].  This Court, therefore, finds that the Debtors were on sufficient notice of this particular claim.

Alternatively, this Court finds that extensive evidence was elicited at trial concerning the disposition of the assets described on the Financial Statement.  The Debtors raised no objection.  For example, the Debtors testified about and produced certain bills of sale.  [Finding of Fact Nos. 112– 115].  The Court finds that the only purpose for eliciting this testimony was to address the Plaintiffs' allegation that the Debtors failed to explain adequately any loss or deficiency from the sale of the assets listed in the Financial Statement.  These issues were therefore tried by consent.  *In re Byers*, 312 B.R. at 25.  Thus, even without sufficient pleadings, the Debtors consented to trial of the § 727(a)(5) claim under FED. R. BANKR. P. 7015(b).[94]

5.  Denial of Discharge is Justified Under § 727(a)(2)(A) Because the Debtors Intentionally Transferred Property Within One Year of the Petition Date

i.  *The Debtors' Actual Intent to Defraud is Inferred from the Circumstances Surrounding the Transfers of Their Assets*

In addition to the numerous § 727 violations discussed above, one final Code provision justifies denial of the Debtors' discharge. Under 11 U.S.C. § 727(a)(2)(A), this Court can deny the Debtors' discharge for transferring or concealing property within one year of the Petition Date if the Debtors intended to hinder, delay or defraud a creditor or the Trustee.  11 U.S.C. § 727(a)(2)(A).  The test is, therefore, four-fold.  There must be (1) a transfer of property; (2) belonging to the Debtors; (3) within one year of the filing of the Petition Date; (4) made with fraudulent intent.  *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989).

The Debtors admit that they sold two jet skis in June of 2010.  [Finding of Fact No. 92].

---

[94] Applying FED. R. CIV. P. 15 to adversary proceedings.  Rule 15 states, "[w]hen an issue not raised by the pleadings is tried be the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after Judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial on that issue." FED. R. CIV. P. 15(b)(2).

Unlike many of the other assets the Debtors sold or transferred—which the Debtors at trial claimed belonged to HDC, Inc.—the Debtors have never taken the position that the jet skis belonged to HDC, Inc. and were sold in the ordinary course of HDC, Inc.'s business, thereby alleviating the need to disclose their sale.  Rather, knowing that it would be totally absurd to concoct a story that the jet skis belonged to HDC, Inc. rather than to themselves personally, the Debtors have simply settled for admitting at trial that they did not disclose the sale of these jet skis.  [*Id.*].  Also, the transfer of these jet skis occurred within the one year time frame; the Debtors filed for bankruptcy only ten months after the sale, in April 2011.  [Finding of Fact No. 60].  Thus, the first three elements of the *Chastant* test are unquestionably satisfied.

That leaves the Debtors to dispute only the last factor:  fraudulent intent.  To prove the intent to defraud, the standard is actual, not constructive, intent.  *In re Chastant*, 873 F.2d at 90–91.  However, "actual intent . . . may be inferred from the actions of the debtor and may be proven by circumstantial evidence."  *Id.* at 91.  Factors evidencing actual intent to defraud under § 727(a)(2)(A) include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Id.* (citations and internal quotation marks omitted).

Here, the chronology of events is most telling.  On December 7, 2009, the Carooms filed the Lawsuit against the Debtors.  [Finding of Fact No. 10].  While the Lawsuit was pending, in March of 2010, the Debtors deeded the Anderson Property to Jim Henley.  [Finding of Fact No.

13].  In May and June of 2010—once again, while the Lawsuit was pending—the Debtors held their several garage, "designer" and "in-house" sales.  [Finding of Fact No. 110].  Also in June, the Debtors sold the two jet skis, receiving $20,500 in the transfer.  [Finding of Fact No. 92]. The Debtors testified that these sales were made to support their family and pay their attorneys' fees in the Lawsuit.  However, only shortly afterwards, the Debtors relocated to Houston.  Even their attorney at the time, Hickam, had no current contact information for the Debtors.  [Finding of Fact No. 15].  It is clear that the Debtors had decided to flee from the very jurisdiction where they had initially chosen to defend themselves (i.e., by filing counterclaims against the Carooms).[95]  Soon after the Debtors departed Arkansas—without a trace—the Arkansas Court entered a Judgment in the Lawsuit in favor of the Carooms.  [Finding of Fact No. 16].

These events demonstrate to this Court that the Debtors left Arkansas purposefully, first liquidating their assets—including the jet skis—and then fleeing the state with cash in hand (at least equal to the amount received from the sale of the jet skis).  [Finding of Fact Nos. 16, 92 & 110].  Thus, actual intent to defraud is clearly present.  Rather than pay their creditors, including the Carooms, the Debtors intentionally defrauded them; therefore, this Court denies the Debtors' discharge under § 727(a)(2)(A).

### ii.  The Debtors' Defense to § 727(a)(2)(A) Fails

Once more, the Debtors contend that facts were not pled with sufficient particularity in the Complaint.  [Tape Recording, 7/18/12 Trial at 12:16:00–12:18:35 p.m.].  This Court disagrees.  While that portion of the Complaint encompassing the § 727(a)(2)(A) cause of action

---

[95] The Debtors moved to Houston approximately seven months after the Carooms had filed these claims against the Debtors to initiate the Lawsuit.  [Finding of Fact Nos. 10 & 14].  The Debtors moved to Houston without ever notifying their attorney in Arkansas at that time, Scott Hickam, as to how he could reach them.  [Finding of Fact No. 15].  Apparently, the Debtors had concluded—wrongfully—at that time that they would avoid the consequences of the Lawsuit by simply moving out of the state of Arkansas.

must comply with the particularity requirements, as this provision involves knowing and intentional fraud, *see In re Cooper*, 399 B.R. at 645 (citing FED. R. BANKR. P. 7009(b)[96]), the Complaint does in fact conform.  While the Complaint does not mention the jet skis specifically, the language in both the Complaint and in item 10 of the SOFA is comprehensive; it requires that debtors list "ALL" transfers within the two year period.  [Adv. Doc. No. 1, at 7].

Similarly, in *Guerriero v. Kilroy (In re Kilroy)*, 354 B.R. 476, 498 (Bankr. S.D. Tex. 2006), the Complaint failed to allege each § 727(a)(2) claim with specifically.  Rather, the Complaint alleged conspiracy to defraud the debtor's creditors.  *Id.*  It did not mention the specific fraudulent transfer at issue, nor that the transfer occurred within one year of the Petition Date.  *Id.*  While the Court recognized that this particular transfer was "not clear from a simple reading of the [Complaint]," the Complaint nevertheless complied with Rule 9(b); the transfer was deemed part of the "conspiracy" that the creditors pled.  *Id.*

In this case, besides reference to § 727(a)(2)(A)'s language, Background Fact No. 18 asserts the following:

> In addition to the foregoing attempts to mislead the Trustee's investigation and this Court, listed below are statements that the Debtors made under oath which upon information and belief may or may not be false, [including] . . . The Statement of Financial Affairs in Question #10 [which] requires debtors to DISCLOSE ALL TRANSFERS OF PROPERTY WITHIN TWO YEARS PRIOR TO THE FILING OF THE CASE.

[Adv. Doc. No. 1, at 7].  The jet skis clearly fall within this category; they were assets belonging to the Debtors that were transferred within two years of the Petition Date.  [Finding of Fact No. 91].  The Debtors did not disclose the sale of the jet skis, thereby "[misleading] the Trustee's investigation," as the Complaint pleads.  [Adv. Doc. No. 1, at 7].  The Debtors should have been

---

[96] Making FED. R. CIV. P. 9 applicable to adversary proceedings.  Rule 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).

fully aware that "ALL" assets within that definition could be raised and be at issue during trial. [*Id.*].   The fact that the Complaint did not specifically mention the jet skis is therefore immaterial.  *In re Kilroy*, 354 B.R. at 498.

Finally, the Debtors concede that the jet ski sale occurred within one year of the Petition Date.  Yet, the Debtors omitted this transfer from their original and amended SOFA.  [Finding of Fact No. 91].   At a minimum, this Court finds that this choice not only frustrated the administration of the estate, but was an intentional attempt to conceal these assets—and their sale—from the Trustee and the Debtors' creditors.  Thus, even if discharge is not barred by § 727(a)(2)(A), to the extent that this sale and its nondisclosure impacts the Debtors' credibility, this Court refers to these events as yet a further reason for finding that the Debtors' credibility is severely lacking.  *See* Section III.

6.   All of the Debtors' Affirmative Defenses Fail

In response to the Plaintiffs' arguments for denial of the Debtors' discharge, the Debtors make three general affirmative defenses.  They allege that:  (1) their omissions were inadvertent and a result of bad advice from their initial bankruptcy attorney (i.e., Damani); (2) their omissions were unintentional and cannot be the basis for a denial of discharge; and (3) the Plaintiffs engaged in pre-trial discovery abuses.  As this Court concludes below, each of these defenses fails.

i.   *Negligence of Counsel is Not a Defense*

The Debtors assert that their numerous omissions were inadvertent because Damani failed to counsel them properly both before and after the Petition Date.  [Tape Recording, 7/18/12 Trial at 11:15:15–11:17:50 a.m.].  The Court rejects this argument.  The U.S. Supreme

Court has made it clear that a client cannot claim that an adverse outcome is unjust based on the actions or omissions of his freely-chosen attorney:

> There is certainly no merit to the contention that dismissal of the petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client.  Petitioner voluntarily chose this attorney as his representative in the actions, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.  Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'

*Link v. Wabash R.R. Co.*, 370 U.S. 626, 634–35 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879)).

The same rationale applies to a debtor; a debtor may not escape the consequences of violating the Code by merely pleading ignorance, and then pointing the finger at the bearer of bad advice.  *Houghton v. Marcella (In re Marcella)*, No. 07-04158, 2009 Bankr. LEXIS 3380, at *52 (Bankr. W.D. Mass. Oct. 15, 2009).  Rather, this defense is justified *only* when a debtor can show both reasonable and good faith reliance.  *See In re Gartner*, 326 B.R. at 374 (internal citations omitted) (defining these requirements within the § 727(a)(4) context).  The Debtors have failed to prove either element.  Rather, the Debtors' conduct illustrates a greater tenet:  that the more time a debtor's counsel spends personally meeting with the debtor, the more difficult it will be for the debtor to escape responsibility by pointing the finger at counsel.

### a.  The Debtors' Reliance on their Attorney was Unreasonable

Reasonable reliance is undermined when a debtor admits to meeting with his counsel, and personally reading and signing his Schedules and SOFA.  *Id.* (citing *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991)).  Like the debtor in *Gartner*, the Debtors here contend that the false statements and omissions on their initial Schedules and SOFA were

attributable to their attorney, Damani.  *See* [Tape Recording, 7/18/12 Trial at 11:15:15–11:17:50 a.m.].   Their reliance, however, was not reasonable.   First, prior to filing their bankruptcy petition, the Debtors had three separate meetings with Damani aggregating several hours. [Finding of Fact Nos. 23, 41 & 60].   In these meetings, Damani counseled them on the requirements of the Code, and the need to provide accurate and complete information in their Schedules and SOFA.  [Tape Recording, 6/26/12 Trial at 2:31:45 – 2:50:00 p.m.].  Second, Ms. Henley admitted—under penalty of perjury—to reviewing and signing both the original Schedules and SOFA.   [Finding of Fact No. 60].   While Mr. Henley denies reviewing the original Schedules and SOFA, and at trial attempted to shift responsibility to his wife, *see* [Tape Recording, 7/18/12 Trial at 11:15:15–11:17:50 a.m.] (noting that Mr. Henley testified that Ms. Henley ultimately handled all of the filing with Damani), he nevertheless has admitted through his trial counsel that he adopts all of the representations made in the original Schedules and SOFA.[97]  [Tape Recording, 6/27/2012 Trial at 4:40:10–4:40:51 p.m.]; [June 14, 2012 Tr. 33:1– 11].

Moreover, Mr. Henley, like his wife, signed the Electronic Declaration for the original Schedules and SOFA.  The Electronic Declaration expressly states that:

> I hereby declare under penalty of perjury that I have read:  the original statements and schedules to be filed electronically in this case; the voluntary petition as amended on the date indicate below and to be filed electronically in this case; the statements and schedules as amended on the date indicated below and to be filed electronically in this case . . . and that the information provided therein is true and correct.  I understand that the Declaration is to be filed with the Bankruptcy Court within five (5) business days after such statements, schedules, and/or amended petition or matrix have been filed electronically.  I understand that a failure to file the signed original of this Declaration as to any original statements and

---

[97] Trial counsel for the Debtors, Leonard Simon, represented more than once during trial that neither of the Debtors disputes the disclosures made and answers given in the original Schedules and SOFA.  [Tape Recording, 6/27/2012 Trial at 4:40:10–4:40:51 p.m.]; [June 14, 2012 Tr. 33:1–11].

> schedules will result in the dismissal of my case and that, as to any
> amended petition, statement, schedule, or matrix, such failure may result
> in the striking of the amendment(s).

[Debtors' Ex. No. 43]. Thus, by signing this document, which Mr. Henley (and Ms. Henley) did

on April 18, 2011, Mr. Henley swore that he was providing true and correct information. [*Id.*].

Under these circumstances, the Debtors do not come within hailing distance of showing

reasonable reliance on Damani. The falsehoods in the original Schedules and SOFA are simply

not attributable to him; these misrepresentations fall entirely on the Debtors' shoulders.

With respect to the amended Schedules and SOFA, the Debtors clearly did the

following[98]: (1) Ms. Henley met with Damani to discuss the necessary amendments after the

meeting of creditors held on May 20, 2011; (2) the Debtors paid Damani an additional $500.00

to file the amended Schedules after that meeting of creditors; and (3) after Crews (i.e., counsel

for the Trustee) sent the Financial Statement to Damani, the Debtors provided Damani with both

the information needed to file the amended SOFA as well as Ms. Henley's letter to Crews

explaining the assets' disposition. [Finding of Fact Nos. 94, 95, 105, & 106]. The Debtors'

argument that they relied on Damani is, therefore, unconvincing.

Damani simply cannot be held responsible for the Debtors' failures. After all, (1)

Damani did not have the Financial Statement when he assisted the Debtors in preparing the

original Schedules and SOFA and the amended Schedules; (2) Damani met with the Debtors for

more than five hours prior to filing their Chapter 7 petition discussing their financial situation

and reviewing records that they gave to him in order to counsel and assist them in completing the

Schedules and SOFA; (3) prior to Damani's receipt of the letter from Crews, bringing to his

attention the existence of the Financial Statement, the Debtors never disclosed to him the assets

---

[98] The Debtors testified that they did not review these amendments prior to Damani's filing. [June 14, 2012 Tr. 79:14–15]. Nevertheless, as discussed above, the Court finds that the Debtors are responsible for the content contained therein.

described in the Financial Statement or the disposition thereof; (4) the Debtors gave evasive and contradictory testimony at the meeting of creditors held on May 20, 2011; and (5) Damani only received information about the undisclosed assets from a third party (i.e., the Trustee).  Damani's own clients, therefore, concealed these assets from him.  *See, e.g.*, *Cadle Co. v. Heil (In re Heil)*, 289 B.R. 897 (Bankr. E.D. Tenn. 2003) (finding fraudulent behavior where debtor made inconsistent statements regarding perceived obligations, failed to disclose asset to his own attorney and the trustee, and had received advice from another experienced bankruptcy attorney that the asset should be disclosed); *Yules v. Gillis (In re Gillis)*, 403 B.R. 137 (1st. Cir. 2009) (debtor acted knowingly and fraudulently in failing to turn over proceeds from estate assets; debtor testified inconsistently regarding the assets at the meeting of creditors and later at his deposition).  *Compare In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) (finding that the debtor's reliance on counsel, who was *fully aware* of all relevant facts, rebutted an inference of fraud by the debtor) (emphasis added).  To the extent that the Debtors relied on Damani for legal assistance—including, but not limited to, filing their original and amended Schedules and SOFA—this reliance was based on their own misinformation and nondisclosure.  Any resulting reliance on Damani was patently unreasonable.[99]

### b.  The Debtors Acted in Bad Faith

Good faith is required to demonstrate attorney reliance, *see In re Gartner*, 326 B.R. at 374, and a court is unlikely to find good faith when the debtor *intended* to omit information from the bankruptcy petition.  *Id*.  As such, the Debtors here have not acted in good faith.  For

---

[99] As an additional example of the Debtors' unreasonable reliance, the first page of the Debtors' bankruptcy petition requires the Debtors to disclose their first, middle, and last name.  Here, Ms. Henley failed to provide her middle name, "Lenee."  Although Damani typed Ms. Henley's first and last name into the petition, responsibility lies with Ms. Henley.  Not only is this information basic, the question clear, and the omission obvious; indeed, Ms. Henley testified that she reviewed the Petition prior to swearing to its accuracy under oath.  [Finding of Fact No. 43].  Damani is ultimately not accountable for this omission.

example, at trial, the Debtors testified that they never reviewed their amended Schedules, and

instead relied on Damani.  [Finding of Fact No. 95].  Yet, under a similar oath, the Debtors

signed the § 341(a) questionnaire at the meeting of creditors, thereby swearing the opposite:  that

they had reviewed and verified as accurate those same amended Schedules.[100]  *See* [Finding of

Fact No. 97].  One of these sworn statements must be false.  That the Debtors find it so easy to

lie under oath undermines not only their credibility, but also their contention that the omissions

in the original and amended SOFA and Schedules were the result of their honest and innocent

reliance on Damani.  The Debtors' blame game must stop here; they must accept responsibility

for the falsehoods in their original and amended SOFA and Schedules.  Without reasonable

reliance or good faith, this Court finds that the Debtors' defense of attorney reliance has no

merit.

> ii.   *The Debtors' Fraudulent Intent is Not Negated by Their Pre- and Post-Petition Actions*

### a.  Using Proceeds From Sales of Undisclosed Assets to Pay Down Debt Does Not Negate Fraudulent Intent.

The Debtors contend that by using the proceeds from the sale of their undisclosed assets

to pay certain creditors—particularly subcontractors—they were acting in good faith.  They

argue that this act thereby negates a finding of fraudulent intent.  This Court disagrees.  The fact

that the Debtors paid their subcontractors with *some* of the proceeds from the sales of

undisclosed assets does little to mitigate the Debtors' intent to deceive the Trustee, the Carooms,

and all of the Debtors' other creditors.[101]  *WTHW Investment Builders v. Dias (In re Dias)*, 95

---

[100] The Debtors have since filed an amended Schedule F with the assistance of their current counsel, Simon.   [June 15, 2012 Tr. 65:22–66:2]; [Docket No. 63].  The Debtors' responses on their amended Schedule F filed April 1, 2012 are the same as the responses on the amended Schedule F filed by Damani on May 24, 2011.  *Compare* [Docket No. 63], *with* [Debtors' Ex. No. 101, at 3].

[101] At trial, the Debtors argued more than once that because the Carooms had extensive knowledge about the Debtors' financial affairs, and because the Carooms hold approximately 97% of the aggregate indebtedness owed by

B.R. 419, 426 (Bankr. N.D. Texas 1988) (finding that the undisclosed sale of an asset to a relative for less than what the asset was worth evidenced the debtor's fraudulent intent; applying some of the proceeds to some of his debt did not negate his fraudulent intent).   Merely paying some creditors with the proceeds does not negate the Debtors' underlying fraudulent intent.

### b. A Third Party's Knowledge Does Not Negate the Debtors' Intentionality

Here, the crux of the Debtors' argument is that the Carooms knew about the Financial Statement and the transfer of the Anderson Property; therefore, the Debtors could not have had any fraudulent intent in failing to disclose this information.  This Court disagrees.  The Carooms' knowledge about the Debtors' Financial Statement and the transfer of the Anderson Property is irrelevant.  *See* [Finding of Fact No. 105].  It is the *Debtors'* duty, not the duty of any of their creditors, to honestly and accurately disclose all transfers, assets, and other relevant information to the Trustee.  *See Lincoln Nat. Life Insur. Co. v. Silver (In re Silver)*, 367 B.R. 795, 824 (Bankr. D.N.M. 2007) (holding that the debtor's failure to report her interest in certain property violated § 727(d)(2), regardless of whether the creditor knew about the property).  A creditor's knowledge of a debtor's assets, ownership interest, or any other information does not relieve the debtor of his duty to the trustee.

Here, the Debtors' failure to disclose the transfer of the Anderson Property and the existence of the Financial Statement violated their duty to the Trustee and all of their other creditors (who did not have the knowledge that the Carooms held).  What the Carooms knew is

---

the Debtors, any failure of the Debtors to disclose should nevertheless not be the basis of a denial of their discharge. Stated differently, the Debtors want this Court to disregard the fact that they have creditors other than the Carooms. In fact, these other creditors hold approximately $50,000 of debt, [Main Case Doc. No. 1, at 20], and their interests are entitled to be protected by the Trustee, if not by themselves.  That is why the Debtors' argument is wholly unpersuasive.  The Debtors' use of proceeds from the sale of undisclosed assets to pay their own expenses and certain subcontractors is information that those creditors who received no payment should be entitled to know in evaluating whether to take action against the Debtors.

beside the point.   The Debtors' argument that the Carooms' knowledge of the Financial Statement and the Anderson Property negates their own fraudulent intent fails as a matter of law.

### c.   The Debtors' Disclosures Do Not Remedy Prior False Oaths or Negate the Debtors' Intent to Deceive

The Debtors contend that they had no fraudulent intent because, once confronted with the undisclosed sale of their jet skis and the assets on the Financial Statement, they cooperated freely and fully with both Damani and the Trustee.  [Finding of Fact Nos. 91, 106, & 107].  This Court disagrees.  "Full disclosure is a prerequisite to the Debtor[s'] obtaining a discharge."  *Fokkena v. Huff (In re Huff)*, 349 B.R. 587, 593 (Bankr. S.D. Iowa 2006).   Yet, here, the Debtors were silent.   They chose to disclose material financial information *only* when directly asked or confronted with the truth.  This behavior justifies a presumption of fraud, as this is the essence of intent to deceive.  *See In re Gartner*, 326 B.R. at 375 ("The decision to amend the Schedules only after untruths are uncovered is evidence of fraudulent intent."); *see also Satriale v. Mumin (In re Mumin)*, No. 97-14424DAS, 1998 WL 160992, at *3 (Bankr. E.D. Pa. April 1, 1998) ("An inference of fraud is permissible [ ] when the evidence indicates that the amendment is not in fact voluntary because the amendment is offered only as a result of development during the meeting of creditors, after the debtor 'knew the cat was out of the bag,' [or] well after the meeting of creditors . . .").

The Debtors' cover-up regarding the jet skis underscores the weakness of their contention that they were completely cooperative after the existence of these assets came to light.  First, they never disclosed the sale of these jet skis in the amended SOFA in response to item 10. [Finding of Fact No. 91].  Nor later, when the sale was discovered, would the Debtors disclose the sale price of these jet skis.  At trial, counsel for the Carooms asked Ms. Henley to disclose the sale price of the jet skis.  [June 15, 2012 Tr. 54:1–25].  In an attempt to avoid answering the

question posed, she stated:  "we sold them for about $300.00 under what the mortgage was."  [*Id.* at 54:23–25].  This Court interjected, and requested that she answer the question posed:  how much did the Debtors receive from the sale of the jet skis?  [Tape Recording, 6/27/2012 Trial at 6:54:44–6:55:05 p.m.].  This time, Ms. Henley informed the Court that the Debtors sold them for approximately $500.00 less than what was owed on them.  [*Id.*].  This Court pressed Ms. Henley further.  [*Id.*].  Finally, Ms. Henley disclosed that the jet ski loan was $21,000.00.  [*Id.*].  Using this information, this Court finds that the Debtors sold the jet skis for approximately $20,500.00—a tidy sum, which, by their nondisclosure, the Debtors clearly wanted to keep out of the glare of the Trustee and creditors in this case.

Aside from not disclosing the sale and sale price of the jet skis, the Debtors—even more egregiously—never produced or mentioned the Financial Statement before, at, or even after the May 20, 2011 meeting of creditors.  [Finding of Fact No. 105]  Rather, almost three months after this meeting, the Carooms—not the Debtors—provided a copy of the Financial Statement to the Trustee.  [*Id.*]  When counsel for the Trustee sent a letter to Damani insisting on an explanation about the assets listed in the Financial Statement, Damani then confronted the Debtors.  [*Id.*].  Only then did Ms. Henley write a letter to the Trustee and his counsel to disclose the sales of the assets described therein.  [Finding of Fact No. 107].  Ms. Henley's action does not indicate honest intent in *any* way, and the Debtors' later decision to amend their SOFA to disclose their asset sales does not excuse the Debtors' earlier fraud; rather, it solidifies its existence.  *In re Gartner*, 326 B.R. at 375 (citing *Sholdra v. Chilmark Fin. LLP (In re Sholdra),* 249 F.3d 380, 382 (5th Cir. 2001)); *see In re Huff*, 349 B.R. at 594 (finding that the debtor's admissions at her meeting of creditors were not the result of her honest intent, but rather due to what the court called the "unavoidable result of two knowledgeable creditors being present at the meeting").

The Debtors are requesting that this Court send a dangerous message:  that as long as a debtor *eventually* discloses his earlier omission, any earlier fraudulent intent is negated.  In effect, this would mean that there are no consequences for a debtor's failure to make proper and timely disclosures.  Here, this message would require the Court to find that the Debtors were without fraudulent intent as a result the Debtors' cooperation *after* the Trustee had already received the Financial Statement from the Carooms, *after* the Trustee's counsel had sent the Financial Statement to Damani requesting an explanation of the history of the undisclosed assets, *and after* Damani confronted the Debtors with the Financial Statement.  This Court has already refused to send such a message in *Askanase v. Lawley (In re Lawley)*, No. 04-42060-H4-7, 2006 Bankr. LEXIS 1591, at *17 (Bankr. S.D. Tex. June 30, 2006); *see also In re Sholdra,* 249 F.3d at 382–83 (holding that the amended schedules and amended statement of financial affairs failed to negate the fact that the debtor knowingly made false oaths on his original Schedules and original SOFA); this Court will not send it here.  Instead, the Court finds that the Debtors intended to deceive, and that their eventual disclosures—after "the cat was let out of the bag"—were insufficient to reverse that intent.  *In re Mumin*, 1998 WL 160992, at *3.

   iii. *The Debtors Have Waived Their Discovery Abuse Claims*.

Finally, the Debtors contend that the Trustee engaged in a pattern of discovery abuse by lodging frivolous, duplicative, and meritless objections to interrogatories, failing to produce requested documents, and neglecting to supplement discovery responses; therefore, the Debtors argue that the Complaint should be dismissed.

There is no question that in March of this year, the Debtors filed an Emergency Motion to Dismiss for Discovery Abuses, and that on the same day, filed a Corrected Emergency Motion to Dismiss for Discovery Abuses.  [Adv. Doc. Nos. 28 & 29].  The Trustee filed a response on this

same day in opposition thereto.  [Adv. Doc. No. 31].  Then, on March 22, 2012, the Carooms filed their response in opposition thereto.  [Adv. Doc. No. 33].  A day later, the Debtors filed a reply to these responses.  [Adv. Doc. No. 35].  On April 2, 2012, this Court held a hearing on these matters.  The Court heard testimony, admitted exhibits, listened to closing arguments, and then made oral findings and conclusions on the record.  The Court granted the Debtors' motion in part and denied it in part, and signed an order to that effect on April 16, 2012.  [Adv. Doc. No. 59].   The Court continued trial for approximately two and a half months so that additional discovery could be taken.  And, indeed, additional discovery was taken, and trial was in fact held.

In closing arguments, counsel for the Debtors once again raised the discovery abuse issues that he had raised in the Corrected Emergency Motion to Dismiss for Discovery Abuses. Counsel for the Debtors urged this Court to deny all relief sought by the Plaintiffs on the grounds that they had committed discovery abuse.  The Court declines to do so.  To the extent that there was any abuse, the Court resolved this issue by its order of April 16, 2012 continuing the trial, and ordering that the Plaintiffs produce additional documents and additional individuals for deposition.  The Plaintiffs complied, and counsel for the Debtors was able to obtain and review documents, and take depositions.  The Debtors cannot now come back after trial and request relief on discovery abuse that has been cured.

To the extent that the Debtors are arguing that some other discovery abuse occurred that would justify denial of the relief sought by the Plaintiffs, the Court finds that the Debtors failed to timely make such an argument.  This failure constitutes a waiver of any claim for relief based on this conduct.  *See Butler v. Pettigrew*, 409 F.2d 1205, 1207 (7th Cir. 1969) (where a party neglected to seek a motion to compel prior to trial and waited until after judgment to request

134

sanctions, it waived its rights under Rule 37(b) and (d) for judgment as a matter of law based on the opposing party's failure to fully answer interrogatories).  In sum, the Debtors argument is untimely.  *See Brandt v. Vulcan, Inc.*, 30 F.3d. 752, 756 (7th Cir. 1994) (holding that unreasonable delay may render a motion for discovery abuse untimely).

For all of the reasons set forth above, all of the Debtors affirmative defenses fail.  Thus, the Plaintiffs have met their burden of proving by a preponderance of the evidence that the elements of each and every one of the following provisions have been satisfied:  (1) § 727(a)(4)(A); (2) § 727(a)(4)(D); (3) § 727(a)(3); (4) § 727(a)(5); and (5) § 727(a)(2)(A).  S*ee Cadle Co. v. Friedheim (In re Friedheim)*, 277 Fed. App'x 485, 489 (5th Cir. 2008) ("The creditor objecting to discharge bears the burden of proof on all elements, which he may meet by a preponderance of the evidence." (citing FED. R. BANKR. P. 4005)).  Accordingly, this Court will deny the Debtors their discharge.

### D.  The Debtors Have Failed to Prove by a Preponderance of the Evidence That the Carooms[102] Violated the Automatic Stay.

Under 11 U.S.C. § 362(a), the filing of a bankruptcy petition operates as an injunction, which automatically stays the "commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."  11 U.S.C. § 362(a)(1).  Without question, the plain language of § 362(a)(1) bars the continuation of a creditor's pending civil court judicial action against a debtor.  *See Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1213–14 (9th Cir. 2002) ("Section 362(a)(1) automatically stays 'the commencement or continuation . . . of a

---

[102] In this Section, the Trustee and the Carooms will be referred to separately.  The Debtors, though the counter-plaintiffs in the § 362 Action, will continue to be referred to as the Debtors.

judicial, administrative, or other action or proceeding against the debtor ['] . . . This statute is unambiguous. The plain language of § 362(a)(1) prohibits the continuation of judicial actions."); *In re Daniels*, 316 B.R. 342, 349 n.4 (Bankr. D. Idaho 2004).

The filing of a bankruptcy petition and the automatic stay do not, however, prevent the commencement or continuation of a criminal action or proceeding against the debtor.  11 U.S.C. § 362(b)(1).  In their counterclaim, the Debtors assert that the Carooms, as well as their agents, violated the automatic stay by assisting and encouraging the Debtors' post-petition arrests.  For the reasons set forth below, the Court finds that the actions of the Carooms—albeit dogged, determined and devastating—did not violate § 362(a)(1).[103]

1.  Because the Carooms Themselves Lacked Actual Knowledge of the Bankruptcy Petition, They Did Not Violate the Automatic Stay.

The automatic stay takes effect upon filing of the bankruptcy petition.  A creditor is not subject to the Code's provisions pertaining to the automatic stay until notice of the bankruptcy filing is received.  *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 267 (Bankr. N.D. Tex. 2002); *In re Lile*, 103 B.R. 830, 837 (Bankr. S.D. Tex. 1989).  A debtor may notify a creditor of his bankruptcy filing orally or in writing.  *In re Lile*, 103 B.R. at 837.  Once the creditor receives notice, "the creditor is obligated to inquire further before ignoring the verbal notice and proceeding to collect on its debt."  *Id.*  "At the very least a call to the office of the clerk of this

---

[103] There is no question that spending the night in jail can be a devastating experience.  Indeed, Ms. Henley credibly testified that after she was taken into custody, she was kicked, her clothes were cut, and she was forbidden from making a phone call to her nine-year-old son.  [Tape Recording, 6/11/12 Trial at 3:14:10–3:18:40 p.m.].  Thus, incarceration can be a very unpleasant experience both physically and emotionally; and counsel for the Debtors, at various times throughout the trial, implied if not expressly argued that the Court should consider the misery experienced by the Debtors while they were in custody in determining its ruling.  *See* [*id.*].  The Court declines to do so because the Court has concluded that the Carooms did not violate the automatic stay.  The Court notes that the Debtors' initial counterclaims against the Carooms in this adversary proceeding included abuse of process, malicious prosecution and defamation—in addition to violation of the automatic stay.  [Adv. Doc. No. 10].  The Court dismissed without prejudice the counterclaims for abuse of process, malicious prosecution, and defamation on the basis that these post-petition causes of action are based solely on state laws and should be adjudicated in state court.  [Adv. Doc. No. 22].  Thus, the Debtors are free to pursue these claims against the Carooms in the district court of Harris County, Texas or in some other forum; the Court expressly makes no ruling on these claims.  [*Id.*].

Court is required." *Trull v. Nationscredit Commerical Corp. (In re Trull)*, No. 93–30343, 1995 WL 17005344, at *6 (Bankr. S.D. Ga. Jan. 26, 1995).  More importantly, when a creditor is put on notice of the debtor's bankruptcy filing, he then has an affirmative duty to act to suspend any collection actions.  *In re Daniels*, 316 B.R. at 350.  If the creditor fails to acquire clarification from the bankruptcy court or clerk, and instead continues his collection, the creditor may be liable for damages.  *In re Lile*, 103 B.R. at 837.  Nevertheless, "if a creditor violates the automatic stay *without* knowledge of the filing of the bankruptcy, it is merely a *technical* violation," *In re Coons*, 123 B.R. 649, 650 (Bankr. N.D. Okla. 1991) (emphasis added), and there are no consequences to the creditor.

In *Coons*, the court analyzed both actual and constructive notice of a bankruptcy filing. 123 B.R. 649.  The debtor asserted that she telephoned her creditor's office, notifying it of her bankruptcy petition.  *Id.* at 649.  However, she failed to provide the creditor with her case number or any additional information about the filing.  *Id.* at 651.  The court found that this debtor-to-creditor phone call was simply too vague to give the creditor actual notice.  However, a separate call between the debtor's attorney and the creditor's attorney was analyzed differently. This communication provided the creditor with sufficient *constructive* notice, and by subsequently repossessing the debtor's assets, the creditor violated the stay.  *Id.*  Even constructive notice imposes a duty of inquiry on the creditor.  *Id.*

Under the *Coons* rationale, knowledge of the bankruptcy filing is the legal equivalent of knowledge of the automatic stay.  *See also In re Coats,* 168 B.R. 159, 166 (Bankr. S.D. Tex. 1993); *Wagner v. Ivory (In re Wagner)*, 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987).  Conversely, knowledge of the debtor's intent to file bankruptcy at some point in the future is *not* the legal equivalent of knowledge of the automatic stay.  Nor does the debtor's intent to file a bankruptcy

petition in the future invoke the automatic stay's protections.  Only an *actual* bankruptcy filing

establishes this shield.  *In re Bragg*, 56 B.R. 46, 49 (Bankr. M.D. Ala. 1985).  Thus, in order to

establish a violation of § 362(a), a debtor must show by a preponderance of evidence that:  (1)

the creditor knew of the existence of the stay; (2) the creditor's actions were taken intentionally;

and (3) those actions constituted stay violations.  *Young v. Repine (In re Repine)*, 536 F.3d 512,

519 (5th Cir. 2008).  If there is not knowledge, a creditor's actions cannot establish a § 362(a)

violation.  *In re Lafanette*, 208 B.R. 394, 395–96 (Bankr. W.D. La. 1996).  Without knowledge,

the violation is not "willful."  *Id.*

> ### i.   *The Carooms Did Not Have Actual Notice of the Debtors' Bankruptcy Until After the Debtors' Arrests*

Mr. Caroom did not receive actual notice of the Debtors' bankruptcy filing from the

Debtors or their counsel until after the Debtors were arrested.  On April 18, 2011 at 4:53 p.m.,

the Debtors' bankruptcy attorney (i.e., Damani) electronically filed their Chapter 7 bankruptcy

petition in this Court.  [Finding of Fact No. 60].  At no time between the Debtors' bankruptcy

filing at 4:53 p.m. on April 18, 2011 and their arrests at approximately 2:20 p.m. on April 19,

2011 did the Debtors or their attorneys (i.e., Damani in Texas, or Hurst in Arkansas) directly

notify Mr. Caroom.

Rather, Mr. Caroom first learned of the bankruptcy on April 19, 2011, shortly after the

Debtors' arrests.  [Finding of Fact No. 74].  In addition, Mr. Caroom received the information

third-hand; Officer Gunter informed Mr. Caroom that, upon their arrests, the Debtors stated that

they had just recently filed for bankruptcy.  [Tape Recording, 6/13/2012 Trial at 3:26:43–3:27:13

p.m.].  Even if this third-party communication constitutes debtor-to-creditor notice—and this

Court does not so hold—the Debtors' statements were far too vague to constitute actual, or even

constructive notice to Mr. Caroom.  Moreover, by the time this information reached Mr. Caroom,

the Debtors were already in handcuffs!  Thus, even with actual notice, Mr. Caroom could not prevent what had already occurred.[104]

Similarly, Ms. Caroom did not receive actual notice of the bankruptcy filing from the Debtors themselves, nor did Ms. Caroom receive constructive notice of it from the Debtors' attorney.  In fact, Ms. Caroom did not learn that the Debtors had filed for bankruptcy until April 20, 2011.  [Finding of Fact No. 82].  She received notice of the bankruptcy filing in an e-mail message from Tapp's office.  [*Id.*].  At no time between the Debtors' bankruptcy filing at 4:53 p.m. on April 18, 2011 and their arrests at approximately 2:20 p.m. on April 19, 2011 did the Debtors or their attorneys directly or indirectly notify Ms. Caroom of their bankruptcy filing.  As a result, this Court finds that Ms. Caroom did not have notice of the Debtors' bankruptcy filing until after the Debtors' arrests.[105]  Without actual notice of the filing, neither of the Carooms violated the automatic stay.

---

[104] Assuming Mr. Caroom received sufficient notice of the bankruptcy filing from Officer Gunter on the afternoon of April 19, this Court still wonders what Mr. Caroom could have done about the Debtors' situation.  By the time Mr. Caroom spoke with Officer Gunter and learned of the Debtors' bankruptcy filing, the Debtors were already in police custody.  [Finding of Fact No. 74].  At best, Mr. Caroom could have immediately contacted Tapp in Arkansas.  Tapp, in turn, could have then attempted to reach Hurst so that the two of them could then locate Judge Wright to request that he sign an order vacating the Body Attachment Order.

Yet, Mr. Caroom did not speak to Officer Gunter until approximately 2:30 p.m. on April 19.  [Finding of Fact No. 69].  Tapp, during the afternoon of April 19, 2011, was attending various hearings in the Hot Springs courthouse.  [Finding of Fact No. 77].  Judge Wright and Hurst were in trial until 3:30 p.m., and Judge Wright left his chambers for the day at approximately 4:00 p.m.  [Finding of Fact No. 79].  Thus, Mr. Caroom would have had a very short window of opportunity to contact Tapp, who would have had a very short window to locate and communicate with Hurst, who in turn would have had a short time frame to locate Judge Wright and request that he sign an order vacating the Body Attachment Order.  Judge Wright would then have had to sign this order and then quickly transmit it to the Harris County District Court before 5:00 p.m. for there to be any chance—however slim—of having that Court enter an order releasing the Debtors from police custody so that they could avoid spending the night in the Harris County jail.

It seems extremely unlikely to this Court that all of these steps could have been accomplished on the afternoon of April 19, 2011.  Ultimately, even if Mr. Caroom received sufficient notice of the bankruptcy filing from Officer Gunter after the Debtors' arrests on April 19, Mr. Caroom could not have taken any actions to obtain the Debtors' release from custody any earlier than was actually done.

[105] Trial counsel for the Debtors complained at one point that the Carooms had never produced phone records for the home phone of the Carooms, implying that if such records had been produced, these documents would have shown numerous phone calls between Tapp and the Carooms on the morning and afternoon of April 19, 2011—thereby proving that Tapp and the Carooms became aware of the bankruptcy filing on the morning of April 19, 2011.  Mr. Caroom credibly testified that he does not have a home phone line.  [Tape Recording, 6/13/12 Trial at 3:24:00–

ii.  *The Carooms Did Not Have Constructive Notice of the Bankruptcy Until After*
     *the Debtors' Arrests*

Like his clients, Tapp, the Carooms' attorney in Arkansas, did not receive notice of the

Debtors' actual bankruptcy filing until after their arrests.  Notice of *intent* to file bankruptcy is

simply not the legal equivalent of notice of the actual bankruptcy filing.  *In re Wagner*, 74 B.R.

at 904.  Thus, while Hurst had told Tapp—before the Debtors' arrests—that they intended to file

for bankruptcy, Tapp failed to receive sufficient notice of the Debtors' actual bankruptcy filing

prior to their arrests.  [Finding of Fact No. 76].  In fact, Hurst, the Debtors' attorney in Arkansas,

did not send Tapp notification of the Debtors' bankruptcy filing until 4:52 p.m. on April 19,

2011—or approximately twenty-four hours after the actual filing, and approximately two and

half hours after the Debtors' arrests.  [Finding of Fact No. 80].  Damani, the Debtors' attorney in

Texas, was even later than Hurst, sending a fax at 5:44 p.m. on April 19, 2011.  [Finding of Fact

No. 62].  Neither attorney telephoned Tapp, or his law office, on either April 18 or 19 to inform

him that the Debtors had indeed filed their Chapter 7 petition at 4:53 p.m. on April 18.  [Finding

of Fact Nos. 62 & 80].  Moreover, Tapp credibly testified that he did not read the faxes sent by

either Hurst or Damani until the following morning, as Tapp was at the Hot Springs courthouse

for the entire day of April 19, 2011.  [Finding of Fact No. 81].  Tapp, therefore, had no notice of

the Debtors' bankruptcy filing until the morning of April 20, 2011.

---

3:24:02 p.m.; 3:48:20–3:48:34 p.m.].  And, the records of the Carooms' cell phone calls were produced, so there was
proper compliance with the discovery requests.  There is no doubt that these circumstances make it difficult to prove
an intentional violation of the automatic stay, but it is the Debtors' burden to satisfy the elements of § 362(k), and
they cannot do so by requesting this Court to speculate on what was actually said in cell phone conversations
between Tapp and the Carooms, or what might have been said on a land-line.  Moreover, Ms. Henley conceded that
the records that were produced reflect that there were no cell phone calls between Tapp and Mr. Caroom between
4:53 p.m. on April 18, 2011 (i.e., when the bankruptcy petition was filed) and approximately 2:30 p.m. on April 19,
2011 (i.e., when the Debtors were arrested).  [Tape Recording, 6/12/12 Trial at 9:40:00–9:42:45 a.m.].  The absence
of such phone calls actually supports this Court's finding that neither the Carooms nor their agent, Tapp had notice
of the bankruptcy filing prior to the Debtors' arrests.

Moreover, even if this Court disregards Tapp's testimony and assumes that Tapp read Hurst's fax the very moment that it arrived (i.e., at 4:52 p.m. on April 19, 2011), this Court cannot possibly find a stay violation based on this evidence. By 4:52 p.m. the Debtors were already in handcuffs. [Finding of Fact No. 68]. Thus, Tapp's first opportunity to receive sufficient notice of the bankruptcy filing occurred more than two hours *after* the Debtors' arrests. As such, he could not impart constructive notice to his clients, the Carooms.

In addition to the fax that Hurst sent to Tapp at 4:52 p.m. on April 19, 2011, Hurst asserts that on the morning of April 19, several hours prior to the Debtors' arrests, he also gave Tapp *personal* notice of the bankruptcy filing by verbally informing him at the Hot Springs courthouse. [Finding of Fact No. 76]. This oral notification would certainly constitute constructive notice of the stay to the Carooms. *See Sermersheim v. Sermersheim (In re Sermershein)*, 97 B.R. 885 (N.D. Ohio 1989) (holding that telephonic notification of the debtor's bankruptcy petition is sufficient notification of the attendant automatic stay).

However, the Court finds that this testimony is not credible, and therefore finds that Hurst did *not* give verbal notice to Tapp on the morning of April 19 that the Debtors had filed their bankruptcy petition the previous day. Not only did Tapp credibly testify that he did not speak at all with Hurst on April 19, 2011, but there is also a very telling point about what Hurst did *not* say on the morning of April 20. At approximately 8:00 a.m. on the morning of April 20, i.e., approximately 18 hours *after* the Debtors' arrests, Judge Wright—having just read the Suggestion of Bankruptcy that Hurst had filed at 4:36 p.m. on April 19, 2011—immediately summoned Tapp and Hurst to his chambers and instructed Hurst to bring an order with him vacating the Body Attachment Order. [Finding of Fact No. 84]. At approximately 8:30 a.m., both Tapp and Hurst appeared in Judge Wright's chambers, and Hurst presented the order to

141

Judge Wright.  [*Id.*].  Yet, there is no record that at this meeting, Hurst ever looked Tapp in the eyes and said something to the following effect:  "I told you yesterday morning that my clients had filed a bankruptcy petition the previous day, so why did you not take steps to stop the arrest warrant that the Houston Police carried out?"  If Hurst's assertion is really true—i.e., that he had verbally informed Tapp the previous morning of the Debtors' Chapter 7 filing—it seems likely that Hurst would have expressed some indignation during the meeting in chambers with Tapp and Judge Wright on the morning of April 20.  But there is no record of any disenchantment from Hurst.  *See* [*Id.*].  His silence is deafening.[106]

The Court also finds that Hurst did not verbally inform Tapp at the Hot Springs courthouse on April 19 of the Debtors' bankruptcy filing for yet another reason.   In his testimony, Judge Wright stated that he signed the order vacating the Body Attachment Order on the morning of April 20, which was almost immediately after he discovered the existence of the Debtors' bankruptcy.  [Finding of Fact No. 84].  Indeed, he testified that he does not want to be in the position of being in violation of the automatic stay.  [Wright Dep. 8:9–16] ("[M]y practice would be to make sure that I'm not doing anything that would get me in contempt of the Federal Bankruptcy Court . . . I want to stay on the right side of that Stay Order.").  It is instructive that when Judge Wright learned about the bankruptcy at approximately 8:00 a.m. on April 20, he

---

[106] Even if Hurst did not inform Tapp on the morning of April 19 about the Debtors filing for bankruptcy the previous day, the Debtors point to a phone call between Judge Wright and Tapp on the afternoon of April 19 as evidence that Tapp (and, for that matter, Judge Wright) knew of the filing.  According to phone records, on April 19, 2011 at 4:06 p.m., Judge Wright called Sky Tapp's office from his cell phone.  This call lasted approximately four minutes.  [Wright Dep. Ex. No. 6].  There is no evidence that this phone call related to the Debtors or the Carooms; rather, Judge Wright testified that he has known Tapp since the 7th grade, and that Tapp is one of the "most active attorneys in this community," with many cases in Judge Wright's division.  [Wright Dep. 7:7–9, 11:22–23].  In fact, *no one* remembers the topic of the phone call, or even if Judge Wright spoke to Tapp directly.  [*Id.* at 19:21–23:17].  Indeed, Hurst did not file the Suggestion of Bankruptcy until 4:36 p.m. on April 19, which was 30 minutes after the phone call from Judge Wright to Tapp.

Yet, even assuming this phone call related directly to the Debtors and their bankruptcy petition, this phone call occurred an hour and half *after* the Debtors' arrests.  This does not demonstrate that Tapp had notice of the Debtors' bankruptcy petition prior to the Debtors' arrests.  The earliest credible evidence of Tapp's notice remains the April 19, 4:52 p.m. fax from Hurst, although Tapp did not actually read this notice until the next morning when he came into the office.  [Finding of Fact No. 80].

moved expeditiously to vacate the Body Attachment Order because he wanted to ensure that his order did not violate the automatic stay.  [Finding of Fact No. 84].  The fact that Judge Wright moved so quickly on the morning of April 20 suggests to this Court that had Hurst actually informed Judge Wright and Tapp on April 19—which is what Hurst has testified that he did, but which this Court does not believe—Judge Wright would have moved immediately on that day to sign an order vacating the Body Attachment Order.  These circumstances further convince this Court that Hurst never verbally informed either Tapp or Judge Wright on the morning of April 19 that the Debtors had filed their Chapter 7 petition the previous afternoon.

   2.   Under Texas law, an agency is a consensual and contractual relationship between a principal and his agent.

   2.   <u>For the Carooms to be Liable Through the Knowledge of Tapp or Officer Gunter, the Debtors Must Prove Agency</u>

   The Debtors argue that even if the Carooms themselves lacked actual and constructive notice of the automatic stay, Tapp and Officer Gunter's knowledge of the Debtors' bankruptcy filing should be imputed to the Carooms because Tapp and Officer Gunter are their agents.  [Tape Recording, 6/20/12 Trial at 1:39:30–2:13:50 p.m.].  According to the Debtors, Tapp and Officer Gunter facilitated the Debtors' post-petition arrest with the assistance and encouragement of the Carooms; and hence, as the Carooms' agents, Tapp and Officer Gunter's violations of the stay also establish the Carooms' liability.  [*Id.*].  This argument fails.

   Under Texas law, an agency is a consensual and contractual relationship between a principal and his agent.  *Schultz v. Rural/Metro Corp. of New Mexico-Texas*, 956 S.W.2d 757, 760 (Tex. Ct. App. 1997).  Whatever an agent does, within the scope of his or her actual (or apparent) authority, binds the principal.  *See Hester v. Graham, Bright & Smith, P.C.*, 289 Fed. App'x 35, 42 (5th Cir. 2008); 3 AM. JUR. 2D Agency § 262 (2008). The extent of an agent's authority is determined in light of all surrounding circumstances, including the parties' relations to one another, the undertaking in which the parties are engaged, and the general usages and

practices of those engaged in such undertakings.  *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1297 (5th Cir. 1994).  In Texas, the scope of employment inquiry also includes the larger issue of "control."  *Palmer v. Flaggman*, 93 F.3d 196, 199 (5th Cir. 1996).  In an agency relationship, the agent acts on behalf of the principal and is subject to the principal's control.

Texas law does not presume agency, and the party who alleges it has the burden of proving it.  *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007); *see also Pearce v. E.L.W. Corp. (In re Pearce)*, 400 B.R. 126, 131 (Bankr. N.D. Iowa 2009) ("An agency relationship may be shown by direct testimony or by circumstantial evidence showing the relationship of the parties and their conduct concerning the transactions at hand.").  Therefore, to show the existence of an agency relationship with the Carooms, the Debtors must demonstrate evidence of agency for each individual:  Tapp and Officer Gunter.

> i.  *The Carooms Had an Agency Relationship with Tapp, but Not With Officer Gunter*

To establish the existence of an agency relationship, a party must show that the principal had both (1) the right to assign tasks to the agent; and (2) the right to direct the execution of those tasks.  *Schultz,* 956 S.W.2d at 760.

### a.  Tapp is the Carooms' Agent.

The Carooms and Tapp have an agency relationship.  Tapp is a licensed attorney in the State of Arkansas and was the Carooms' attorney in the Lawsuit.  [Finding of Fact No. 15].  The law is "quite clear."  *Auguston v. Linea Aerea Nacional-Chile S.A. (LAN-Chile)*, 76 F.3d 658, 665 (5th Cir. 1996).  An "attorney is an agent for the client."  *Id.*  The Carooms, as Tapp's clients, have the right to assign tasks to Tapp and direct the way he accomplishes the tasks.  Any violation of the stay by Tapp could therefore be imputed to the Carooms.  *In re Ginther Trusts*, 2006 WL 3805670, at *22.

**b.  Officer Gunter is Not the Carooms' Agent.**

The Debtors have not proven that the Carooms and Officer Gunter have an agency relationship.  The Debtors assert that Officer Gunter was the Carooms' agent and that the Carooms directed Officer Gunter's actions between April 15, 2011 and April 19, 2011 relating to the Debtors' arrests.  This Court disagrees.  The Carooms did not have the right to control the manner in which Officer Gunter performed his duties.  As the Tenth Circuit has stated, when a police officer is acting within his official capacity, a third-party principal simply cannot exercise the necessary control over his actions.  *McGeorge v. Continental Airlines, Inc.*, 871 F.2d 952 (10th Cir. 1989) (internal citation omitted).  As an HPD Officer, Officer Gunter is not—and never was—employed by the Carooms.  The Carooms did not have the right to direct the way in which Officer Gunter set in motion and assisted in the Debtors' arrests.  Officer Gunter was never under the Carooms' direct supervision, and Officer Gunter's actions were executed entirely within his official capacity as a HPD officer.  *See* [Finding of Fact Nos. 57–59]. Although it is clear that the Carooms' relationship influenced and encouraged Officer Gunter's extensive involvement in the Debtors' arrest, *see* [Finding of Fact No. 58], this is not enough to establish an agency relationship.[107]   As such, even if Officer Gunter himself violated the

---

[107] Counsel for the Debtors argued that Officer Gunter's close relationship with Mr. Caroom made him an agent of the Carooms.  The Court acknowledges that Officer Gunter's relationship with Mr. Caroom is a much closer relationship than a citizen typically has with the police officer who is responding to a request for assistance by that citizen.  [April 3, 2012 Tr. 17:8–17].  Indeed, the fact that Officer Gunter sent Mr. Caroom the photographs of  the Debtors handcuffed in the squad car, and then soon thereafter personally met Mr. Caroom at the Ferrari dealership soon, and then later in the evening had dinner in Galveston with Mr. Caroom underscore the close relationship between Officer Gunter and Mr. Caroom.  [Finding of Fact Nos. 73–74]; [June 15, 2012 Tr. 113:1–22]; [Tape Recording, 6/12/2012 Trial at 2:33:00–2:35:00 p.m.].  The numerous cell phone and texting communications between Officer Gunter and the Carooms during the period April 15–19, 2011 also leave little doubt that Mr. Caroom and Officer Gunter have more than a casual relationship.  [Finding of Fact No. 32].  And finally, Officer Gunter refers to Mr. Caroom as his "uncle" despite there being no blood relationship.  [Finding of Fact No. 29]; [Tape Recording, 6/12/2012 Trial at 1:26:08–1:26:58 p.m.].  Counsel for the Debtors wants this Court to cite these circumstances to conclude that the actions taken by Officer Gunter relating to the Debtors' arrests are actions taken by an agent.  However questionable Officer Gunter's actions might be, the actions that he took to facilitate the Debtors' arrests were done in his capacity as an HPD officer, not as a private henchman paid by the Carooms.

automatic stay—and this Court does *not* so hold—his violation may not be imputed to the Carooms.

  *ii.*  *Neither Tapp Nor Officer Gunter Violated the Automatic Stay*

### a. Tapp Had No Knowledge of the Stay

  Tapp is an agent of the Carooms. Therefore, any knowledge he acquired "within the scope of [the] agency is imputed to the principal for purposes of determining whether the principal willfully violated the automatic stay." *In re Taylor*, 430 B.R. 305, 314 (Bankr. N.D. Ga. 2010); *Kline v. Deutsche Bank Nat'l Trust Co. (In re Kline)*, 420 B.R. 541, 548 (Bankr. D.N.M. 2009); *see also Green Tree Servicing v. Taylor*, 369 B.R. 282, 287 (S.D. W. Va. 2007). Yet, as already discussed above, Tapp did not receive actual or constructive notice of the Debtors' bankruptcy filing until the morning of April 20, 2011—when he reviewed Hurst's telefax sent at 4:52 p.m. the previous day—and thus, he was unaware of the automatic stay until well *after* the Debtors' arrests. [Finding of Fact Nos. 8 & 77]. As Tapp is not liable for a § 362(a)(1) violation, neither are the Carooms.

### b. Officer Gunter Did Not Violate the Stay

  Officer Gunter was not an agent of the Carooms. Even if he was, he lacked sufficient knowledge of the Debtors' bankruptcy filing to enable the Court to find that he willfully violated the automatic stay. First, Ms. Henley's statement from the squad car that the Debtors were in bankruptcy was too vague to put Officer Gunter on notice of the bankruptcy filing. [Finding of Fact No. 70]. Her husband and she failed to give sufficient information (i.e., case number or name of a court) to support this general assertion. *See In re Coons*, 123 B.R. at 649. Thus, this Court finds that Officer Gunter lacked actual or constructive notice.

Second, at the earliest, Officer Gunter learned of the Debtors' bankruptcy filing at the Debtors' arrest scene itself.  By then, with a valid arrest warrant in hand, the chain of events that led to the Debtors' arrests had already commenced.  The Debtors' notification was too late, and the police were within their right to execute the warrant.[108]

Moreover, even if the Debtors' statements as they were being arrested put Officer Gunter on actual notice of the stay, his ability to reverse the violation was limited.  What could Officer Gunter have done to undo the arrest?  The arrest team was following an express order of the Harris County District Court to apprehend the Debtors.[109]  At best, he could have alerted:  (1) Spence, the Assistant District Attorney for Harris County, who would have needed to obtain a court order vacating the arrest warrant; or (2) the Carooms, who could then have called Tapp, who in turn could have called Hurst, who could have gone to Judge Wright's chambers, and, if Judge Wright were available, could have presented to him an order vacating the Body Attachment Order—which the clerk of the Arkansas Court would then have had to transmit to the Harris County District Clerk.  It is highly doubtful that all these steps could have been accomplished to avoid the arrest of the Debtors or to obtain their release any earlier than actually occurred the following day.  *See* [Finding of Fact No. 86].  Stated differently, even if Officer Gunter and the Carooms had moved immediately on the afternoon of April 19, 2011 to obtain the Debtors' release from custody, the result would very likely have been the same:  the Debtors would not have been released from custody until the next day (i.e., April 20, 2011).

### c.   Commencing a Criminal Action Did Not Violate the Stay

---

[108] Under the circumstances, it also seems reasonable to this Court that the arresting officers disregarded the Debtors' assertions.  Their generic plea of "We filed bankruptcy!" could have been interpreted as a ploy to avoid arrest.

[109] Officer Gunter credibly testified at trial that even if the Carooms themselves had told him to stop arresting the Debtors, he could not have done so; he had to follow "protocol."  [Tape Recording, 6/12/12 Trial at 2:22:58–2:24:50 p.m.].

To establish a violation of the automatic stay, the Debtors are required to show that the Carooms and their agents knew of the stay and acted intentionally, and also that those actions constituted a violation of § 362(a)(1).  Thus, despite sufficient notice or knowledge of the actual bankruptcy petition, the arrest itself must constitute a § 362(a) violation.  Because the arrest falls under the § 362(b)(1) exception, this Court finds that even if the Carooms knew about the existence of the stay prior to the Debtors' arrests, they did not violate the stay due to the exception set forth in § 362(b)(1).

Section 362(b)(1) specifically bars an automatic stay from affecting "the commencement or continuation of a criminal action or proceeding against the debtor."  11 U.S.C. § 362(b)(1).  This issue was addressed in *In re Davis*, where the court concluded that the creditor's involvement in a criminal investigation and prosecution of the debtor did not violate the automatic stay.  244 B.R. 776 (Bankr. N.D. Ill. 2000).  According to *Davis*, the § 362(b)(1) exception "covers, from start to finish, all of the parts or proceedings that constitute a criminal action.  For example, § 362(b)(1) shields the filing of a criminal complaint or other process that initiates the criminal action even if the person responsible is a private citizen who is the debtor's creditor."  *Id.* at 790 (citing 1 D. Epstein, S. Nickles and J. White, *Bankruptcy* § 3–20 at 206 (1992 ed.) (footnote omitted)).

This Court acknowledges that there are other courts that hold a contrary position, finding that a creditor violates the automatic stay by assisting in a criminal proceeding.  *See In re Dovell*, 311 B.R. at 494 ("The exception to the automatic stay set forth in 11 U.S.C. § 362(b)(1) is inapplicable where the criminal proceeding is initiated for the purpose of collecting a debt.").  This Court, however, disagrees with this line of reasoning.  The language of § 362(b)(1) is unequivocal.  *See Pickett v. Quinn (In re Pickett)*, 321 B.R. 663, 668 (Bankr. D. Vt. 2005); *Bryan*

*v. Rainwater*, 254 B.R. 273, 278 (N.D. Ala. 2000).  It plainly states that "the commencement or continuation of a criminal action or proceeding against the debtor" does not violate the automatic stay.  11 U.S.C. § 362(b)(1).

In *In re Bartel,* 404 B.R. at 590, for instance, the debtor filed a motion for summary judgment, arguing that the creditors violated the automatic stay by cooperating with police.  An officer came to the debtor's home, questioned him about the money he owed his creditors, and according to the debtor, attempted to intimidate him into paying his creditor's claim.  *Id.*  Yet, despite these actions, the language of § 362(b)(1) controlled and the court held that "a criminal proceeding is not subject to the automatic stay, even where it relates to debt collection or where the debtor alleges that the state is proceeding in bad faith."  *Id.*

Under the same rationale, the issuance and execution of the Debtors' criminal warrants clearly fell within the criminal process, and was a criminal proceeding excepted under § 362(b)(1).  After all, the Carooms themselves did not issue the arrest warrant, nor were they present at the arrest scene.  *See* [Finding of Fact Nos. 74 & 82].  Under § 362(b)(1), cooperating in a criminal investigation is not enough to violate the automatic stay.  Thus, while it appears that the Carooms were heavily involved in providing Officer Gunter with some of the information necessary for him to procure the arrest warrants for the Debtors, *see* [Finding of Fact Nos. 55–58, 69, 72 & 74], their actions were simply insufficient to satisfy the Debtors' burden under §§ 362(a)(1) and (k).  Because § 362(b)(1) applies, the automatic stay did not prevent obtaining warrants for the Debtors' arrests and effectuating those warrants, as these actions constitute a criminal process.  *See Bloss v. State*, 127 Tex. Crim. 216, 218 (Tex. Crim. App. 1934) ("[A] search warrant is criminal process.") (internal citations omitted)

In sum, under the circumstances described above, this Court concludes that the Carooms did not violate the automatic stay; therefore, the Debtors are entitled to no damages under § 362(k)(1).

## V. Conclusion

The bankruptcy process is only fair when debtors are willing to present themselves and their financial status fully and openly to the court and their creditors. As such, discharge is a privilege granted to those who are willing to comply with the Code. *See In re Jones*, 327 B.R. 297; *see also United States v. Cluck*, 87 F.3d 138, 140 (5th Cir. 1996).

The Debtors have been neither honest nor forthright. Upon filing for bankruptcy on April 18, 2011, they had an affirmative duty to disclose all information related to their financial condition. Instead, they repeatedly omitted, misrepresented and evaded the truth, and covered up the disposition of thousands of dollars worth of personal and real property assets from the Carooms, the Trustee, their other creditors, and this Court. *See* [Finding of Fact Nos. 41–54, 60 & 87–125]. In their Schedules, SOFA, and subsequent amendments, the Debtors demonstrated a pattern of omissions and false oaths. This evasion is insupportable, and, under five separate subsections of 11 U.S.C. § 727(a), the Debtors have not earned the benefit of a discharge.

Nor can the Debtors blame Damani for this result. He personally met with them extensively in order to review all of the information which they provided to him about their financial condition. *See* [Finding of Fact Nos. 23, 41, 43, 60, 94 & 95]. The problem is that the Debtors failed to provide all of the relevant information to Damani, [Finding of Fact No. 41]; therefore, to the extent that he typed in the answers to the Schedules and SOFA—which he did as the Debtors looked on [Finding of Fact No. 43]—he did so based upon the incomplete information which the Debtors gave to him. [Finding of Fact Nos. 41 & 43–54]. The Debtors

did not "come clean" with Damani until after he received the Financial Statement from the Trustee's counsel, at which point Damani confronted the Debtors.  [Finding of Fact No. 105]. The Debtors should be pointing thumbs at themselves, not fingers at Damani.

Nor can the Debtors blame the Carooms for their woes, although they assuredly tried to do so at trial.  *See, e.g.*, [Tape Recording, 7/18/12 Trial at 11:49:49–11:50:33 a.m.].  There is no question that the Carooms vigorously prosecuted their claims in the Lawsuit in Arkansas and thereafter have made every effort to collect the Judgment with a "chew and choke" approach. *See* [Finding of Fact Nos. 55–58, 69, 72 & 74].  While counsel for the Debtors characterized the Carooms' conduct as vicious and outrageous, the fact of the matter is that the Carooms properly availed themselves of the Arkansas judicial system and have the right to attempt to collect the Judgment.  Indeed, the Debtors themselves chose to avail themselves of the Arkansas judicial system by filing counterclaims against the Carooms in the Lawsuit.  [Finding of Fact No. 11]. Stated differently, the Debtors consented to resolving their disputes with the Carooms in the Arkansas state court.  The fact that the Debtors chose to flee from this forum does not in any way undermine the right of the Carooms to seek to collect the Judgment.  [Finding of Fact No. 14]. Assuredly, this Court is not enamored with Mr. Caroom's facilitating the transmission of the photograph of Ms. Henley's arrest to her ex-husband, [Finding of Fact No. 72], as this tactic threatens any harmony that might exist between Ms. Henley and her ex-husband that is so necessary for the well-being of their minor children.  Nevertheless, the Carooms, Tapp and Officer Gunter had no actual or constructive knowledge of the Debtors' bankruptcy filing prior to the Debtors' arrests, and this Court cannot find a § 362(a)(1) violation on speculation alone. Regardless of any involvement in the Debtors' arrests, the Carooms did not violate the automatic stay.  Finally, any act by the Carooms undermining the parent-child relationship—however

unseemly—does not alone constitute a violation of the automatic stay and does not somehow lessen the seriousness of the Debtors' false oaths and obfuscation in this Chapter 7 case.

If either Hurst or Damani had sent a telefax to Tapp in the early evening of April 18, 2011—i.e., a few minutes after the filing of the bankruptcy petition—giving him notice of the Debtors' Chapter 7 case, then there is no question that the Carooms, through their agent, Tapp, would have been on notice of the automatic stay; therefore, to the extent that the Carooms knew that the Officer Gunter was laying the ground work to obtain the arrest warrants, they would have had the duty to attempt to stop this process. *See In re Johnson*, 253 B.R. 857, 861 (Bankr. S.D. Ohio 2000) ("Creditors and their counsel are not allowed to sit by and watch the litigation they have commenced proceed by shifting responsibility to local authorities charged with collecting judgments obtained through their efforts."). But, unfortunately for the Debtors, Hurst and Damani did not send telefax notice of the bankruptcy filing until the late afternoon and early evening of April 19, 2011—i.e., a few hours *after* the arrests of the Debtors. [Finding of Fact No. 80]. Thus, the Debtors were arrested not because the Carooms violated the automatic stay, but because their own attorneys lacked a sense of urgency. If there is any finger-pointing that the Debtors can legitimately do, it is to blame Hurst and Damani for not putting Tapp on notice immediately after the filing of the bankruptcy petition. Immediate notice after the filing on April 18, 2011 would have foreclosed the possibility of the Debtors being arrested on the afternoon of April 19, 2011.

Of course, the Debtors themselves could have prevented their arrest if they had only initially complied with Judge Wright's order to file a Schedule of Assets and Verified Affidavit of Assets as required by the Arkansas Court's partial summary judgment. [Finding of Fact No. 19]. Had they done so, Judge Wright would never have signed the Body Attachment Order.

[Finding of Fact No. 21]. But, the Debtors chose not to comply with this order, as they did not want to disclose their financial condition to the Carooms, nor did they want the Carooms to know about the numerous sales of assets and the conveyance of the Anderson Property back to Jim Henley. Their unwillingness to disclose this information carried over to their Chapter 7 case. They just did not want the Carooms, or the Trustee, to know what transfers they had made, and how much income those transfers generated. By taking this approach, the Debtors violated the most fundamental canon of bankruptcy: disclose, disclose, disclose. *Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)*, 372 B.R. 289, 305 (Bankr. S.D. Tex. 2007) ("The three most important words in the bankruptcy system are: disclose, disclose, disclose."). And, because of their cover-up and obfuscation, they will not receive a discharge.

For all of the foregoing reasons, the Court grants the relief sought in the Plaintiffs' Objection to Discharge and denies the relief sought in the Debtors' counterclaim against the Carooms. The Court will issue a separate Order consistent with this Opinion.

Signed this 28th day of September, 2012.

Jeff Bohm
Chief United States Bankruptcy Judge